**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | **1ı07CR 0060** |
| | : | |
| **vs.** | : | **INDICTMENT** |
| | : | 18 U.S.C. § 2 |
| | : | 18 U.S.C. § 924(c)(1) |
| **DENISE HUFFMAN (1)** | : | 21 U.S.C. § 841(a) |
| **ALICE HUFFMAN BALL (2)** | : | 21 U.S.C. § 841(C) |
| **PAUL H. VOLKMAN (3)** | : | 21 U.S.C. § 846 |
| | : | 21 U.S.C. § 856 (a)(1) |
| | : | 21 U.S.C. § 856 (b) |

**BECKWITH**

THE GRAND JURY CHARGES THAT:

At all times material to this Indictment:

<u>Introduction</u>

1.     Beginning on or about October 1, 2001, and continuing up to and including the date of the Indictment, the defendant, DENISE HUFFMAN (hereinafter referred to as "HUFFMAN"), operated two pain clinics: Tri-State Health Care & Pain Management (hereinafter referred to as "Tri-State"), and South Point Pain Management (hereinafter referred to as "South Point"). Tri-State was originally opened in South Shore, Kentucky, on or about October 1, 2001. Tri-State was later relocated to 1200 Gay Street, Portsmouth, Ohio, on or about April 1, 2003. HUFFMAN then relocated Tri-State to 1219 Findlay Street, Portsmouth, Ohio, on or about December 30, 2003, where it was operated until being relocated by HUFFMAN on or about February 1, 2006 to South Point, Ohio. The South Point location is still in operation.

1

2.　　　Beginning on or about October 1, 2001, and continuing up to and including the date of this Indictment, the defendant, ALICE HUFFMAN (a/k/a: Alice Huffman Ball) (hereinafter referred to as "BALL"), served as office manager and controlled the day to day operations of both Tri-State and South Point. The defendant, BALL, also managed the Tri-State dispensary center within the office located at 1200 Gay Street, Portsmouth, Ohio, from on or about July 22, 2003, up to and including December 30, 2003. BALL then managed the dispensary center at Tri-State from on or about December 30, 2003, up to and including the time the dispensary center was closed on September 9, 2005.

3.　　　Beginning on or about April 1, 2003, and continuing up to and including September 9, 2005, the defendant, PAUL HOLLAND VOLKMAN (hereinafter referred to as "VOLKMAN"), represented himself as a chronic pain management doctor. At Tri-State and elsewhere, VOLKMAN issued countless prescriptions for excessive dosages of Schedule II, Schedule III , and Schedule IV controlled substances. Many of the prescriptions were outside the scope of medical practice or were not administered for a legitimate medical purpose in the usual course of professional practice. VOLKMAN issued a number of prescriptions for controlled substances despite actual knowledge that customers were abusing, misusing, and distributing the drugs. On multiple occasions, VOLKMAN's dosages resulted in the addiction of said patients, overdoses and death.

### Background On Defendants

4.　　　At all points relevant to this Indictment the defendant, DENISE HUFFMAN, has no known medical education. During 2000, HUFFMAN worked in the medical office of Dr. David Proctor. Beginning sometime in 1999 and continuing into 2000, the exact dates being unknown,

2

Proctor operated an illicit pain clinic in South Shore, Kentucky. Proctor was charged and ultimately plead guilty in April, 2003, to the illegal distribution of prescription medications. HUFFMAN opened and operated Tri-State Health Care and Pain Management in South Shore, Kentucky on or about October 1, 2001. Tri-State moved to Portsmouth, Ohio in April 1, 2003.

5.      At all points relevant to the Indictment the defendant, ALICE HUFFMAN BALL, has little or no known medical education or background. From on or about 2002 up to and including the date of this Indictment, BALL was the manager of Tri-State and functions as the manager at South Point. Part of her duties as office manager included the day to day operation and control of the on site drug dispensary while it was located at 1200 Gay Street, Portsmouth, Ohio, from July 22, 2003, and then at 1219 Findlay Street in Portsmouth, Ohio, until the dispensary closed on or about September 9, 2005.

6.      At all points relevant to the Indictment the defendant, PAUL HOLLAND VOLKMAN received a Ph.D. in pharmacology and toxicology from the University of Chicago, in 1972. VOLKMAN received a degree in medicine from the University of Chicago in 1974.  On or about November 14, 1975, VOLKMAN received his medical license from the State of Illinois.  On or about July 15, 1996, VOLKMAN received a medical license from Ohio.

**General Allegations And Terminology**

7.      The Controlled Substances Act ("CSA") governs the manufacture, distribution, and dispensation of controlled substances in the United States.  The CSA and the Code of Federal Regulations ("CFR") contain definitions relevant to this indictment, some of which are set forth below.

3

8. The term "controlled substance" means a drug or other substance, or immediate precursor, included in Schedule I, II, III, IV, and V, as designated by Title 21 of the United States Code, Section 802(c)(6), and the CFR.

9. The term "Schedule II" means the drug or other substance has a high potential for abuse; the drug has a currently accepted medical use with severe restrictions; and abuse of the drug or other substances may lead to severe psychological or physical dependence.

10. The term "dispense" means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance.

11. The term "distribute" means to deliver (other than by administering or dispensing) a controlled substance.

12. The term "practitioner" means a medical doctor, physician, or other individual licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which she or he practices, to dispense a controlled substance in the course of professional practice.

13. The Drug Enforcement Administration ("DEA") issues registration numbers to qualifying doctors, who become authorized to dispense Schedule II, III, IV, and V controlled substances. To issue a prescription for a controlled substance, a doctor must have a DEA registration number for each physical office location in any state which they are dispensing medicine.

14. A prescription for a controlled substance violates the Controlled Substances Act and CFR if it is issued outside the scope of medical practice or is not for a legitimate medical purpose in the usual course of a professional practice.

4

15. The term "dosage" is the amount, frequency, and number of doses of medication authorized by a practitioner, who has been issued a DEA registration number.

16. The term "titration" is to prescribe medication so that patients have optimal pain relief with minimal side effects.

17. The purpose of a urine test is to determine if the prescribed medications and/or illicit drugs (e.g., cocaine and marijuana) are present in the urine.

18. The purpose of a serum test is to determine the level of prescribed medications and/or illicit drugs (e.g., cocaine and marijuana) in a patient's blood.

19. The term "serious bodily injury" means bodily injury which involves a substantial risk of death, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

## Charged Controlled Substances

20. OxyContin, which is also known as "Oxy," "Hillbilly Heroin," "Killer," and "Coffin," is a Schedule II controlled substance whose active ingredient is oxycodone. Demand for OxyContin has grown to epidemic proportions in parts of Ohio, Kentucky, and other parts of the United States. Currently drug dealers can sell an 80 mg OxyContin pill on the street for $80 to $100 or more.

21. OxyContin, which is a brand name pill designed, manufactured, and promoted by Purdue Pharma to be a safer and less abusable drug for the treatment of chronic pain, is an analgesic-narcotic that contains oxycodone. Introduced to the market in 1995, OxyContin is a pill formulated to gradually release steady amounts of narcotics for 12 hours. OxyContin pills have contained dosages of 20 mg, 40 mg, and 80 mg.

5

22.    OxyContin and other Schedule II drugs have a high potential for abuse and can be crushed and snorted or dissolved and injected to get an immediate high. This abuse can lead to addiction and overdose, and, sometimes death. The injection method of abuse of OxyContin oftentimes leaves highly visible scars and ulcers on a patient's arms.

23.    OxyFast is a brand name liquid that contains oxycodone.

24.    Roxicodone, also known as "Roxy," is a brand name pill that contains oxycodone.

25.    Percocet, also known as "Perc," is a brand name pill that contains oxycodone.

26.    Darvon is a brand name pill that contains propoxyphene, a Schedule IV controlled substance.

27.    Dilaudid, also known as "K-4," and "D," is a brand name pill that contains hydromorphone, a Schedule II controlled substance.

28.    Lortab, also known as "Tab," is a brand name pill that contains hydrocodone, a Schedule III controlled substance.

29.    Methadone, also known as "Meth," is a generic pill that contains methadone hydrochloride, a Schedule II controlled substance.

30.    Morphine Sulfate Immediate Release, also known as "MSIR," and MS Contin is a brand name pill that contains morphine, a Schedule II controlled substance.

31.    Diazepam is a benzodiazepine, a Schedule IV controlled substance.

32.    Alprazolam is a benzodiazepine, a Schedule IV controlled substance. Xanax is the brand name for Alprazolam.

33.    Carisoprodol is a generic pill is not a federally controlled substance. Carisoprodol, however, is a controlled substance in the state of Kentucky. Soma is the brand name for

6

Carisoprodol.

34.     Valium is the brand name for Diazepam.

### Defendant Volkman's Licenses And Pain Practices

35.     At various times beginning on or about April 2003, to include on or about February

10, 2006, VOLKMAN practiced medicine in both Chicago, Illinois, and/or Southern Ohio.

VOLKMAN represented himself to be a specialist in chronic pain treatment and pain management in

his practice in Southern Ohio.

36.     In February 2006, VOLKMAN's DEA registration number, AV6952837, was

summarily suspended and later rescinded for improper prescriptions outside the scope of medical

practice or were not administered for a legitimate medical purpose in the usual course of a

professional practice.

### COUNT 1

### THE GRAND JURY FURTHER CHARGES THAT:

37.     Paragraphs 1 through 36 of the Indictment are re-alleged and incorporated into Count

1 of this Indictment.

38.     Beginning in or about October 1, 2001, and continuing up to and including the date of this

Indictment, within the Southern District of Ohio, and elsewhere, the defendants, DENISE

HUFFMAN, ALICE HUFFMAN BALL, and PAUL HOLLAND VOLKMAN along with others

known and unknown to the grand jury, did knowingly, intentionally, and unlawfully combine,

conspire, confederate, and agree together with others known and unknown to the grand jury to

7

knowingly, intentionally, and unlawfully distribute and dispense a mixture and substance containing a detectable amount of diazepam, hydrocodone, methadone hydrochloride, hydromorphone, oxycodone, alprazolam, carisoprodol, and propoxyphene, in violation of Title 21, United States Code, Section 841(a)(1) and 841(C).

39. Death, addiction, and serious bodily injury resulted from the use of the substances so prescribed and distributed.

## Nature and Purpose of Conspiracy

The purposes of the conspiracy included, but were not limited to, the following:

40. To make as much money as possible by distributing and dispensing controlled substances such as diazepam, hydrocodone, methadone hydrochloride, hydromorphone, oxycodone, alprazolam, carisoprodol, and propoxyphene, to patients, other drug users, and conspirators.

41. To facilitate the re-distribution of controlled substances, including, but not limited to, diazepam, hydrocodone, methadone hydrochloride, hydromorphone, oxycodone, alprazolam, carisoprodol, and propoxyphene, to drug users.

42. To satisfy the demand for the illegal distribution, sale, and consumption of controlled substances, including, but not limited to, diazepam, hydrocodone, methadone hydrochloride, hydromorphone, oxycodone, alprazolam, Carisoprodol, and propoxyphene, in the areas of southern Ohio, northern Kentucky, and elsewhere, including, but not limited to, West Virginia, Tennessee, Ohio and Kentucky.

8

## Ways, Manners, And Means Of The Conspiracy

43.     During the course and in furtherance of the conspiracy, from a time beginning on or about October 1, 2001, and continuing up to and including the date of this Indictment, DENISE HUFFMAN owned and operated the Tri-State Health Care and Pain Management Clinic (Tri-State). Tri-State was owned and operated by HUFFMAN in several locations. The first Tri-State location was in South Shore, Kentucky, from on or about October 1, 2001, through on about April 1, 2003. HUFFMAN relocated Tri-States to 1200 Gay Street, Portsmouth, Ohio, on or about April 1, 2003, were Tri-State operated until on or about December 30, 2003. HUFFMAN then relocated Tri-State to 1219 Findlay Street, Portsmouth, Ohio, on or about December 30, 2003, where it was located until on or about February 1, 2006. On or about 2006, HUFFMAN reopened Tri-State as the South Point Pain Management Clinic, located in South Point, Ohio.

44.     During the course and in furtherance of the conspiracy, DENISE HUFFMAN would secure doctors for brief periods of time ranging from one day to several years through what are known as locum tenens or temporary service contracts to prescribe pain medication for "customers" at her clinic.

45.     During the course and in furtherance of the conspiracy, that these customers would travel long distances; in some cases in excess of 400 miles round trip or in excess of ten hours of travel time round-trip, to be treated at Tri-State for severe pain.

46.     During the course and in furtherance of the conspiracy, HUFFMAN would charge each customer cash amounts that started at approximately $125.00 and escalated ultimately to $200.00 per Tri-State visit. The customer paid the money to HUFFMAN or BALL before being allowed access to a doctor.

9

47.     During the course and in furtherance of the conspiracy, these physicians would "examine" approximately 25 or more customers a day.

48.     During the course and in furtherance of the conspiracy, each of these customers would receive at most a cursory examination to determine the extent of the pain being suffered by the customer resulting in few proper patient/physician relationships being developed between Tri-State customers and its doctors.

49.     During and in furtherance of the conspiracy, Tri-State and its' doctors provided large amounts of prescription medications to customers that they knew to be drug addicts.

50.     During the course and in furtherance of the conspiracy, as part of the treatment, these customers would receive the same collection of prescription drugs.

51.     During the course and in furtherance of the conspiracy, DENISE HUFFMAN would not accept any customer who did not pay for the visit with cash.

52.     During the course and in furtherance of the conspiracy, HUFFMAN would not refund any money to a customer who did not receive service from the doctor.

53.     During the course and in furtherance of the conspiracy, BALL would instruct physicians that all customers were to receive pain medication whether of not it was medically justified.

54.     During the course and in furtherance of the conspiracy, HUFFMAN and BALL would intercede on behalf of customers and would coerce or threaten physicians who did not prescribe the desired medication whether or not the physician felt that the desired medication was medically appropriate.

10

55.    During the course and in furtherance of the conspiracy, physicians left the clinic after receiving threats of serious physical harm. HUFFMAN would then use a temporary service to replace the doctor as quickly as possible.

56.    During the course and in furtherance of the conspiracy, HUFFMAN along with other members of her staff would maintain the presence of firearms, ball bats, and other weapons in the clinic to help maintain order among the customers receiving medication for severe pain.

57.    During the course and in furtherance of the conspiracy, persons known to the Grand Jury would solicit customers through a door to door campaign to return to Tri-State to receive medication.

58.    During the course and in furtherance of the conspiracy, HUFFMAN did procure the services of VOLKMAN, on or about April 1, 2003, to serve as the physician prescribing medication at Tri-State.

59.    During the course and in furtherance of the conspiracy, VOLKMAN became aware that a vast number of Tri-State Patients were drug addicts.

60.    During the course and in furtherance of the conspiracy, VOLKMAN and BALL would direct other employees at the clinic to dispense single doses of controlled substances to both customers and clinic employees during the course of their employment in what were referred to as "clinical trials". The customers and employees were then observed for an undetermined amount of time before having the customers and/or employees submit a urine sample to the clinic.

61.    During the course and in furtherance of the conspiracy, VOLKMAN continued the practice of not conducting any meaningful examination of these customers to determine if there existed any legitimate medical need or purpose for the prescription of controlled substances.

11

62.     During the course and in furtherance of the conspiracy, VOLKMAN continued Tri-State's practice of prescribing the same drugs to customers.

63.     During the course and in furtherance of the conspiracy, VOLKMAN rapidly increased the prescriptions to these customers and prescribed excessive amounts of controlled substances, including, but not limited to, diazepam, hydrocodone, methadone hydrochloride, hydromorphone, oxycodone, alprazolam, carisoprodol, and propoxyphene.

64.     During the course and in furtherance of the conspiracy VOLKMAN rapidly increased these medication levels with the knowledge and understanding or a reasonable cause to believe and understand that his prescription practice was causing an addiction to controlled substances to those customers not already addicted to prescription medication and that these prescriptions were outside the scope of legitimate medical practice or not administered for a legitimate purpose in the usual course of a professional practice.

65.     During the course and in furtherance of the conspiracy, VOLKMAN knowingly caused or had a reasonable expectation of addiction by these customers. The customers would then return more frequently to Tri-State and VOLKMAN to obtain excessive amounts of these controlled substances, thus insuring additional payments to Tri-State and VOLKMAN.

66.     During and in furtherance of the conspiracy, VOLKMAN rarely, if ever, counseled these customers regarding alternative treatments, such as physical therapy, psychological or addiction counseling, surgery, or any other treatment for customers' pain, instead of high levels of narcotics.

67.     During the course and in furtherance of the conspiracy, HUFFMAN, BALL and VOLKMAN, on or about July 30, 2003, opened a dispensary center within the confines of Tri-State, at 1200 Gay Street, Portsmouth, Ohio, as a result of local pharmacies refusing to honor any

12

prescriptions written by VOLKMAN. The local pharmacies refused to honor any Tri-State or

VOLKMAN prescription due to concerns about the "large amounts of narcotics being prescribed and

the criminal backgrounds of many of the customers."

68.     During the course and in furtherance of the conspiracy, beginning in April 2003, and

continuing up to and including September 9, 2005, HUFFMAN, BALL, and VOLKMAN, ordered an

amount of Schedule II Controlled Substances in excess of one and ½ million pills to distribute to Tri-

State patients from the dispensary center located at 1219 Findlay Street, Portsmouth, Ohio.

69.     During the course and in furtherance of the conspiracy, VOLKMAN and BALL

neglected to properly maintain a record of the distribution of controlled substances from the

dispensary center resulting in the disappearance of over 1,000,000 pills of Schedule II Controlled

Substances with a street value in excess of $5,000,000.00.

70.     During the course and in furtherance of the conspiracy, VOLKMAN in his status as

Tri-State doctor, wrote prescriptions for Schedule II Controlled Substances for an additional one

million (1,000,000) pills.

71.     During the course and in furtherance of the conspiracy, HUFFMAN would provide

controlled substances to employees as payment for services rendered to the clinic whether or not

such medication was legally prescribed.

72.     During the course and in furtherance of the conspiracy, HUFFMAN and BALL would

as part of the operation of the dispensary center, without appropriate medical cause, withhold from

patients random dosage amounts of the prescribed medication without any legitimate purpose.

73.     During the course and in furtherance of the conspiracy, VOLKMAN would not

diagnose customers. VOLKMAN allowed HUFFMAN and BALL to make their own arbitrary

13

medical determinations on the patients ailments based on a brief interview of the patient and no other type of evaluation. VOLKMAN then used HUFFMAN and BALL's diagnosis to justify the prescriptions provided.

74.     During the course and in furtherance of the conspiracy, HUFFMAN, BALL, and VOLKMAN distributed and dispensed, and did aid and abet the distribution and dispensing of controlled substances, including, but not limited to, diazepam, hydrocodone, methadone hydrochloride, hydromorphone, oxycodone, alprazolam, carisoprodol, and propoxyphene.

75.     During and in the course and in furtherance of the conspiracy, HUFFMAN, BALL, and VOLKMAN, would require urine screens from customers. VOLKMAN would then ignore the results of the test findings that showed the excessive amounts of narcotics in a customer's body.

76.     During and in the course and in furtherance of the conspiracy, Tri-State employees, HUFFMAN, BALL and VOLKMAN would administer urine tests for the purpose of disguising the lack of any legitimate medical purpose for the prescription, dispensing or distribution of controlled substances.

77.     During the course and in furtherance of the conspiracy, VOLKMAN frequently issued prescriptions for narcotics including, but not limited to, diazepam, hydrocodone, methadone hydrochloride, hydromorphone, oxycodone, alprazolam, carisoprodol, and propoxyphene, to patients despite obvious indications (red flags) that such customers were abusing, misusing, and distributing the controlled substances prescribed.

78.     During the course and in furtherance of the conspiracy, VOLKMAN frequently issued narcotics prescriptions despite obvious physical signs of drug abuse by many of his customers and

14

conspirators, as well as the presence of toxic levels of controlled substances revealed in the urine screens.

79.     During the course and in furtherance of the conspiracy, conspirator customers colluded with Tri-State employees, HUFFMAN, BALL, and VOLKMAN, on various ways to continue to obtain excessive amounts of controlled substances, including ways to avoid triggering red flags and conceal and explain away evidence of red flags.

80.     During the course and in furtherance of the conspiracy, HUFFMAN, BALL, and VOLKMAN discussed the status and potential legal defenses to federal and state law enforcement investigations with other doctors under investigation and counter measures concerning the unlawful distribution of prescription narcotics by HUFFMAN, BALL, and VOLKMAN.

81.     During the course and in furtherance of the conspiracy, VOLKMAN, as part of the initial patient evaluation, required the customer to state that they were not a law enforcement agent and were not conducting an undercover investigation of the clinic.

82.     During the course and in furtherance of the conspiracy, VOLKMAN prescribed excessive amounts of controlled substances, including, but not limited to, hydrocodone, methadone hydrochloride, hydromorphone, oxycodone, alprazolam, carisoprodol, and propoxyphene, with the knowledge and understanding or having a reasonable cause to believe that these controlled substances were being further distributed by his customers due to the high cost in cash required for the office visit and obtaining of the controlled substances.

83.     During the course and in furtherance of the conspiracy, the operators of Tri-State and VOLKMAN, specifically, requested the local emergency rooms not to notify Tri-State and/or VOLKMAN personally of any Tri-State or VOLKMAN customer who had overdosed on

prescription medications.

84.    During the course and in furtherance of the conspiracy, VOLKMAN had a customer sign a "death waiver" and had him acknowledge that the customer was aware of the risk to the customer's life if that customer then took the medication.

85.    During the course and in furtherance of the conspiracy, VOLKMAN would then prescribe an excessive amount of controlled substances to the "death waivered" customer.

86.    During the course and in furtherance of the conspiracy, VOLKMAN continued to prescribe excessive amounts of controlled substances knowing that these distributions have resulted in numerous overdoses, and, in some cases, deaths to his customers, including, but not limited to: Aaron Gillespie (died June 27,2003); Charles Jordan (died October 21, 2003); Daniel Coffee (died November 17, 2003); Jeffrey Reed (died November 20, 2003); Mary Catherine Carver (died January 10, 2004); James Estep (died February 11, 2004); Kristi Ross (died March 9, 2004); Dwight Parsons (died August 12, 2005); and Steve Hieneman (died April 20, 2005).

87.    During the course and in furtherance of the conspiracy, medical files for Tri-State customers discovered to be deceased were removed from the clinic files so that they could not be reviewed by law enforcement officials.

88.    During the course and in furtherance of the conspiracy, HUFFMAN, BALL and VOLKMAN and other co-conspirators obtained substantial income and resources from their illegal distribution of controlled substances.

## Overt Acts in Furtherance Of The Conspiracy

In furtherance of the conspiracy and to effect the objects thereof, HUFFMAN, BALL and VOLKMAN, committed overt acts in the Southern District of Ohio and elsewhere including, but not limited to, the following:

89.     On or about October 31, 2001, Aaron Gillespie began being seen as a customer of Tri-State in South Shore, Kentucky.

90.     On or about April 23, 2003, VOLKMAN while at Tri-State, in Portsmouth, Ohio, first prescribed Aaron Gilliespie Controlled Substances.

91.     VOLKMAN prescribed a drug cocktail, of oxycodone, hydrocodone, and other drugs, to Aaron Gilliespie, on June 23, 2003. Aaron Gilliespie died on June 27, 2003. The cause of death was multiple drug intoxication.

92.     On or about February 8, 2002, in Portsmouth, Ohio, Charles Jordan began being seen as a customer of Tri-State.

93.     On or about April 10, 2003, VOLKMAN while at Tri-State, in Portsmouth, Ohio, first prescribed Charles Jordan Controlled Substances.

94.     VOLKMAN prescribed a drug cocktail, of oxycodone, hydrocodone, and other drugs, to Charles Jordon, on October 16, 2003. Charles Jordon died on October 21, 2003. The cause of death was multiple drug intoxication

95.     On or about November 17, 2003, Daniel Coffee died after, consuming a portion of the Controlled Substances prescribed by VOLKMAN, within the Southern District of Ohio.

96.     On or about November 20, 2003, Jeffrey Reed died after, consuming a portion of the Controlled Substances prescribed by VOLKMAN, within the Southern District of Ohio.

17

97.     On or about September 11, 2003, in Portsmouth, Ohio, Mary Catherine Carver began being seen as a patient of Tri-State.

98.     On or about September 11, 2003, VOLKMAN while at Tri-State, in Portsmouth, Ohio, first prescribed Mary Catherine Carver Controlled Substances.

99.     VOLKMAN prescribed a drug cocktail, of oxycodone, hydrocodone, and other drugs, to Mary Catherine Carver, on January 8, 2004. Mary Catherine Carver died on January 10, 2004. The cause of death was multiple drug intoxication.

100.    On or about August 21, 2002, in Portsmouth, Ohio, James Estep began being seen as a customer of Tri-State.

101.    On or about September 26, 2003, VOLKMAN while at Tri-State, in Portsmouth, Ohio, first prescribed James Estep Controlled Substances.

102.    VOLKMAN prescribed a drug cocktail, of oxycodone, hydrocodone, and other drugs, to James Estep, on February 10, 2004. James Estep died on February 11, 2004. The cause of death was multiple drug intoxication.

103. On or about January 7, 2002, in Portsmouth, Ohio, Kristi Ross began being seen as a customer of Tri-State.

104.    On or about February 11, 2004, VOLKMAN while at Tri-State, in Portsmouth, Ohio, first prescribed Kristi Ross Controlled Substances.

105.    VOLKMAN prescribed a drug cocktail, of oxycodone, hydrocodone, and other drugs, to Kristi Ross, on February 11, 2004. Kristi Ross died on March 9, 2004. The cause of death was multiple drug intoxication.

18

106.     On or about February 4, 2002, in Portsmouth, Ohio, Dwight Parsons began being seen as a customer of Tri-State.

107.     On or about April 16, 2003, VOLKMAN while at Tri-State, in Portsmouth, Ohio, first prescribed Dwight Parsons Controlled Substances.

108.     VOLKMAN prescribed a drug cocktail, of oxycodone, hydrocodone, and other drugs, to Dwight Parsons, on August 11, 2004. Dwight Parsons died on August 12, 2004. The cause of death was multiple drug intoxication.

109.     On or about March 18, 2003, in Portsmouth, Ohio, Steven Heineman began being seen as a customer of Tri-State.

110.     On or about April 14, 2003, VOLKMAN while at Tri-State, in Portsmouth, Ohio, first prescribed Steve Heineman Controlled Substances.

111.     VOLKMAN prescribed a drug cocktail, of oxycodone, hydrocodone, and other drugs, to Steve Heineman, on April 19, 2005. Steve Heineman died on April 29, 2005. The cause of death was multiple drug intoxication.

**In violation of Title 21 U.S.C. § 846.**

## COUNT 2

1.     Paragraphs 1 through 111 of this Indictment are re-alleged and incorporated into Count 2.

2.     Beginning on or about April 1, 2003, and continuing up to and including October 1, 2003, within the Southern District of Ohio, and elsewhere, the defendants, DENISE HUFFMAN, ALICE HUFFMAN BALL, and PAUL HOLLAND VOLKMAN, with others known to the grand

19

jury, did knowingly, wilfully and unlawfully open, lease, rent, use or maintain any place; to wit: Tri-State Health Care located at 1200 Gay Street, Portsmouth, Ohio, whether permanently or temporarily

for the purpose of distributing any controlled substance.

**All in violation of Title 21 U.S.C. § 856(a)(1), (b) and 18 U.S.C. § 2.**

## COUNT 3

1.     Paragraphs 1 through 111 of this Indictment are re-alleged and incorporated into Count 3.

2.     Beginning on or about October 1, 2003, and continuing up to and including January 1, 2006, within the Southern District of Ohio, and elsewhere, the defendants, DENISE HUFFMAN, and  ALICE HUFFMAN BALL and PAUL HOLLAND VOLKMAN, with others known to the grand jury, did knowingly, willfully and unlawfully open, lease, rent or maintain any place; to wit: Tri-State Health Care located at 1219 Findlay Street, Portsmouth, Ohio, whether permanently or temporarily for the purpose of distributing any controlled substance.

**All in violation of Title 21 U.S.C. § 856(a)(1), (b) and 18 U.S.C. § 2.**

## COUNT 4

1.     Paragraphs 1 through 111 of this Indictment are re-alleged and incorporated into Count 4.

2.     On or about June 25, 2003, within the Southern District of Ohio, the defendants, DENISE HUFFMAN, ALICE HUFFMAN BALL and PAUL HOLLAND VOLKMAN did

20

knowingly, intentionally, and unlawfully distribute and dispense a mixture and substance containing
a detectable amount of Oxycodone, a Schedule II controlled substance, not for a legitimate medical
purpose and outside the scope of medical practice, to Aaron Gillespie. Death resulted from the use of
the substance so distributed.

**In violation of Title 21 U.S.C. § 841(a)(1), 841(C) and 18 USC § 2.**

## COUNT 5

1.      Paragraphs 1 through 111 of this Indictment are re-alleged and incorporated into
Count 5.

2.      On or about October 16, 2003, within the Southern District of Ohio, the defendants,
DENISE HUFFMAN, ALICE HUFFMAN and PAUL HOLLAND VOLKMAN  did knowingly,
intentionally, and unlawfully distribute and dispense a mixture and substance containing a detectable
amount of Oxycodone, a Schedule II controlled substance, outside the scope of medical practice or
not for a legitimate medical purpose in the usual course of a professional practice, to Charles Jordan.
Death resulted from the use of the substance so distributed.

**In violation of Title 21 U.S.C. § 841(a)(1), 841(C) and 18 USC § 2.**

## COUNT 6

1.      Paragraphs 1 through 111 of this Indictment are re-alleged and incorporated into
Count 6.

2.      On or about November 17, 2003, the exact date being unknown to the Grand Jury,
within the Southern District of Ohio,  the defendants, DENISE HUFFMAN, ALICE HUFFMAN

21

BALL and PAUL HOLLAND VOLKMAN did knowingly, intentionally, and unlawfully distribute and dispense a mixture and substance containing a detectable amount of Oxycodone, a Schedule II controlled substance, outside the scope of medical practice or not for a legitimate medical purpose in the usual course of a professional practice, to Daniel Coffee. Death resulted from the use of the substance so distributed.

**In violation of Title 21 U.S.C. § 841(a)(1), 841(C) and 18 USC § 2.**


## COUNT 7

1.      Paragraphs 1 through 111 of this Indictment are re-alleged and incorporated into Count 7.

2.      On or about November 20, 2003, the exact dates being unknown to the Grand Jury, within the Southern District of Ohio, the defendants, DENISE HUFFMAN, ALICE HUFFMAN BALL and PAUL HOLLAND VOLKMAN did knowingly, intentionally, and unlawfully distribute and dispense a mixture and substance containing a detectable amount of Oxycodone, a Schedule II controlled substance, outside the scope of medical practice or not for a legitimate medical purpose in the usual course of a professional practice, to Jeffrey Reed. Death resulted from the use of the substance so distributed.

**In violation of Title 21 U.S.C. § 841(a)(1), 841(C) and 18 USC § 2.**

22

## COUNT 8

1.     Paragraphs 1 through 111 of this Indictment are re-alleged and incorporated into Count 8.

2.     On or about January 8, 2004, within the Southern District of Ohio, the defendants, DENISE HUFFMAN, ALICE HUFFMAN BALL and PAUL HOLLAND VOLKMAN did knowingly, intentionally, and unlawfully distribute and dispense a mixture and substance containing a detectable amount of Oxycodone, a Schedule II controlled substance, outside the scope of medical practice or not for a legitimate medical purpose in the usual course of a professional practice, to Mary Catherine Carver. Death resulted from the use of the substance so distributed.

**In violation of Title 21 U.S.C. § 841(a), 841(C) and 18 USC § 2.**

## COUNT 9

1.     Paragraphs 1 through 111 of this Indictment are re-alleged and incorporated into Count 9.

2.     On or about February 10, 2004, within the Southern District of Ohio, the defendants, DENISE HUFFMAN, ALICE HUFFMAN BALL and PAUL HOLLAND VOLKMAN did knowingly, intentionally, and unlawfully distribute and dispense a mixture and substance containing a detectable amount of Oxycodone, a Schedule II controlled substance, outside the scope of medical practice or not for a legitimate medical purpose in the usual course of a professional practice, to James Estep. Death resulted from the use of the substance so distributed.

**In violation of Title 21 U.S.C. § 841(a)(1), 841(C) and 18 USC § 2.**

23

## COUNT 10

1.      Paragraphs 1 through 111 of this Indictment are re-alleged and incorporated into Count 10.

2.      On or about February 11, 2004, within the Southern District of Ohio, the defendants, DENISE HUFFMAN, ALICE HUFFMAN BALL and PAUL HOLLAND VOLKMAN did knowingly, intentionally, and unlawfully distribute and dispense a mixture and substance containing a detectable amount of Oxycodone, a Schedule II controlled substance, outside the scope of medical practice or not for a legitimate medical purpose in the usual course of a professional practice, to Kristi Ross. Death resulted from the use of the substance so distributed.

      **In violation of Title 21 U.S.C. § 841(a)(1), 841(C) and 18 USC § 2.**

## COUNT 11

1.      Paragraphs 1 through 111 of this Indictment are re-alleged and incorporated into Count 11.

2.       On or about April 19, 2005, within the Southern District of Ohio, the defendants, DENISE HUFFMAN, ALICE HUFFMAN BALL and PAUL HOLLAND VOLKMAN did knowingly, intentionally, and unlawfully distribute and dispense a mixture and substance containing a detectable amount of Oxycodone, a Schedule II controlled substance, outside the scope of medical practice or not for a legitimate medical purpose in the usual course of a professional practice, to Steve Hieneman. Death resulted from the use of the substance so distributed.

      **In violation of Title 21 U.S.C. § 841(a)(1), 841(C) and 18 USC § 2.**

24

## COUNT 12

On or about July 22, 2003, within the Southern District of Ohio, the defendants,

DENISE HUFFMAN, ALICE HUFFMAN BALL, and PAUL HOLLAND VOLKMAN, in

furtherance of the commission of a drug trafficking crime, to wit; Conspiracy to Distribute

Controlled Substances, for which DENISE HUFFMAN, ALICE HUFFMAN BALL, and PAUL

HOLLAND VOLKMAN, could be prosecuted in a court of the United States, did possess a firearm,

to wit; a 9mm semi-automatic handgun.

**All in violation of 18 U.S.C. § 924(c)(1) and 2.**

## COUNT 13

On or about August 30, 2003, within the Southern District of Ohio, the defendants,

DENISE HUFFMAN, ALICE HUFFMAN BALL, and PAUL HOLLAND VOLKMAN, in

furtherance of the commission of a drug trafficking crime, to wit; Conspiracy to Distribute

Controlled Substances, for which DENISE HUFFMAN, ALICE HUFFMAN BALL, and PAUL

HOLLAND VOLKMAN, could be prosecuted in a court of the United States, did possess a firearm,

to wit; a 9mm semi-automatic handgun.

**All in violation of 18 U.S.C. § 924(c)(1) and 2.**

## COUNT 14

On or about June 7, 2005, within the Southern District of Ohio, the defendants,

DENISE HUFFMAN, ALICE HUFFMAN BALL, and PAUL HOLLAND VOLKMAN, in

furtherance of the commission of a drug trafficking crime, to wit; Conspiracy to Distribute

25

Controlled Substances, for which DENISE HUFFMAN, ALICE HUFFMAN BALL, and PAUL

HOLLAND VOLKMAN could be prosecuted in a court of the United States, did possess a firearm,

to wit; a 9mm semi-automatic handgun.

**All in violation of 18 U.S.C. § 924(c)(1) and 2.**

## COUNT 15

On or about September 29, 2005, in the Southern District of Ohio, the defendants,

DENISE HUFFMAN and ALICE HUFFMAN BALL, in furtherance of the commission of a drug

trafficking crime, to wit; Conspiracy to Distribute Controlled Substances, for which DENISE

HUFFMAN and ALICE HUFFMAN BALL, could be prosecuted in a court of the United States, did

possess a firearm, to wit; a 9mm semi-automatic handgun.

**All in violation of 18 U.S.C. § 924(c)(1) and 2.**

## COUNT 16

1.      Beginning on or about September 11, 2005, and continuing up to and including on or

about October 7, 2005, within the Southern District of Ohio, the defendant, PAUL HOLLAND

VOLKMAN (hereafter referred to as "VOLKMAN"), did knowingly, willfully and unlawfully, lease,

rent, use or maintain any place, to wit: 1310 Center Street, Portsmouth, Ohio whether permanently or

temporarily for the purpose of distributing any controlled substance.

2.      As part of the operation of the clinic, VOLKMAN neither publically advertised the

opening of his new private pratice or secured a business telephone to be used at the clinic by staff or

customers to contact VOLKMAN for medical needs.

26

3.      As part of the operation of that practice these customers, despite claims of severe pain would travel long distances; in some cases in excess of 400 miles round trip or in excess of ten hours of travel time round-trip, to receive prescriptions for controlled substances from VOLKMAN.

4.      As part of the operation of that practice, these customers, despite claiming to be in severe pain, would arrive at the location at 1310 Center Street, Portsmouth, Ohio, several hours before it was scheduled to open and stand in long lines, some times obstructing the flow of traffic in and out of the area.

5.      As part of the operation of the practice, VOLKMAN did secure the services of an armed guard to control the behavior of the crowd of these customers claiming to be in severe pain.

6.      As part of the operation of the practice, VOLKMAN continued his practice of not providing any meaningful examination of these customers to determine if there existed any legitimate medical need or purpose for the types of medication VOLKMAN would then prescribe to these individuals.

7.      As part of the operation of the practice, VOLKMAN would prescribe excessive amounts on controlled substances to customers that he had previously refused to treat and subsequently dismissed from the Tri-State clinic.

8.      As part of the operation of the practice, VOLKMAN would allow current customers to have separate and new patient files opened under different names so that the individual could pay additional money to VOLKMAN and subsequently receive an even larger amount of controlled substances.

9.      As part of the operation of the practice, VOLKMAN would only accept cash payments from his customers for the purchase of his prescriptions.

27

10.     As part of the operation of this practice, VOLKMAN continued his practice of not wanting to be notified by the local hospitals or morgues of any of his patients who had overdosed or died as a result of drug intoxication.

11.     Beginning on or about September 11, 2005, and continuing up to and including on or about October 7, 2005, within the Southern District of Ohio, the defendant, PAUL HOLLAND VOLKMAN, did knowingly, willfully and unlawfully, lease, rent, use or maintain any place, to wit: 1310 Center Street, Portsmouth, Ohio whether permanently or temporarily for the purpose of distributing any controlled substance.

**All in violation of Title 21 U.S.C. § 856(a)(1) and (b).**


## COUNT 17

1.     Paragraphs 1 through 10 of Count 16 of this Indictment are re-alleged and incorporated into Count 17.

2.     On or about September 28, 2005, within the Southern District of Ohio, the defendant, PAUL HOLLAND VOLKMAN, did knowingly, intentionally, and unlawfully distribute and dispense a mixture and substance containing a detectable amount of Oxycodone, a Schedule II controlled substance, outside the scope of medical practice or not for a legitimate medical purpose in the usual course of a professional practice, to Scottie Lynn James. Death resulted on September 29, 2005, from the use of the substance so distributed.

**In violation of Title 21 U.S.C. § 841(a)(1), 841(C).**

28

## COUNT 18

1.     Paragraphs 1 through 10 of Count 16 of this Indictment are re-alleged and incorporated into Count 18.

2.     On or about September 30, 2005, within the Southern District of Ohio, the defendant, PAUL HOLLAND VOLKMAN, did knowingly, intentionally, and unlawfully distribute and dispense a mixture and substance containing a detectable amount of Oxycodone, a Schedule II controlled substance, not for a legitimate medical purpose and outside the scope of medical practice, to Bryan Brigner. Death resulted on October 2, 2005, from the use of the substance so distributed.

   **In violation of Title 21 U.S.C. § 841(a)(1), 841(C).**


## COUNT 19

1.     Beginning on or about October 10, 2005, and continuing up to and including on or about February 13, 2006, within the Southern District of Ohio, the defendant, PAUL HOLLAND VOLKMAN (hereafter referred to as "VOLKMAN"), did rent a building located at 5565 Highway 23, Chillicothe, Ohio, and did use that address to operate a "pain management clinic".

2.     As part of the operation of the practice, customers, despite claims of severe pain, would travel great distances or endure lengthy car trips to the Chillicothe clinic to receive prescriptions from VOLKMAN for controlled substances.

3.     As part of the operation of that practice, these customers, despite claims of severe pain, would arrive at the location at 5565 Highway 23, Chillicothe, Ohio, several hours before the clinic was scheduled to open and stand in long lines, some times obstructing the flow of traffic in and out of the area.

29

4.      As part of the operation of the practice, customers would pay the employees of the clinic cash to be "moved up in the line" so that the customer would see the doctor sooner than otherwise their position in line would allow.

5.      As part of the operation of the practice, VOLKMAN did secure the services of an armed guard to control the behavior of the crowd of customers claiming to be in severe pain.

6.      As part of the operation of the practice, VOLKMAN would have security guards "wand" or use a metal detector to examine if his customers, claiming to be in severe pain, were armed.

7.      As part of the operation of the practice, VOLKMAN continued his practice of not providing any meaningful examination of these customers to determine if there existed any legitimate medical need or purpose for the types of medication VOLKMAN would then prescribe to these individuals.

8.      As part of the operation of the practice, VOLKMAN would prescribe excessive amounts on controlled substances to customers that he had previously refused to treat and subsequently dismissed from the Tri-State clinic.

9.      As part of the operation of this practice, VOLKMAN continued his practice of not wanting to be notified by the local hospitals or morgues of any of his customers who overdosed or died as a result of drug intoxication.

10.     As part of the operation of the practice, VOLKMAN did file a police report claiming a break-in of the clinic located at 5565 Highway 23, Chillicothe, Ohio.

11.     As part of the operation of the practice, VOLKMAN did not report anything of value taken from the clinic with the exception of seven (7) medical "patient" files.

30

12.    As part of the operation of the practice, VOLKMAN, filed a police report alleging a break-in of his office. VOLKMAN claimed that the only things missing were a specific number of files. VOLKMAN could not recall the customer names associated with those files nor could he explain how he knew that those particular medical filed were missing.

13.    As part of the operation of the practice, medical files for VOLKMAN customers that were discovered to be deceased were reported stolen or were removed from the other clinic files so that they could not be reviewed by law enforcement officials.

14.    As part of the operation of the practice, VOLKMAN would only accept cash payments from his customers for the purchase of his prescriptions.

15.    Beginning on or about October 10, 2005, and continuing up to and including February 13, 2006, within the Southern District of Ohio, the defendant, VOLKMAN, did knowingly, willfully and unlawfully, lease, rent, use or maintain any place, to wit: 5565 Highway 23, Chillicothe, Ohio whether permanently or temporarily for the purpose of distributing any controlled substance.

   **All in violation of Title 21 U.S.C. § 856(a)(1) and (b).**


### COUNT 20

1.    Paragraphs 1 through 15 of Count 19 as listed in this Indictment are re-alleged and incorporated into Count 20.

2.    On or about October 28, 2005, within the Southern District of Ohio, the defendant, PAUL HOLLAND VOLKMAN, did knowingly, intentionally, and unlawfully distribute and dispense a mixture and substance containing a detectable amount of Oxycodone, a Schedule II controlled substance, not for a legitimate medical purpose and outside the scope of medical practice,

31

to Earnest Ratcliff. Death resulted on October 29, 2005 from the use of the substance so distributed.

**In violation of Title 21 U.S.C. § 841(a)(1), 841(C).**

## COUNT 21

1.      Paragraphs 1 through 15 of Count 19 as listed in this Indictment are re-alleged and incorporated into Count 21.

2.      On or about November 19, 2005, within the Southern District of Ohio, the defendant, PAUL HOLLAND VOLKMAN, did knowingly, intentionally, and unlawfully distribute and dispense a mixture and substance containing a detectable amount of Oxycodone, a Schedule II controlled substance, not for a legitimate medical purpose and outside the scope of medical practice,

to Mark Reeder. Death resulted on November 19, 2005 from the use of the substance so distributed.

**In violation of Title 21 U.S.C. § 841(a)(1), 841(C).**

## COUNT 22

1.      Paragraphs 1 through 15 of Count 19 as listed in the Indictment are re-alleged and incorporated into Count 21.

2.      On or about December 23, 2005, within the Southern District of Ohio, the defendant, PAUL HOLLAND VOLKMAN, did knowingly, intentionally, and unlawfully distribute and dispense a mixture and substance containing a detectable amount of Hydrocodone, a Schedule III controlled substance, not for a legitimate medical purpose and beyond the bounds of medical

32

practice, to William Wicker. Death resulted on December 28, 2005 from the use of the substance so distributed.

**In violation of Title 21 U.S.C. § 841(a)(1), 841(C).**

## **Forfeiture Allegations**

THE GRAND JURY FURTHER CHARGES THAT:

1.      Pursuant to 21 U.S.C. § 853(a), and as a result of the violations in Counts 1-15, the defendant, DENISE HUFFMAN shall forfeit to the United States:

> (a) any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the said violations;

> (b)  and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the said violations, including but not limited to the following:

MONEY JUDGMENT

A sum of money equal to $3,087,500.00 in United States currency, representing the amount of proceeds obtained as a result of the offense, the conspiracy and knowingly, willingly and unlawfully maintaining any place for the purpose of illegal distribution of controlled substances, of which she has been charged.

2.      Pursuant to 21 U.S.C. § 853(a), and as a result of the violations in Counts 1-15, the defendant, ALICE HUFFMAN BALL shall forfeit to the United States:

> (a) any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the said violations;

33

(b)  and any property used, or intended to be used, in any manner or part, to commit, or to

facilitate the commission of the said violations, including but not limited to the following:

MONEY JUDGMENT

A sum of money equal to $3,087,500.00 in United States currency, representing the amount

of proceeds obtained as a result of the offense, the conspiracy and knowingly, willingly and

unlawfully maintaining any place for the purpose of illegal distribution of controlled substances, of

which she has been charged.

3.     Pursuant to 21 U.S.C. § 853(a), and as a result of the violations in Counts 1-22, the

defendant, PAUL HOLLAND VOLKMAN, shall forfeit to the United States:

(a)  any property constituting, or derived from, any proceeds obtained, directly or indirectly,

as a result of the said violations;

(b)  and any property used, or intended to be used, in any manner or part, to commit, or to

facilitate the commission of the said violations, including but not limited to the following:

MONEY JUDGMENT

A sum of money equal to $3,787,500.00 in United States currency, representing the amount

of proceeds obtained as a result of the offenses, the conspiracy and knowingly, willingly and

unlawfully maintaining any place for the purpose of illegal distribution of controlled substances, of

which he has been charged.

BANK ACCOUNTS

(a)  The contents of Huntington Bank Account No. 02082812515, in the name of Paul H.

Volkman, M.D.; and

(b)  The contents of JP Morgan Chase Bank (Bank One) Account No. 6790064149140, in the

34

name of Paul H. Volkman, M.D.

(c)  The contents of the Fifth Third Bank Account No. 2737660, in the name of Tri-State

Health Care and Pain Management (also known as "Tri-State").


## Substitute Assets

If any of the above-described forfeitable property, as a result of any act or omission of the

defendant(s):

(a)  cannot be located upon the exercise of due diligence;

(b)  has been transferred or sold to, or deposited with, a third party;

(c)  has been placed beyond the jurisdiction of the court;

(d)  has been substantially diminished in value; or

(e)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) as incorporated in 18

U.S.C. § 982(b)(1), to seek forfeiture of any other property of said defendant(s) up to the value of the

above forfeitable property.


**A TRUE BILL.**

_____
**GRAND JURY FOREPERSON**


**GREGORY G. LOCKHART**
**United States Attorney**

_____
**ANTHONY SPRINGER**
**Deputy Criminal Chief**

35