1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF OHIO

3    WESTERN DIVISION

4         - - -

5  UNITED STATES OF AMERICA,      : CASE NO. 1:07cr60(3)

6              Plaintiff,  : Cincinnati, Ohio

7      - v -          : Monday, March 14, 2011
                        1:32 p.m.
8  PAUL H. VOLKMAN,              :
                        DAY 8 OF JURY TRIAL
9          Defendant.  : AFTERNOON SESSION

10         - - -

11    TRANSCRIPT OF PROCEEDINGS
    BEFORE THE HONORABLE SANDRA S. BECKWITH, SENIOR JUDGE,
12                AND JURY

13         - - -

14  APPEARANCES:

15  For the Plaintiff:   TIMOTHY D. OAKLEY, ESQ. (AUSA)
                         ADAM L. WRIGHT, ESQ. (AUSA)
16                       U.S. Attorney's Office
                         221 East Fourth Street, Suite 400
17                       Cincinnati, OH  45202

18  For the Defendant:

19  WENDE C. CROSS, ESQ.           CANDACE C. CROUSE, ESQ.
    W.C. Cross & Associates, LLC   Strauss & Troy, LPA
20  3460 Reading Road              The Federal Reserve Building
    Cincinnati, Ohio  45202        Cincinnati, Ohio  45202
21

22  Also Present:     Agent Christopher Kresnak (DEA)

23  Law Clerk:        Laurie J. Nicholson, Esq.

24  Courtroom Deputy:  Mary C. Brown

25  Court Reporter:    Jodie D. Perkins, RMR, CRR

Proceedings reported by stenotype.
Transcript produced by computer-aided transcription.

1    AFTERNOON SESSION, Monday, March 14, 2011

2    (The jury entered the courtroom at 1:32 p.m.)

3    MICHAEL POLICASTRO, M.D.

4  being previously duly sworn, was examined and testified further

5  as follows:

6    THE COURT:  Welcome back, everyone.  I think we're

7  ready to resume.

8    Mr. Wright.

9    DIRECT EXAMINATION (Cont'd)

10  BY MR. WRIGHT:

11  Q.  Doctor Policastro, before we move on to Scottie Lin James,

12  I want to just step back, given that we've reviewed the

13  circumstances of eight different patients, and I wanted to get

14  your view as a toxicologist about whether or not the

15  prescriptions that we see so far make any medical sense to you.

16  A.  That's a difficult statement.  The pain medication

17  utilization would be prescribed.  The combination of said

18  hypnotics in high frequencies that are shorter than the

19  half-lives does not make toxicologic sense.

20  Q.  Okay.  And why not?

21  A.  Because of the increase in risk for adverse outcome.  The

22  combination -- utilization of opiates and sedatives

23  dramatically increases your risk of adverse effect.  When you

24  look at drug and poisoning overdoses, particularly opiate

25  related deaths, very rarely are they in isolation.  Very rarely

1    is that a single drug, by itself, is very rarely associated
2    with death.   The combination of agents that we see,
3    particularly when treating patients that have opiate related
4    deaths, tend to be a combination of opiates and sedatives.
5    Q.   In your daily job you're a consultant of sorts for other
6    physicians in the hospital that are prescribing medications; is
7    that right?
8    A.   I am available for consultation, correct.
9    Q.   And if someone said I want to prescribe two sedatives and
10   two opiates, what would you tell them?
11   A.   I would state that there's a significant risk for negative
12   adverse outcome.   For example, when we do procedures on
13   patients, even if they are in chronic pain or acute pain, when
14   I see patients that are on opiates and sedatives and I have to
15   do procedures on those patients, we have to put these patients
16   on oxygen monitor/cardiac monitor due to the risk of sudden
17   death.
18        And when I say that, I mean the significant decline in your
19   respiratory status in an unmonitored situation.   Oftentimes
20   these patients are already on pain medication, so giving them a
21   medication on top of that for a procedure, we would have to
22   utilize the modalities that I mentioned.
23   Q.   So you would have to put -- if you were going to observe --
24   put somebody on these kinds of medications, you would need to
25   put them on oxygen or at least monitor them in some way?

1  A.   Correct.

2  Q.   And why would that be?

3  A.   Because of the sudden unexpected decline in respiration and

4  oxygenation.

5  Q.   You wouldn't just let them sit in the waiting room and see

6  what happened?

7            MS. CROSS:   Objection.

8            THE COURT:   Overruled.

9  Q.   Would you do that?

10  A.   No.

11  Q.   Why not?

12  A.   Because of sudden risk of decline.  After we perform a

13  procedure on a patient when utilizing those medications, we

14  observe them for a long period of time in the emergency

15  department with continuous monitoring, as mentioned.

16  Q.   And would that monitoring include professional staff that

17  would be observing the patient?

18  A.   Yes.

19  Q.   And some kind of monitoring device to detect their

20  breathing?

21  A.   Correct.  Their oxygenation, which is a marker of

22  breathing, as well as with observation of their breathing

23  status.

24  Q.   And would the doctor ever come in and make sure that things

25  were going okay?

1  A.   The doctor being me?

2  Q.   Yes.

3  A.   Yes.

4  Q.   We talked a good deal about the opiates.   And I want to

5  just ask you a few questions about the sedatives, in particular

6  Soma.

7       Is Soma a medication that you typically would prescribe in

8  your experience?

9  A.   No.

10  Q.   Why not?

11  A.   Because Soma's utilization has been found that it has a

12  highly abusive potential.   It has significant euphoria and it

13  is well recognized that, in the past, Soma, which is

14  metabolized meprobamate, meprobamate was primarily seen as a

15  drug of abuse.   My clinical experience with this is that

16  patients that request Soma are often patients that have a

17  greater likelihood of drug abuse.

18  Q.   Is Soma a medication that you have ever prescribed for pain

19  purposes?

20  A.   No.

21  Q.   And you also talked a little bit about short-acting and

22  long-acting medication.   Could you just explain the difference

23  again for the jury?

24  A.   Short-acting is exactly what it sounds like -- it is short

25  acting.   Long-acting is longer acting.   With regard to the use

1    of oxycodone, again, the long-acting form has -- you can think

2    of it as two ways:  There's a short phase, which is rapidly

3    absorbed, and it lasts a long, long time over a period of time.

4    Q.   And one last question just generally.  In your review of

5    the medical records, did you come across any documents that

6    related to blood levels?

7    A.   Did I come across any documents that relate to blood

8    levels?

9    Q.   Yes.

10   A.   Yes.

11   Q.   Describe those documents from what you remember.

12   A.   The documents in relation to each patient or --

13   Q.   Just the ones that were sent to the Mayo Lab.

14   A.   So there were utilization of labs, both urine and blood.

15   The problem is interpretation of specific levels on spot

16   urinalysis.  At times there was a urine sent for quantitative

17   value, meaning that when the person urinated, they test the

18   urine, said these drugs are present.  And that's fine, saying

19   that the drugs are present.

20        There was a quantitative value noted, which makes basically

21   no sense in isolation.  What you are trying to determine from

22   this is through a series of urinalysis, analysis of several

23   urine specimens, would be:  Could you determine a rate of

24   excretion to imply toxicity?

25   Q.   Well, wait a minute.  Let's back up.  I mean, so you're

1   saying that the actual urine test might be able to show a
2   presence?
3   A.   It absolutely shows presence.  It says this drug is
4   present.
5   Q.   Why couldn't it tell you if someone was taking their
6   medication as prescribed?
7   A.   Because all you have is that the urine is present.  That
8   value, in and of itself, cannot be attributed to compliance.
9   All you can say is that the drugs were taken.  The dosing
10  regimen cannot be accurately obtained from it.
11      More importantly, in isolation from a single urine test,
12  you can't determine dose compliance on it.  It is meant for a
13  spectrum.  But even that is dependent upon too many factors.
14  The urine clearance is added clearance, meaning from the liver,
15  kidney, et cetera.
16      The other thing that it does not take into account, and
17  which is the most important, is the combination of these drug
18  agents.  So, for example, a blood test that was sent for a
19  meprobamate level, which is the metabolite of Soma, one of the
20  sedatives, that drug concentration in itself assumes that
21  you're just taking that one drug.  It doesn't determine
22  toxicity based off of the interaction of all of the other
23  drugs.
24  Q.   As a toxicologist, would you ever try to use a blood level
25  to determine whether or not someone was taking three pills a

1  day as opposed to five pills a day?

2  A.  No.

3  Q.  Is that -- because in order to determine it, you would need

4  so many tests over time to be able to get an accurate view?

5  A.  There's too many factors to determine true dose compliance.

6  It would require several periods of observation to determine

7  what this person's plasma concentration is based off of their

8  unique genetic mechanisms.

9       The other point too, as I mentioned, when you're dealing

10  with multiple drug interactions, a single concentration is not

11  going to be reflective of toxicity.

12  Q.  So what did you make of the blood level reports that you

13  saw in the medical records that were part of your review?

14  A.  There were a number.

15  Q.  Does it correlate with anything?

16  A.  I cannot determine toxicity based off of that.  As I

17  mentioned, the urinalysis values could not be retrograde

18  calculated to determine plasma concentration, which is

19  basically, from each secretion in the urine, you could not

20  determine a plasma concentration.  And in addition, like I

21  said, the meprobamate blood levels could not be used in

22  isolation because several drugs were used.  So even if that

23  value is normal from the laboratory range reported, you can't

24  determine is there multiple drug interactions.

25  Q.  Meaning if there's more than one drug in the system, then

1    the numbers are even harder to interrupt?

2    A.    Yes.

3    Q.    Let's turn to Scottie Lin James, who died on

4    September 30th, 2005.  When was her last visit to  Doctor

5    Volkman?

6    A.    9/30/05.

7    Q.    Are you sure?

8    A.    I apologize.   9/26/05.

9    Q.    And how many days after that did she die?

10    A.    9/30/05.

11    Q.    And her age?

12    A.    Thirty.

13    Q.    And time of death?

14    A.    7:24 a.m.

15    Q.    What were your sources of information regarding that?

16    A.    The progress notes, the diagnostic tests, prescriptions,

17    autopsy report, toxicology report and death certificate.

18    Q.    What warning signs did you see, just based on your review

19    of the medical records?

20    A.    So in the review of the medical records, she had openly

21    deceived to obtain narcotics.  She stated that she had a

22    history of ovarian cancer when, in fact, she had cervical

23    dysplasia, which is a precancerous, at most, lesion of the

24    cervix.   This was not ovarian cancer.  It was noted by Doctor

25    Volkman and his staff that the patient openly deceived them and

1   she was dismissed from their practice.

2   Q.   As a toxicologist and as a physician, why would that kind

3   of deception concern you in deciding what to prescribe someone?

4   A.   Again, that would imply a potential history of substance

5   abuse and, again, their risk for adverse outcome would be

6   greater than an individual that does not have those risk

7   factors.

8   Q.   Have you ever had someone try to fake cancer in order to

9   get pain medication?

10  A.   No.

11  Q.   I'm going to ask you about the two visits as we go.   The

12  first visit, let's walk through what Ms. James received on

13  September 16th, 2005.

14  A.   She received two narcotic pain medications, which are

15  oxycodone, Percocet, and two sedatives, which are Xanax and

16  Soma.

17  Q.   And you had talked earlier in the context of Mr. Jordan

18  about something called toxicological chaos, and I wondered

19  actually what you meant by that.

20  A.   It is what I mentioned before, is that when you have dosing

21  frequencies more often than the extent of half-life, it is

22  virtually impossible to accurately depict what a peek plasma

23  concentration will be.   And as a result of that, the safety

24  index of the drug declines.

25  Q.   Now, let's look at the prescriptions that Ms. James

1  receives ten days later, on September 26th, 2005.  What does

2  she receive?

3  A.   Oxycodone and Percocet, which are opiate pain medicines.

4  Q.   And let's add these up in that ten-day period.  What did

5  Ms. James receive?

6  A.   She received oxycodone, Percocet, Xanax and Soma.

7  Q.   And how many pills was she supposed to take, according to

8  these two inscriptions each day --

9  A.   Forty-two.

10  Q.   Should any human being be taking 36 pills a day of

11  oxycodone?

12  A.   I can't answer that specifically.

13  Q.   Is that a prescription that you would typically see in your

14  practice?

15  A.   The number of tablets is very large.  But, again, as I

16  mentioned, the analgesic ceiling is not there.  What would be

17  important is with regards to frequency of that medication

18  dispense.

19  Q.   Is someone supposed to be taking oxycodone that

20  frequently -- we'll move on.

21      Let's look at the autopsy report for Miss James.  What did

22  you find?

23  A.   That she was found to have fluid in her lungs again and

24  other organs were filled with fluid.

25  Q.   What's visceral congestion?

A.   Organs.

Q.   Fluid in the organs?

A.   It is just reflective of the congestion, overall.

Q.   Okay.  And how again does the opiate or how again do the drugs cause that kind of --

A.   They trigger a reaction in the brain and the lungs to fill with fluid.

Q.   And what did you find in the toxicology report?

A.   Several things were actually pertinent.  She had the presence of oxycodone, which was noted she was prescribed oxycodone.  She had a vitreous level, as well as a blood level.

As I mentioned, oxycodone appears to come into the eyes slower than out of the eye.  There's some correlation between the eye and the blood, again, these numbers are there.

Does postmortem redistribution occur and can values be elevated?  Yes.  So does she have presence of the drug?  Yes.

Q.   And then besides oxycodone -- just to be clear, both of those were within the range of levels associated with death?

A.   Reported in the medical literature, yes.  But they may be artificially elevated secondary to PMR, which is postmortem redistribution.

Q.   What other drugs were present in Ms. James' system?

A.   So she had a metabolized cocaine, which is important to note and may be a significant contributing factor to her death. With each of these, there's a concentration present.  Cocaine

is broken into two metabolites:  Benzoylecgonine, as well as an

equaline monomethyl group, which is either anhydrous or not, so

basically there's products of cocaine that exist.

Cocaine was also noted in her urine, the parent compound,

but the metabolites were primarily found in her blood.

Q.   We'll talk about cocaine in just a little bit.  But what

other drugs did you find?

A.   She had Xanax, Benadryl, and the presence of a

benzodiazepine, which may or may not be Xanax by itself, which

is the alprazolam.

Q.   So let's talk about the cocaine that you noticed from the

toxicology report.  Just at a real basic level, how are opiates

and sedatives different from cocaine?

A.   Completely.  So cocaine is a stimulant.  I guess Charlie

Sheen would be a good example of cocaine toxicity at times.

But a patient that presents with sweatiness, very elevated in

their mood, very fast heartbeat, very high blood pressure, is

somebody who presents with cocaine intoxication.  They may or

may not present with chest pain at that time.

Q.   In the ER have you dealt with cocaine overdoses?

A.   I see cocaine quite frequently.

Q.   And so how does a patient who is undergoing cocaine

overdose present?

A.   Overdose, that's a very cautious word with regards to that.

So a patient that can have cocaine present that is not

1    intoxicated, as well as be intoxicated with cocaine but not
2    have severe life-threatening toxicity, it is a spectrum.  So
3    cocaine patients can present a wide spectrum of that.  It
4    depends on if they're in the intoxicated phase or post
5    intoxication phase where they present with depression, you
6    know, sedation, things like that.  But an acutely intoxicated
7    patient with cocaine is very elevated in their mood, high blood
8    pressure, tachycardia, sweaty, they present with stimulant.
9    Q.   Okay.   And how would that compare with someone who has
10   received too many sedatives and opiates?
11   A.   The opposite.   So patients with sedatives present with
12   depression in their mental status, their breathing may or may
13   not be slower, they tend to be stuporous, basically meaning
14   that their cognition is declined.   So the opposite of cocaine
15   intoxication.
16   Q.   And how common is cocaine-induced heart attack?
17   A.   So, that's a very complex question.   So the patients that
18   present to the -- with cocaine chest pain, the incidents of
19   myocardial infarction is about 6 percent.   The incidents of
20   abnormal heart rate, for instance, is about 0.14 percent.
21   Q.   Okay.   So what does that mean, that first 6 percent number?
22   A.   The means that patients that are actively having chest pain
23   that presented to the hospital or actually presented to the
24   Emergency Department from the studies, only 6 percent of them
25   had evidence of a myocardial infarction.

1  Q.  Which is meaning?

2  A.  Meaning heart attack.

3  Q.  And so what about the other 94 percent?

4  A.  They did not have heart attack.

5  Q.  Meaning that there was some cocaine in the system, but it

6  hadn't caused a heart attack?

7  A.  Correct.

8  Q.  Okay.  And then the second number that you gave us?

9  A.  So that's what is important with cocaine.  So cocaine does

10  several different things to your blood vessels and to the body.

11  As I mentioned, all of this occurs from blocking the reuptake

12  of the excitatory chemicals.  So that makes you jazzed up.  So

13  that makes norepinephrine, dopamine, all of these chemicals

14  higher.

15      The issue is, is that you have an increase in risk for

16  spasm of your blood vessels, which is primarily the mechanisms

17  by which cocaine causes chest pain.  It also can increase the

18  progression of plaque or that junk in the blood vessel, the

19  atherosclerosis.  And it can cause acceleration of clot

20  formation.

21      Additionally, you can see patients have seizures, bleeding

22  in their head, tearing of their blood vessels, spasm of the

23  blood vessels in the gut.  So there's a variety of spectrum of

24  pathology that can present with cocaine.

25  Q.  Okay.  One last thing before I ask you about the

1    conclusions that you reached.  If Ms. James had only received

2    these medications, the oxycodone and Percocet that have been

3    prescribed on September 26th, 2005, and not the medication that

4    she was prescribed ten days before, would that have been enough

5    to cause her death, in your opinion?

6    A.   Opiates, by themselves, would be, in isolation, lower

7    likely to produce sudden death.  They can.  I can't answer that

8    with medical certainty.

9    Q.   Okay.  Based on your review of the entire file, did you

10   reach a conclusion regarding the cause of death of Scottie Lin

11   James to a reasonable degree of medical certainty?

12   A.   Yes.

13   Q.   And what was that?

14   A.   Multiple drugs, overdose, produced her death.  No single

15   drug, including cocaine and opiates, by themselves, would just

16   produce an isolation or death.

17   Q.   Is that cocaine level significant?

18   A.   You can't answer that.  It's the metabolized cocaine, which

19   is associated with ingesting cocaine.  So, having the presence

20   of the cocaine metabolite with a single number by itself, I

21   cannot tell you would necessarily imply intoxication nor death.

22       The issue with cocaine, as I mentioned, is that outside of

23   the vasospasm, it can produce abnormal heart rhythms.  So in

24   those patients that have coronary disease, with other drugs,

25   could this produce death, particularly in Scottie Lin James?

1   Yes, it can.

2   Q.    Is it -- is there any way to tell when Ms. James ingested

3   the cocaine?

4   A.    Not accurately.

5   Q.    What kind of half-life does cocaine have?

6   A.    So it depends on the mechanism and the route of injection

7   if you snort it, shoot it or smoke it.    So the parent compound,

8   cocaine, you feel the effects of it within minutes, depending

9   on the route of injection.    The cocaine parent compound is in

10  the blood for about 20 minutes, maybe up to two hours.

11       So the presence of cocaine in her urine could imply that

12  she had a more recent ingestion.    However, cocaine can just,

13  like all of these other drugs, have postmortem redistribution.

14  So she could have distribution of the cocaine proper.    But

15  having the parent compound, cocaine, would potentially imply a

16  more recent injection.    But you cannot say that with definitive

17  conclusion.

18  Q.    And I assume that the Benadryl was not a lethal substance?

19  A.    I don't recall what the concentration was.    But the problem

20  is that both Benadryl and cocaine block sodium channels.    So if

21  you take a lethal concentration of Benadryl, it is possible to

22  have death from the combination of cocaine and Benadryl, or

23  even just Benadryl alone, by itself.    But I don't recall the

24  concentration.    I would have to review.

25  Q.    Okay.    Let's move on to Bryan Brigner.    What was his date

1   of death?

2   A.    10/2/05.

3   Q.    Okay.   And how long did he see Doctor Volkman?

4   A.    From 7/6/05 to 9/30/05.

5   Q.    And was his date of death two days later?

6   A.    10/2/05, correct.

7   Q.    And the time of death?

8   A.    7:30 in the morning.

9   Q.    What documents did you have to review regarding

10  Mr. Brigner?

11  A.    Partial progress notes, diagnostic tests, prescriptions,

12  autopsy report, toxicology report and death certificate.

13  Q.    And let's look at the last visit that Mr. Brigner made to

14  Doctor Volkman on September 30th, 2005.   What kinds of drugs

15  did Doctor Volkman prescribe?

16  A.    Oxycodone; Lortab, which is hydrocodone, these are both

17  opiate pain medicines; Valium, which is a sedative; and Soma,

18  which is another sedative.

19  Q.    So two opiates and two sedatives; is that right?

20  A.    Yes.

21  Q.    And what did you find in the autopsy report regarding the

22  circumstances of Mr. Brigner's death?

23  A.    That he had fluid in his lungs, he vomited into his lungs,

24  his bladder was distended and he had pill fragmentation noted.

25  Q.    And what's bladder distention again?

A.   When the smooth muscles are not contracting accurately and you get constipation of the bladder, so to speak.

Q.   And would all of these four items be associated with a drug-induced death?

A.   Yes.

Q.   Let's look at what you found in the toxicology report relating to opiates relating to Mr. Brigner.

A.   Again, same concentrations are noted, as I mentioned.  The vitreous sample, it appears that oxycodone, in particular, as well as other drugs that are lipophilic, et cetera, go into the eyes slower and come out slower.  It was noted that the femoral sample was present.  These are in the medical ledger as reported, again, within the range associated with death, again, but these values can be artificially elevated with postmortem redistribution.

Q.   In terms of the hierarchy of sample site, are femoral and vitreous number one and number two?

A.   Newer literature has stated that the vitreous samples may be equivalent of the femoral.  However, the concordance of agreement on that is greater than one.  So either -- several things need to be taken into account, that the drugs go in the eye slower and out slower, so this may be a more observed phenomenon of postmortem redistribution than appreciated in the past.

Q.   Are these sample sites better than heart blood?

1  A.   Yes.

2  Q.   And then how about for hydrocodone, what levels did you see

3  from the femoral and vitreous samples taken?

4  A.   Again, they were consistent with the medical literature

5  that was noted for hydrocodone-associated deaths.   But, again,

6  the values in isolation cannot necessarily be seen together.

7  They may be artificially elevated associated with postmortem

8  redistribution.

9  Q.   Okay.   But let's -- oxycodone and hydrocodone are present.

10 And were sedatives present, as well?

11 A.   Yes.

12 Q.   What's the significance of those -- the combination of

13 opiates and sedatives being found in the blood?   Just the

14 presence, not the number.

15 A.   The presence of those drugs, coupled with the history that

16 we've seen in the past, again, coupled with the fluid in the

17 lungs, vomiting into the lungs, extension of the bladder, is

18 consistent with opiate-induced direct death, coupled with

19 sedative hypnotics.

20 Q.   Now, it looks like there were a few other drugs that were

21 found in Mr. Brigner's system.   Can you explain what those are?

22 A.   The Sertraline is an antidepressant.   Actually, Sertraline

23 is cardio protective.   There was a study performed after

24 patients with myocardial infarction that found that there was

25 no greater increase and risk of cardiac death or increase in

clots, because it interferes with the secretion of serotonin, which is one of the chemicals that it works with to prevent platelets from forming together, meaning there is no increase in risk of clot.

Q.   So this would counteract some of the negative effects --

A.   Potentially.

Q.   -- that occur?  And how about the other drugs?

A.   So Haldol deserves mention.  So haloperidol is a typical antipsychotic.  It may produce abnormal heart rhythms or it may not.  It is noted to increase the heart cycle associated with -- it is noted to associate -- to increase the electrical heart cycle, which may predispose you to abnormal heart rhythms.

Q.   Now, wasn't an antipsychotic one of the other drugs that you needed to consider in prescribing opiates and sedatives?

A.   Yes.

Q.   And walk me through that again.  Why would it have been a red flag?

A.   Just because, again, the risk for drug/drug interactions.

Q.   Did you consider the potential for a heart attack by Mr. Brigner?

A.   Yes.

Q.   Explain to us what your findings were.

A.   So this was provided after the time of my report, I believe.  And so he was found to have significant coronary

1    lesions.  He had some confusing statements noted by the

2    pathologist with regards to the autopsy.  He was found to have

3    two large plaque lesions of his right coronary artery, which is

4    just basically the right side of the heart and the bottom part

5    of the heart.

6         One of the lesions was -- I believe it was the distal

7    lesion was found -- meaning towards the bottom of the blood

8    vessels -- was found to have blood in it.  That can be a

9    significant marker for an unstable plaque, which may trigger

10   acute heart attack.  And I felt that that was to be noted

11   significantly.  So he does have evidence of significant

12   coronary lesions.

13        There's also another lesion of the LAD.  But what was

14   confusing to me was that the pathologist noted that no evidence

15   of acute clot was noted in the blood vessel, no evidence of

16   acute scar or infarct was noted.

17   Q.   And would those be things that you would expect to see from

18   a heart attack induced death?

19   A.   You would assume, yes.  But the issue, as noted in the

20   overall assessment of this patient, is somebody that had acute

21   coronary lesion with multiple drugs present.

22   Q.   And, again, what effects do opiates and sedatives have on

23   the heart's ability to function?

24   A.   Well, it will depress its function over time.  But patients

25   with significant coronary obstructing lesion, in this case he

1    had this hemorrhagic plaque, I can tell that you this was not

2    an acute heart attack in itself.  And the presence of Haldol

3    also could have triggered an abnormal heart rhythm as oxygen

4    would decline and his carbon dioxide would go up, which

5    predisposes you to increased heart rhythms.  So it's

6    multifactorial.

7    Q.   How do you approach someone who has got a heart condition

8    in terms of deciding how much opiates and sedatives to

9    prescribe?

10   A.   It depends again on their duration of treatment and things

11   like that.  When we talked about tolerance and things like

12   that, somebody with underlying significant coronary disease, if

13   they have oxygen requirements, if they have lung disease and

14   things like that, you would be very cautious with the

15   utilization of combination drug therapy.

16   Q.   Would you even prescribe that kind of slurry of medications

17   for somebody who had a bad heart?

18   A.   The drugs themselves, as I mentioned, overall don't

19   interact with the heart specifically as much as with the lung

20   and the interaction amongst the other organs themselves.  I

21   would not prescribe two sedatives and two opiates to anyone

22   because of the risk for drug/drug interaction.

23   Q.   Would you ever recommend that if someone asked you in your

24   role as a director of medical toxicology?

25   A.   No.

1    Q.    What was your conclusion, to a reasonable degree of medical

2    certainty, regarding the cause of death of Mr. Brigner?

3    A.    That he had significant cardiac lesion and was found to

4    have significant drugs present.  He had evidence of combination

5    drug overdose and significant cardiac lesions.  I cannot

6    describe a specific cause of death.

7    Q.    So it wasn't one or the other, from what you could tell?

8    A.    I could not weigh what was a greater likelihood.  They were

9    both present.  He had significant lesion present.

10   Q.    If the pathologist explained what he or she meant, would

11   that potentially change your opinion?

12   A.    Potentially.  But, as I mentioned, that hemorrhagic plaque

13   is a significant risk factor for acute myocardial infarction.

14   So I still think that's a significant value.

15   Q.    Let's move to Ernest Ratcliff, who died on October 23rd,

16   2005.

17        What was the date of his first and last visit with Doctor

18   Volkman?

19   A.    10/21/05, from the chart.

20   Q.    And how many days after that visit did Mr. Ratcliff die?

21   A.    Two.

22   Q.    And how old was he?

23   A.    Thirty-eight.

24   Q.    And his time of death?

25   A.    Eight a.m.

Q.   What sources of information did you have relating to

Mr. Ratcliff?

A.   Progress note, prescriptions, toxicology report and death

certificate.

Q.   By progress note, do you mean singular, just one progress

note?

A.   I would have to -- well, I mean, it was the note that was

from 10/21.

Q.   Let's look at the one prescription that Mr. Ratcliff

receives from Doctor Volkman.   What kinds of drugs do we see

here?

A.   Same drugs that we've seen in the past prescribed, which

are oxycodone, Lortab, which are two opiates, and two

sedatives, which are Xanax and Soma.

Q.   And what did we see -- actually, let's -- one other thing

that we haven't talked about yet.   We've noted a few times

individuals who have concerns regarding compliance, and I was

wondering, as a toxicologist and as a physician, your view on

giving someone a prescription for 660 pills at one time, if

there are compliance concerns.

     Would that be something that you would do?

A.   That would be very concerning.

Q.   And why would that be?

A.   Because, again, the risk for adverse outcome.   That is a

large quantity of medications.

1    Q.   Well, what would you worry they would do?

2    A.   You have the question of risk for overdose; you have the

3    risk for, again, if they're noncompliant, could they be

4    dispensed to other individuals and not themselves.   So those

5    would be my concerns.

6    Q.   And have you ever had those concerns in dealing with a

7    patient?

8    A.   For?

9    Q.   In terms of prescribing medication.

10   A.   Yes.

11   Q.   And what have you done as a result of those concerns?

12   A.   If I am concerned that the patient would have either

13   diversion of those agents or risk of significant toxicity, I do

14   not prescribe those agents.

15   Q.   Let's look at what you found in the toxicology report

16   relating to Mr. Ratcliff's death.   What drugs were present?

17   A.   Oxycodone, hydrocodone and methadone.

18   Q.   Are these all three opiates?

19   A.   Yes.

20   Q.   And the oxycodone and hydrocodone was obviously prescribed

21   by Doctor Volkman.   And the methadone was not, correct?

22   A.   Correct, there was no prescription for methadone.

23   Q.   Let's go through each one on its own.   What about the level

24   of oxycodone?

25   A.   It is noted it is in the range but, again, there was no

1  sample site.  The drug itself undergoes postmortem

2  redistribution.  So the value report is there.  Is it within

3  the range?  Yes.  Could it be artificially elevated?  Yes.  So

4  it is noted.

5  Q.  And how about hydrocodone?

6  A.  Same thing.  It was noted.  It is .07, it was slightly

7  below the range.  But as we mentioned, it can undergo

8  postmortem redistribution, it can be artificially high.  The

9  combination of agents may have lower values cumulatively when

10  there are multiple drugs present.

11  Q.  And for the ranges, are those just single drugs associated

12  with death?

13  A.  Yes.

14  Q.  And the third one is methadone.  What was the significance

15  of that?

16  A.  Methadone is very significant, and I would state that that

17  is perhaps one of the most important findings out of this.

18  Q.  And why is that?

19  A.  Because methadone by itself has significant lethality.  The

20  reason being is that methadone's half-life is up to 54 hours.

21  And oftentimes what we see is that when patients have a single

22  ingestion, particularly even if they're tolerant individuals,

23  they have a high risk of drug death for a variety of reasons.

24  Number one is the delayed onset of absorption, which is what we

25  talked about in the past, of unexpected absorption in blood

1  levels.   So they have an apparent sudden onset of respiratory

2  death.

3      The other issue too is that methadone interferes with a

4  specific channel in the heart which creates abnormal heart

5  rhythms.   So it is lethal by two mechanisms.

6  Q.   And what was your -- and there's also alprazolam present.

7  What is that?

8  A.   Xanax, the sedative.

9  Q.   So what was your conclusion to a reasonable degree of

10 medical certainty about what caused the death of Mr. Ratcliff?

11 A.   Multi-drug death.

12 Q.   And could you say whether it was the oxycodone, or the

13 methadone, or the hydrocodone, or the Xanax?

14 A.   As I mentioned, you cannot ascribe to any single agent with

15 regard to -- they're all opiates.   My concern is that the

16 interpretation of that methadone value, no one can accurately

17 do.   Methadone is a significant component.   And I would place a

18 greater concern on its presence.   So I would not ascribe it to

19 any single agent, but I think methadone is a significant

20 component associated with his death.

21 Q.   And could you say that he had died -- if it was only

22 methadone, would you be able to say that that would have caused

23 his death?

24 A.   The drug concentration itself, again, in isolation doesn't.

25 But if he had clinical toxidrome of fluid in his lungs, et

1  cetera, but the presence of methadone with an unexpected death

2  could absolutely imply drug death.  Methadone is a significant

3  component and risk factor for a drug death by itself.

4  Q.  And if it was only oxycodone and hydrocodone, would that

5  have been sufficient to cause his death?

6  A.  In a clinical toxidrome, present with fluid in his lungs

7  and things like that, given the prior described history that

8  we've talked about.

9  Q.  Mark Reeder, November 19th, 2005, date of death.  How long

10 did Mr. Reeder -- or when did he receive his last prescription

11 from Doctor Volkman?

12 A.  10/25/05.

13 Q.  And how about when did he -- how long after that did he

14 die?

15 A.  On 11/19/05, which I believe is like 25 or something days.

16 Q.  His age?

17 A.  Thirty-four years old.

18 Q.  And time of death?

19 A.  10:40 a.m.

20 Q.  And what information did you have to review regarding the

21 death of Mr. Reeder?

22 A.  Progress notes, prescriptions, diagnostic studies, autopsy,

23 toxicology report and death certificate.

24 Q.  What warning signs existed relating to Mr. Reeder?

25 A.  He had significant morbid obesity and was a smoker.

1  Q.   And obesity and smoking is a concern for these drugs

2  because of what reason?

3  A.   Because of the respiratory variance that we spoke about.

4  Q.   Let's look at the prescription that Mr. Reeder received on

5  his last visit to Doctor Volkman.   What drugs was he

6  prescribed?

7  A.   Oxycodone, Norco, which is hydrocodone, so two opiates, and

8  Xanax and Soma, which is two sedatives.

9  Q.   Taking the oxycodone, 30 milligrams, ten pills a day, is

10 that within the half-life of oxycodone or is it one of these

11 situations where it is going to be overlapping?

12 A.   It would be overlapping if the time interval is less than

13 the 2.5 to 6 hour half-life.

14 Q.   Okay.   So is there a way that Mr. Reeder could have taken

15 these while not tripping over the half-life of oxycodone?

16 A.   Yes.

17 Q.   How would that have had to work?

18 A.   So he would have to take, for example, two to three tablets

19 every six hours, or greater.

20 Q.   And is it possible to do that while you're also taking

21 Norco, Xanax and Soma?

22 A.   It's possible to take those two.   But, again, the

23 combination of multiple opiates with multiple sedatives, again

24 are centrally acting agents, which dramatically increases your

25 risk for adverse breathing, irrespective of the initial dose

1    interval for one of these agents.

2    Q.   So is there a safe way he could have taken all four of

3    these medications?

4    A.   In my opinion, no.

5    Q.   Let's look at the toxicology report for Mr. Reeder.   What

6    did you see?

7    A.   The presence of the oxycodone and hydrocodone.

8    Q.   And I see that the hydrocodone is below the range of levels

9    associated with death?

10   A.   Again, as we noted, these values are present.   They may be

11   artificially elevated with postmortem redistribution.   The

12   concentrations that I had listed were associated with

13   hydrocodone deaths, so it is below.

14   Q.   And then what other drugs were present in the system?

15   A.   Carisoprodol, which is Soma; alprazolam, which is Xanax;

16   and alcohol, which is another depressant.

17   Q.   Oxycodone, hydrocodone, carisoprodol and alprazolam were

18   all prescribed by Doctor Volkman; is that correct?

19   A.   Yes.

20   Q.   And the range level for hydrocodone is only dealing with a

21   one-drug situation as opposed to a four-drug situation; is that

22   right?

23   A.   Correct.

24   Q.   Was the alcohol significant at all in your read?

25   A.   It is another depressant, so it may be a significant

1  contributing factor.

2  Q.   Did you consider the possibility of heart death relating to

3  Mr. Reeder?

4  A.   Yes.

5  Q.   And what did you conclude?

6  A.   Again, notation that heart disease existed.  He had a

7  blockage of his blood vessel, but no clot was seen, no plaque

8  hemorrhage was noted, there was no infarct or scar noted on the

9  gross heart or on microscope.

10  Q.   So none of the indications that you expect for a

11  heart-induced death?

12  A.   In my opinion, yes.

13  Q.   Meaning that --

14  A.   There was no other notation of the findings for myocardial

15  infarction.

16  Q.   And what was your conclusion to a reasonable degree of

17  medical certainty regarding cause of death of Mark Reeder?

18  A.   That he died as a result of multiple drug overdose.

19  Q.   A few more charts.

20       MR. WRIGHT:   But may I have a moment, Your Honor,

21  before I wrap up?

22       THE COURT:   You may.

23    Do you need some water?

24       THE WITNESS:   Yes, ma'am, if you wouldn't mind.

25       THE COURT:   Ms. Brown, I think maybe a fresh cup would

1    be a good thing.

2        (Courtroom deputy complied.)

3    BY MR. WRIGHT:

4    Q.   One thing before we wrap up.  We talked a little bit about

5    blood levels earlier on, including the reports that you saw in

6    the medical records.

7        Do you remember that?

8    A.   Yes.

9    Q.   Now, that level is different than the blood levels that we

10   were talking about in terms of the toxicology reports, right?

11   A.   Drug read levels reported from the laboratory values, for

12   example, meprobamate or the urine levels, is that what you're

13   speaking of?

14   Q.   I'm talking about is there a difference between blood

15   levels for someone who is alive versus blood levels for someone

16   who is dead?

17   A.   Yes.

18   Q.   And for someone who is alive, can you use blood levels to

19   determine compliance with a particular dosing regimen?

20   A.   Can you determine compliance for when you're alive with

21   dosing regimen?  For a single drug, it is possible.  For

22   multiple drugs, it's complex and difficult.  But to compare a

23   living blood sample value to a postmortem value sample to

24   determine toxicity is incorrect.

25   Q.   Why is that?

A.    Because the volume of distribution of drugs after death is
different.    Therefore, a plasma concentration is not
equivalent.    So it is a specific formula to determine what is
concentration, plasma -- what is a blood level achieved.    So
when they're measuring them, these are in people that had died
and saying, these are what these values exist, they may be
elevated, they may be low.    But to ascribe a living blood
sample value of toxicity to a postmortem value of toxicity is
incorrect.

Q.    I would like to walk through just looking backwards at the
twelve individuals that we've reviewed.    And the first thing is
this chart entitled Combination Of Drugs Prescribed.    What does
this tell us, Doctor?

A.    That of the twelve patients that are listed here,
100 percent of them have a combination of opiates and
sedatives.

Q.    And at a real basic level, what does that combination --
what concerns does that kind of combination raise?

A.    Combination of two centrally acting agents increases your
risk for adverse outcome as it applies to breathing.

Q.    And how about the numbers that received two opiates and two
sedatives?

A.    75 percent of the patients, basically nine of the twelve,
received two opiates and two sedatives.

Q.    Now, let's just look at the two sedatives.    What

1  synergistic effects exist when you prescribe Xanax and Soma?

2  A.   It is exactly that, it is synergistic, it increases the

3  likelihood of adverse outcome.   But sedatives alone have a

4  higher therapeutic index of safety, meaning that these drugs

5  are harder to die of as a result of overdose or taking them.

6  But when you combine them, that safety factor decreases.

7  Q.   And in your experience, have you ever prescribed two

8  opiates and two sedatives at the same time?

9  A.   No.

10  Q.   And if anyone asks you if they should, what would you tell

11  them?

12  A.   No.

13  Q.   Let's look at the combination of drugs that these

14  individuals received at the time of their death.   What does

15  this show us?

16  A.   That of the patients listed there, you can see the

17  proportionality of prescriptions of oxycodone, hydrocodone,

18  benzodiazepines, which were either Xanax or Valium, and Soma,

19  which is the other sedative.

20  Q.   So it looks like everyone received the benzodiazepines,

21  correct?

22  A.   Correct.

23  Q.   And then 10 out of 12 received Soma?

24  A.   Correct.

25  Q.   And is Soma a drug that you've ever prescribed?

1    A.    No.

2    Q.    And what are the two Xs for oxycodone?  I see that for

3    Mr. Gillespie, Mr. Jordan and Ms. James.

4    A.    Those were two prescriptions for oxycodone.

5    Q.    So it looks like, is it right that eleven out of twelve

6    received some form of oxycodone; is that right?

7    A.    Yes.

8    Q.    Now, let's look at the ones who received the exact same

9    combination.

10   A.    50 percent of the patients that are presented here received

11   the exact same prescription of oxycodone, hydrocodone,

12   benzodiazepine, which was Xanax, and Soma.

13   Q.    Now, you mentioned earlier on that there were a number of

14   patients' specific considerations that you needed to take into

15   account when prescribing medications.

16        Do you remember that?

17   A.    Yes.

18   Q.    Is this kind of pattern consistent with those kinds of

19   patient specific concerns?

20   A.    This would not appear to take into account patient specific

21   drug tailored therapy.

22   Q.    So what about something like obesity, how would that change

23   the kinds of drugs that someone would receive?

24   A.    Again, so those patients that have significant obesity are

25   a greater risk for respiratory adverse affects by themselves,

1  just with the opiates by themselves.

2      The combination use of a sedative and an opiate in an obese

3  patient puts them at greater risk for central respiratory

4  depression.

5  Q.  What do you do when someone is obese and they're asking you

6  for these medication?

7  A.  So you have to weigh what is the most appropriate therapy.

8  Muscle relaxants -- or I'm sorry, sedatives are not analgesics,

9  they're not pain relief, per se.  So the question is:  What is

10  the most appropriate patient-tailored therapy?

11  Q.  And in your experience, would an individual like Danny

12  Coffee, Mary Carver, James Estep, Dwight Parsons, Ernest

13  Ratcliff and Mark Reeder receive the exact same combination of

14  drugs?

15  A.  Would I prescribe the same drugs or is there concern that

16  they were prescribed all the same drugs?  Yes, there is

17  concern.

18  Q.  Now, let's look at the date of the last visit to Doctor

19  Volkman compared to the date of the death.  And I am just going

20  to skip ahead to the next slide.  What does this show?

21  A.  So all of these patients were patients that received the

22  exact same combination drug therapy, which was oxycodone,

23  hydrocodone, Soma and Xanax.  And they all, at the time of

24  their death, died within a significant short period of time

25  from receiving oftentimes a change in that medication dose just

1    prior to their death.

2    Q.   So 11 out of 12 died within five days of their visit; is

3    that right?

4    A.   Yes.

5    Q.   How many died within two or one day of their visit?

6    A.   Eight.

7    Q.   And how many of that group of 12 received an increase in

8    the prescription in their last visit to Doctor Volkman?

9    A.   Eleven of the 12.

10   Q.   And why would that be significant?

11   A.   Again, when you accelerate the dosing of these medications,

12   again, that particular combination of sedative hypnotics -- I'm

13   sorry, sedatives and opiates, that safety index declines.

14   Q.   The safety index, explain to me how that impacts your

15   decision whether or not to increase the medication someone is

16   already receiving.

17   A.   So, as we mentioned with regards to the tolerance, you can

18   become tolerant to the pain relief effects.  But the tolerance

19   to the side effect profile is still limited by that adverse

20   effect profile.

21        So as you accelerate the dosing regimen and frequency of

22   these drugs, particularly two centrally acting agents, the risk

23   of harm dramatically increases.

24   Q.   Now, you said two centrally acting agents; what do you

25   mean?

A.  They both act in the same synergistic way, they both
depress respirations and cause sedation.

Q.  Now, when you say two centrally acting medications, are you
talking about --

A.  Opiates and sedatives.

Q.  Okay.  So you're talking about the nine out of twelve who
are receiving two opiates and two sedatives?

A.  Yes.

Q.  Would the same concern apply for someone who is receiving
an opiate and a sedative?

A.  Yes.

Q.  Because -- okay, let's look at the age of death and I'll
just skip ahead.  How many were under the age of 40?

A.  75 percent.

Q.  And then that isn't counting Mr. Jordan, who was 40 years
old; is that right?

A.  No.

Q.  Is this the kind of list of ages that you would expect to
be associated with heart attack induced death?

A.  It would be lower likely.  This is the same epidemiology
characteristics of patients that have unintentional drug
overdose death -- they tend to be under the age of 50, 40, they
tend to be younger and, again, have multiple drugs present.

Q.  And is that the kind of situation that, you know, when
you're at Good Sam on a Saturday night that you see something

1  coming in, this profile of a person?

2  A.  This is the profile of the patients that I see that present

3  with combination drug therapy overdoses.

4  Q.  And I just wanted to ask you about the time of death.  How

5  many died in the morning?

6  A.  66 percent.

7  Q.  And why is that significant?

8  A.  Again, we talked about the respiratory variance that

9  occurred nocturnally, or at night.  So chronic opioid therapy,

10  by itself, changes that pattern of breathing at night.  Those

11  patients that are obese, that are now on opiates themselves,

12  that have combination drugs, are at significant risk for

13  respiratory depression, particularly at night.

14  Q.  And that's because your breathing pattern changes when you

15  sleep?

16  A.  Yes.

17           MR. WRIGHT:  No further questions, Your Honor.

18           MS. CROSS:  Your Honor, may we approach?

19           THE COURT:  You may.

20      (The following transpired at a sidebar conference.)

21           MS. CROSS:  Your Honor, I'm trying to abide by the

22  schedule, but I have to use the restroom and I don't know if it

23  would be more appropriate to go take the break now or I can

24  just press on until 3:00.

25           THE COURT:  Okay.  Well, it is not going to cause a

1    problem, I don't think, for anybody other than you if we don't

2    take the break, so we will.

3            MS. CROSS:   Thank you.

4        (Ends sidebar conference.)

5            THE COURT:   All right.   Folks, we're going to take the

6    afternoon break early, from now until 2:45.   Let me just remind

7    everyone not to discuss the case among yourselves or with

8    anyone else or permit anyone to discuss it with you or in your

9    presence.   Report any violation to Ms. Brown.   No research or

10   investigation over the break on your own regarding the case or

11   any issue or person involved.   And no Internet chitchat of any

12   kind regarding the trial.

13       See you back in 15 minutes.

14       (The jury left the courtroom at 2:33 p.m.)

15           THE COURT:   Doctor, you can take a 15-minute break

16   now, and no discussion of your testimony with anyone.

17           THE WITNESS:   Yes, ma'am.

18           THE COURT:   Counsels, anything you would like to put

19   on the record in the absence of the jury before we take a

20   break?

21           MR. WRIGHT:   No, Your Honor.

22           MS. CROUSE:   No, Your Honor.

23           THE COURT:   Okay.   See you back in 15 minutes.

24       (Recess.)

25       (The jury entered the courtroom at 2:59 p.m.)

1     (Doctor Policastro resumed the witness stand.)

2          A JUROR:   Your Honor, if I may, my apologies to the

3     Court for delaying the proceedings.   A business call

4     interfered, and it put me over a couple minutes and therefore

5     it delayed the jury from promptly returning.

6          THE COURT:   Okay.   Apology accepted.   Thank you.

7                        CROSS-EXAMINATION

8     BY MS. CROSS:

9     Q.   Good afternoon, Doctor Policastro.   Your field expertise is

10    in the area of toxicology and emergency medicine?

11    A.   Yes, ma'am.

12    Q.   And toxicology is basically the -- simplified -- is the

13    study and evaluation of the adverse effects of chemicals or

14    drugs?

15    A.   Yes.

16    Q.   And toxicology is an interdisciplinary science, right?   It

17    integrates fields of other areas of medicine, right?

18    A.   Yes.

19    Q.   It integrates the principles and methods of chemistry?

20    A.   Yes.

21    Q.   Biology?

22    A.   Yes.

23    Q.   Pharmacology?

24    A.   Yes.

25    Q.   Physiology?

1   A.   Yes.

2   Q.   And medicine, right?

3   A.   Yes.

4   Q.   But not in that list is pathology, right?

5   A.   No.

6   Q.   You are not trained in pathology?

7   A.   No.

8   Q.   You have no experience in pathology?

9   A.   I took pathology as a training in medical school.  It was

10  not a specific class.  I did not have a fellowship nor

11  residency in pathology.

12  Q.   So you have no experience in pathology, correct?

13  A.   No.

14  Q.   You are not a coroner?

15  A.   No.

16  Q.   Never have written an autopsy report?

17  A.   No.

18  Q.   Never performed an autopsy?

19  A.   No.

20  Q.   That's what pathologists do, correct?

21  A.   Yes.

22  Q.   And pathologists not only perform autopsies, which not only

23  determine cause of death, but they also may discover

24  information about genetic progression of diseases, correct?

25  A.   Yes.

1  Q.  Now, determining cause of death involves much more than

2  merely determining a person's blood concentration level,

3  correct?

4  A.  Yes.

5  Q.  Now, you were asked to give an opinion about the effects of

6  certain drugs in this case, right?

7  A.  Yes.

8  Q.  And your opinion today is that the drug interactions in the

9  cases that you reviewed could and did result in respiratory

10  depression and death?

11  A.  Yes.

12  Q.  Now, if a pathologist were to disagree with you on your

13  conclusions, you would just take issue, right?

14         MR. WRIGHT:  Objection.

15         THE COURT:  Sustained.

16  Q.  Now, as an emergency medicine doctor, an ER doctor -- can I

17  say it like that?

18  A.  Yes.

19  Q.  You've never seen a patient more than one time, have you?

20  A.  That is not correct.

21  Q.  Well, you don't treat patients in the ER over long periods

22  of time, correct?

23  A.  Correct.

24  Q.  You don't take care of continuing chronic problems in the

25  ER, correct?

1  A.    Incorrect.

2  Q.    So in the ER, it is your testimony that you care for

3  chronic pain patients over a long period of time?

4  A.    No.

5  Q.    Now, your resume -- and you've testified that you are board

6  certified in emergency medicine, right?

7  A.    Yes.

8  Q.    And clinical toxicology or medical toxicology?

9  A.    Yes.

10 Q.    And we say medical or clinical toxicology because there are

11 all different types of branches of toxicology, isn't there?

12 A.    Yes.

13 Q.    But your specific area is clinical/medical toxicology,

14 right?

15 A.    Yes.

16 Q.    And that involves interpreting drug concentrations, which

17 is used to treat and give prognosis of patients, right?

18 A.    Yes.

19 Q.    In other words, you don't, on a regular basis, deal with

20 dead people?

21 A.    No.

22 Q.    And as a clinical medical toxicologist -- well, let me ask

23 this:   There are various types of or parts of toxicology; the

24 study of toxicology, right?

25 A.    Yes.

Q.   And forensic toxicology is one of those parts?

A.   Yes.

Q.   And you are not board certified in forensic toxicology, are you?

A.   No.

Q.   You are not a member of the American Board of Forensic Toxicology?

A.   No.

Q.   Nor are you a member of the American College of Forensic Toxicology, right?

A.   No.

Q.   In the field of forensic toxicology, and I know your area is medical clinical toxicology, but in the field of forensic toxicology, there is a branch of it or a field of forensic toxicology that deals with postmortem toxicology, right?

A.   Yes.

Q.   And postmortem toxicology, under the umbrella of forensic toxicology, involves interpreting postmortem drug concentrations to determine whether the drugs had an effect on cause of death, right?

A.   Yes.

Q.   And you would agree that you have had no specific training or experience in the field of forensic toxicology, right?

A.   No.

Q.   So you've been trained and your experience is as a treating

1    physician who deals with the effects of certain drugs on living

2    people, primarily?

3    A.    Yes.

4    Q.    And because you're not a pathologist or involved in

5    forensic toxicology, you can't say what value is placed on a

6    toxicology report by a pathologist or medical examiner,

7    correct?

8    A.    No.

9    Q.    Now, we're going to get into the specifics, but I want to

10   ask you an overall question for my understanding.  Is it your

11   testimony that if a person is on any of the combination of

12   drugs that we've seen in the Power Point and they died, that

13   the drugs caused their death?  Is that your testimony?

14   A.    Is any person that's on those drugs --

15   Q.    And they die.

16   A.    Is that the only cause of their death?

17   Q.    Would you attribute the drugs to the cause of death?

18   A.    No.

19   Q.    Are you saying that in this case, though -- I guess I

20   didn't ask my question very artfully.

21          My question is:  In this case, given the combinations of

22   drugs, is it your testimony that because of the combination of

23   drugs, that the person -- the cause of death are the drugs?

24   A.    The combination of the drugs, coupled with their co-morbid

25   factors, yes.

1  Q.  And is it your testimony that if a patient is on any of

2  those combination of drugs and they don't die, that they're

3  soon going to die?

4  A.  Not soon going to die.  They have an increase in risk to

5  have adverse respiratory effects.

6  Q.  So, in other words, if they're on this combination of

7  drugs, they're going to die, is that what you're saying?

8  A.  No.

9  Q.  So the combination of the drugs that we've seen, you're not

10  saying necessarily has to cause death, right?

11  A.  Correct.

12  Q.  Now, just asking a few questions about your education, I

13  know that you have -- you testified that you graduated from

14  Wright State University School of Medicine?

15  A.  Yes, ma'am.

16  Q.  And that was in 2001?

17  A.  Yes.

18  Q.  So that was ten years ago?

19  A.  Yes.

20  Q.  And you completed a fellowship, right, after that?

21  A.  I completed residency first and then a fellowship.

22  Q.  And you weren't an attending or treating physician while

23  you were completing your fellowship, were you?

24  A.  I was an attending physician.

25  Q.  You was?  Where?  I'm sorry.

1  A.   Where was I an attending physician?

2  Q.   Yes, sir.

3  A.   At Jewish Hospital and at University of Cincinnati.

4  Q.   Okay.   And so you've been an attending treating physician

5  for how long?

6  A.   Since I graduated from my residency.

7  Q.   Which was in?

8  A.   I'm sorry.  I blanked out, I apologize.   2004.

9  Q.   So you actually have been a treating attending physician

10  for almost five years, if my math is right?

11  A.   Yes, ma'am.

12  Q.   And you said that your fellowship consisted of telephone

13  consults regarding drug interactions?

14  A.   As well as bedside consultations, correct.

15  Q.   As well as bedside consultations.   And bedside

16  consultations in a hospital setting?

17  A.   Yes.

18  Q.   And were those bedside consultations in the hospital

19  setting for chronic pain patients?

20  A.   There was no differentiation of the patients.   They were

21  for whatever was the suspected overdose.

22  Q.   So you can't say?

23  A.   Every patient that I've seen may or may not have been a

24  chronic pain patient.   They were on a variety of toxins.

25  Q.   Understood.   But my question is:   How many of those

1  patients that you saw at bedside consultation were chronic pain
2  patients, if you know?
3  A.  I can't give you a number.
4  Q.  Speaking of chronic pain, you are not a pain management
5  doctor, correct?
6  A.  Correct.
7  Q.  You received no training in pain management, correct?
8  A.  Correct.
9  Q.  And no education in pain management, right?
10 A.  Correct.
11 Q.  Have you even been to a seminar regarding pain management
12 or chronic pain issues?
13 A.  I have been to seminars dealing with the toxicology of
14 opiate management and sedative management, and that would be
15 inclusive of patients that have chronic pain.
16 Q.  And you're not board certified in pain management, correct?
17 A.  No.
18 Q.  But you are board certified in emergency medicine?
19 A.  And medical toxicology.
20 Q.  And medical toxicology.  Can you just describe what that
21 means, board certified?
22 A.  It means I completed a residency in emergency medicine.  I
23 took an oral board and written board.  I'm a practicing
24 emergency physician with that.
25     The medical toxicology, I took a written board.

1  Q.  And in the medical field, being board certified is high

2  honors, right?

3  A.  I would say it is distinguished, yes.

4  Q.  Distinguished honors.  I mean, if your -- most hospitals

5  and practice groups want someone who is board certified in a

6  field, correct?

7  A.  Correct.

8  Q.  Because it means a lot, right?

9  A.  It means something.

10  Q.  Well, you've done extra training, you've done extra testing

11  to be above those who haven't, correct?

12  A.  Correct.

13  Q.  But in some -- all of your employment and your experience

14  has pretty much been in emergency medicine and medical

15  toxicology, right?

16  A.  Yes, ma'am.

17  Q.  You stated that just last week you had someone in the ER

18  who overdosed?

19  A.  Correct.

20  Q.  Was that overdose due to oxycodone or hydrocodone?

21  A.  It was a combination of oxycodone, heroin and Xanax.

22  Q.  You stated that you were -- you've been published.  Can you

23  tell the jury what that means?

24  A.  Well, I published a textbook article on insulin

25  sulfonylurea toxicity.  So I published those textbook chapters

1    when I was a medical student with an attending toxicologist.  I

2    have also written articles on urinary obstruction, which was

3    published.  I am currently writing manuscripts with several

4    other physicians.

5    Q.   On what topic?

6    A.   On what topic?

7    Q.   Yes, sir.

8    A.   Toxicology.

9    Q.   Have you ever written any articles about chronic pain

10   issues or pain patients?

11   A.   No.

12   Q.   Now, you mentioned -- I believe we'll get into it a little

13   bit in more detail, but I believe you mentioned that there was

14   a publication that you relied on in forming your conclusion.

15   I'm not saying the only, but you relied on it, Baselt?

16   A.   Baselt is a textbook that was one of many resources that I

17   looked at.

18   Q.   And in looking at that textbook for the support of your

19   conclusions, you were looking at ranges of therapeutic and

20   toxic levels of drugs?

21   A.   I was utilizing that, amongst several articles, correct.

22   Q.   And when you looked at that Baselt, B-a-s-e-l-t, I may not

23   be pronouncing it correctly, textbook, Baselt actually

24   describes ranges, therapeutic and toxic ranges of drugs for

25   opiate-naive people, correct?

1  A.   That's why I mentioned the articles that I looked at.

2  Q.   But is that correct?

3  A.   It is representative of a variety of patients.   Baselt was

4  the least important resource that I used.

5  Q.   I didn't ask you how much value you placed on it yet,

6  Doctor Policastro.   I just asked you simply does Baselt give

7  you ranges for therapeutic and toxic levels for people that are

8  opiate-naive?

9  A.   I would have to review the resource again.

10 Q.   So you don't remember?

11 A.   I do not recall specifically.   Baselt accumulates other

12 articles and reports the values that is reflected in those

13 articles.   I would have to relook at every specific article

14 that it mentioned in that.

15 Q.   But you would agree with me that Baselt does not deal with

16 therapeutic ranges for chronic pain patients, right?

17 A.   I would have to relook at the article as it relates to

18 those values.

19 Q.   Are you saying you don't remember?

20 A.   I'm stating I do not recall.

21 Q.   But it is a resource that you relied upon in forming your

22 conclusions here?

23 A.   It was one of 34 resources that I looked at.   I do not

24 recall the exact specifics of the articles that they mentioned

25 in the reference range.

1  Q.   So is that yes to my question?

2  A.   Is what yes?

3  Q.   You mentioned a medical phenomenon, for lack of a better

4  word, qualitative synergistic effect.   You've said it quite --

5  numerous times here.

6       What does that mean?

7  A.   It means that drugs that are present that act together.

8  Q.   That's it?

9  A.   It means exactly that.

10 Q.   Okay.   And the qualitative synergistic effect was the most

11 important factor in your conclusions that you spoke about

12 earlier, right?

13 A.   Given the other co-morbid factors, yes.

14 Q.   My question is it was the most important factor that you

15 used, that you considered, right?

16 A.   Yes.

17 Q.   Now, if I were to look up in one of the textbooks that you

18 mentioned, one of the 34 textbooks or resources, I'm sorry,

19 that you said you relied on to give your opinion in this case,

20 where would I find the qualitative synergistic effect

21 phenomenon?

22 A.   It is not specifically mentioned in those terms.

23 Q.   So I would not be able to find it, correct?

24 A.   You would be able to find evidence listed that combination

25 of multiple central acting agents is a significant risk factor

1   for overdose and respiratory depression.

2   Q.   So -- so qualitative synergistic effect, as you termed it,

3   would not be something that we might hear from another medical

4   personnel that came in here?

5   A.   I can't speak to what other personnel would state to.

6   Q.   Is it something commonly referred to in your practice,

7   qualitative synergistic effect?

8   A.   As a toxicologist, yes.

9   Q.   So other toxicologists speak in those terms as well?

10  A.   Correct, the differentiation between a number and the drug

11  proper.

12  Q.   And do toxicologists oftentimes work in conjunction with

13  pathologists?

14  A.   Are you speaking about medical toxicologists or forensic

15  toxicologists?

16  Q.   Either.

17  A.   I can't speak who they work in conjunction with.  There's

18  meetings with, we have conversations with.

19  Q.   As a medical toxicologist, do you work in conjunction with

20  pathologists?

21  A.   On a routine basis, no.

22  Q.   And so is qualitative synergistic effect a term that a

23  pathologist would readily hear?

24  A.   I can't speak to what a pathologist would regularly hear.

25  I'm not a pathologist.

1  Q.   Now, I believe you stated that this was your first court

2  appearance where you've been qualified as an expert, right?

3  A.   Yes, ma'am.

4  Q.   And how many times have you been consulted for expert

5  testimony in a court case?

6  A.   How many times total?

7  Q.   Yes, sir.

8  A.   Four.

9  Q.   And have they all been on behalf of the government?

10  A.   No.

11  Q.   Have they been civil cases?

12  A.   Two were.

13  Q.   So two cases were civil and two were criminal?

14  A.   Correct.

15  Q.   Now, Doctor, you would agree with me that untreated pain is

16  a serious problem in our country, correct?

17  A.   Yes.

18  Q.   In fact, experts agree that tens of millions of Americans

19  suffer from either undertreated or untreated pain, right?

20  A.   I don't know where you're getting that statistic, but, yes,

21  people are in pain that have not been treated.

22  Q.   And -- well, I'm not really saying a statistic, but I'm

23  saying that tens of millions -- do you know that tens of

24  millions of people, Americans, suffer from either undertreated

25  or untreated pain?  Have you even heard that before?

1  A.  I've heard that people have undertreated pain.

2  Q.  Have you heard of those numbers before?

3  A.  I would have to see your resource.  I'm not exactly sure

4  where you're using that from.

5  Q.  I'm just asking you, have you heard that?

6  A.  I don't know your statement, where it was qualified in a

7  medical journal.  Are people treated that have untreated pain?

8  Yes.

9  Q.  Well, let me ask this:  Have you heard of the American Pain

10  Foundation?

11  A.  I'm not familiar with it.

12  Q.  You don't know that that's a professional organization of

13  pain specialists?

14  A.  I'm not a pain specialist.

15  Q.  Well, let me ask this:  The medical field of treating

16  chronic pain was fairly in its infancy back in 2005, correct?

17  A.  I can't speak to what the field was in its infancy.

18  Q.  Because you don't know about chronic pain or pain

19  management?

20  A.  I am not a pain physician.

21  Q.  So you're not really here today to speak on opiate therapy

22  then, opioid therapy then, correct?

23  A.  No.

24  Q.  Because you can't; you're not trained or educated in that

25  field?

1  A.  Correct.

2  Q.  Now, I believe you stated -- correct me if I'm wrong --

3  that you have treated chronic pain patients in the ER?

4  A.  Chronic pain patients presenting to the emergency

5  department, yes.

6  Q.  And you've treated them?

7  A.  Yes.

8  Q.  Isn't it true that the American Society For Pain Management

9  recommends that when treating chronic pain patients, the dose

10  of opiate should be increased by between 50 and 100 percent at

11  each visit until the pain is alleviated?

12  A.  You're speaking of an outpatient therapy that I cannot

13  speak to, nor an organization that I'm a member of.

14  Q.  Because ER is not an outpatient -- isn't ER an outpatient

15  facility?

16  A.  It's connected to a hospital.  Depending upon where I work,

17  a large percent of those patients will be admitted to the

18  hospital.

19  Q.  But most people come to the ER, get patched up and they're

20  out, right?

21  A.  I would not agree with that.

22  Q.  Okay.  Well, some people come to the ER, get patched up and

23  they're out, right?

24  A.  A certain percentage of those patients, correct.

25  Q.  Okay.  And so my statement about the recommendation for

1   increasing dosages of opiate levels, you said you would not

2   know about because I'm speaking about an outpatient?

3   A.   By what -- the statement that you made, you were talking

4   about outpatient chronic pain management.

5   Q.   What's the difference between outpatient chronic pain

6   management and where you are?

7   A.   You referred to a continuing of care, an acceleration of

8   that care.   Where I practice would be acute management of that

9   chronic pain.   If I'm making significant adjustments to those

10  medications and if they had a pain treating physician, I would

11  contact them.

12  Q.   What if they don't?

13  A.   Well, then who is prescribing their chronic pain medicine?

14  Some physician is.   And I would contact that physician.

15  Q.   When you looked at the recommended dosages for and

16  schedules of drugs that Doctor Volkman prescribed in this

17  case -- you did do that, right?

18  A.   Did I look at his prescriptive dosing?   Yes.

19  Q.   Okay.   And where did you research to determine the

20  recommended dosages and schedules for the drugs involved in

21  this case?

22  A.   I didn't research specifically the recommended dosages.   It

23  is part -- it was part of my clinical training, as well as

24  within the resources with regards to the kinetic data of the

25  drugs.

1  Q.   Okay.  Slow down because you lost me here.  So when you

2  looked at the dosages and the various drugs involved in this

3  case --

4  A.   Yes.

5  Q.   -- you're saying that you never researched what the

6  recommended dosages were for those types of drugs?

7  A.   Your statement is confusing to me.  What I relied upon was

8  what is the pharmacology action of those drugs.  Irrespective

9  of the dose proper, there's a specific kinetic data of those

10 drugs.

11 Q.   So -- and I'm not trying to put words in your mouth.  Does

12 that mean that you didn't consider nor was it important what

13 the recommended dosages and schedules were for the drugs that

14 you evaluated in this case?

15 A.   It is important.  But you asked me did I consult a specific

16 single resource to determine what that dosing schedule is.

17 Q.   And you did not?

18 A.   I utilized all of the resources that were noted in my

19 report, plus my clinical training.

20 Q.   You would agree that chronic pain can be brought on by a

21 wide variety of illnesses, correct?

22 A.   Yes.

23 Q.   Like cancer?

24 A.   Yes.

25 Q.   Low back disorder?

1  A.   Yes.

2  Q.   Rheumatoid arthritis?

3  A.   Yes.

4  Q.   Shingles?

5  A.   Yes.

6  Q.   Post-surgical pain?

7  A.   A variety of conditions, yes.

8  Q.   Trauma?

9  A.   Yes.

10 Q.   Fibromyalgia?

11 A.   There is significant debate if fibromyalgia is a

12 significant disease per se, but it is an observed rheumatologic

13 phenomenon.

14 Q.   A lot of various illnesses can cause chronic pain, correct?

15 A.   Yes.

16 Q.   And again, you would agree that chronic pain is

17 undertreated?

18 A.   Chronic pain exists.  It should be treated.  I don't know

19 if it is overtreated or undertreated.  I can't affirm that

20 statement nor deny it.

21 Q.   Why not?

22 A.   What is your source from you stating that chronic pain is

23 undertreated?

24 Q.   So you're saying that you just can't make a determination

25 whether it is undertreated or untreated in this country?

A.    Correct.  It's treated, it's undertreated -- patients have
pain, patients need to be treated for pain.  I don't know the
proportionality, incidence or prevalence of chronic pain that's
treated or untreated.

Q.    What are some of the common physical characteristics of a
person who may have unrelieved pain?  Can you describe that for
the jury?

A.    Patients that have un--

Q.    Unrelieved pain.  What are their physical characteristics?

A.    Variance upon the patient.

Q.    What are some of the characteristics?

A.    There may be grimacing, there may be posturing.  They may
be laying supine, they may be agitated, hostile, they may be
flat in their affect.  They may have a variety of conditions
that would present that way.

Q.    Can they also appear to be a drug seeker?

A.    Patients could have any appearance.  I wouldn't necessarily
describe what you stated.

Q.    But one of the characteristics could be that they appear to
be a drug seeker, right?

A.    Yes.

Q.    And someone who has unrelieved pain who may appear to be a
drug seeker could potentially look like a drug addict to a
nonmedical person, right?

A.    I can't speak to what they would look like to a nonmedical

1  person.

2  Q.   Could they look like a drug addict to a medical person?

3  A.   Anyone could look like anything to anyone.

4  Q.   Now, we're going to get to the slide in a minute, but you

5  testified about a number of factors that would concern you in

6  prescribing pain narcotic medicine.

7       Do you remember?

8  A.   Yes.

9  Q.   And it's not against the law or inappropriate to prescribe

10  pain medication to a pain patient who has had a history of drug

11  abuse, is it?

12  A.   No.

13  Q.   It is not against the law or necessarily inappropriate to

14  prescribe pain medication to someone who is obese, correct?

15  A.   No.

16  Q.   And I'm not going to go through all the other factors that

17  you talked about that concern you, but my point is, it is a

18  case-by-case determination, right?

19  A.   Correct.   There should be caution in prescribing

20  medications to patients that have specific disease states.

21  Q.   So you're not -- you didn't testify to the jury that if a

22  patient has some of these physical attributes that would

23  concern you that you wouldn't treat them?

24  A.   No.

25  Q.   You would treat them for their pain, correct?

1  A.   Correct.

2  Q.   Despite obesity, right?

3  A.   Correct.

4  Q.   Or drug history?

5  A.   Correct.

6  Q.   Or any of the other factors you've mentioned, right?

7  A.   Correct.

8  Q.   What about heart disease?  If a patient presented and they

9  were an established chronic pain patient and they had a history

10 of heart disease, would you not prescribe pain medication for

11 their pain?

12 A.   There's a double negative there.  I would prescribe pain

13 medication.

14 Q.   Okay.  I'm sorry, I didn't mean to be confusing.

15      Can we talk about dependence versus addiction for a moment?

16 There is a difference, correct --

17 A.   Yes.

18 Q.   -- between physical dependence and addiction, right?

19 A.   Yes.

20 Q.   And a patient who is incapacitated by pain will necessarily

21 become dependent on their pain medication, right?

22 A.   It's possible.

23 Q.   If a person's in pain and the pain medicine gives them

24 relief, then their body will become dependent on that

25 medication to provide relief, right?

1   A.   Other modalities can be used for pain relief other than

2   pain medication.

3   Q.   I understand, but I'm only talking about pain medication.

4   A.   Yes.

5   Q.   And that's quite different from addiction, though, right?

6   A.   Correct.

7   Q.   Can you describe for the jury the difference?

8   A.   What is the difference between addiction and physical

9   dependence?

10  Q.   Yes, sir.

11  A.   Addiction would be individuals that attempt to make

12  mechanisms by which to continue to achieve a specific agent.  I

13  mean, anything can be an addiction per se.  So I am not --

14  Q.   Fair enough.  With regard to pain medication, addicts will

15  take some of the drugs that we've seen in this case for a

16  euphoria, a euphoric feeling, to get high, right?

17  A.   Maybe or maybe not.  They will also try to prevent the

18  physical withdrawal of that agent.  So they may not have a

19  euphoric feeling with it.  It is to prevent, as you mentioned

20  before, a physical dependence.

21  Q.   But the difference between the addict and the pain patient,

22  the established pain patient, is that the established pain

23  patient doesn't get the euphoric high from the medication; is

24  that right?

25  A.   I would not state that.

1  Q.   So your testimony is that they do get high off of their

2  pain medication that they're dependent upon?

3  A.   I'm not suggesting that they may or may not.  A level of

4  euphoria is not necessarily different between someone that's a

5  chronic pain management patient and an addict, per se.

6  Q.   So if a person is a chronic -- established chronic pain

7  patient and they have built up tolerance for their medication,

8  do they still get the high or the euphoria, is that your

9  testimony?

10  A.   They may or may not.  I can't state definitively.  Just

11  because you have a tolerance to sedation doesn't mean that you

12  don't have euphoria.  Just because you have a tolerance and

13  require an increasing dose does not mean that there's not an

14  associated euphoria.

15  Q.   So there could be euphoria?

16  A.   Yes.

17  Q.   Now, help me with the testimony that you said -- I believe

18  you said there's no tolerance to respiratory depression,

19  correct?

20  A.   No, I did not say that.

21  Q.   You did not say that?

22  A.   There is tolerance to respiratory depression after a

23  certain period of time.

24  Q.   Okay.

25  A.   I don't believe I ever said that there's no tolerance to

1   respiratory depression.

2   Q.   That's fair, I may have written it down wrong.   But your

3   testimony is that there is tolerance to your -- what does that

4   mean, tolerance to respiratory depression?

5   A.   So after you take a medication, and we'll specifically

6   speak of opiates, within days to perhaps even as short as hours

7   per se, you have an initial increase in your respiratory rate

8   to the sedation and decreasing your breathing.   So as a result

9   of that, you will increase -- your body will make an adaptive

10  response.

11      Over time, you tolerate the greater and greater levels of

12  the carbon dioxide, that's tolerance to the respiratory

13  effects.   However, that is not a ceiling effect.   Unlike with

14  the pain medication effect that you're talking about, that you

15  can continue to escalate the doses and perhaps never achieve

16  pain management, but you are limited in the respiratory

17  depressant effects of that drug.   It will occur.

18  Q.   So, on the one hand, there's no ceiling for prescribing

19  opiates to treat pain, correct?

20  A.   Correct.

21  Q.   The FDA has not put a ceiling on how much you can

22  give/prescribe, right?

23  A.   Correct.

24  Q.   All right.   But, on the other hand, you're saying that a

25  patient who has become tolerant on the medication also becomes

1  tolerant to respiratory depression?

2  A.   Correct.   But tolerance is not a ceiling effect for

3  respiratory depression.

4  Q.   Okay.   What does that mean?  Break it down.

5  A.   The -- unlike the pain value, where you can continue to

6  escalate, you can't continue to escalate towards eternity

7  because at some point in time you will stop breathing because

8  the carbon dioxide level continues to elevate and that oxygen

9  level will decline.

10 Q.   Okay.   But as we speak, there's been no ceiling on

11 prescribing dosages for opiates to treat pain, right?

12 A.   The dosages have to be taken into account with the

13 frequency of administration.   The actual quantity dosages that

14 you're speaking of, correct, there is no ceiling effect on --

15 to achieve that, based off of numbers.   However, as I

16 mentioned, the interval frequency of administering those drugs

17 will be important with regards to that side effect profile.

18 Q.   Okay.   And we're going to get into that.   I'm just trying

19 to get to the very simple answer whether or not there's a

20 ceiling of prescribing opiates by the FDA.

21 A.   There is no quantity value associated with prescribing pain

22 medicines to achieve pain relief.   You are limited by the side

23 effect profile.

24 Q.   Okay.   Now, in formulating your opinion that you have given

25 today, one of the considerations has been the toxicology

1    report, correct?

2    A.   It is one of a number of factors, correct.

3    Q.   And you would agree with me that there are at least 58 pain

4    relief drugs that contain oxycodone, correct?

5    A.   You mean under multiple formulations that contain

6    oxycodone?

7    Q.   Yes, sir.

8    A.   Yes.

9    Q.   I'm saying it in a real --

10   A.   I don't know the exact.

11   Q.   -- elementary level so I can answer.  But there are a

12   number of drugs, pain relief medications, that contain

13   oxycodone, right?

14   A.   There are multiple formulations, correct.

15   Q.   I mean, more than 50?

16   A.   I don't know the exact number.  There's -- if it has

17   oxycodone in it, then it is oxycodone.

18   Q.   So no matter what the level of oxycodone is in a

19   medication, if it has oxycodone in it, it is oxycodone?

20   A.   No, the milligram dosages would be different.  I mean, the

21   potency of that medication due to the milligram dosages would

22   be different.  But oxycodone is oxycodone.

23   Q.   Okay.  So I'm just trying to make sure that we're all on

24   the same page as we continue.

25        There are various drugs that contain oxycodone, right?

1  A.   Yes.

2  Q.   And if it contains oxycodone, you would consider it to be

3  oxycodone?

4  A.   Yes.

5  Q.   Okay.   Now, there's no chemical test to distinguish this

6  pill that may have oxycodone in it versus this pill that may

7  have oxycodone in it, correct?  When you see the tox result, it

8  is just going to say oxycodone, right?

9  A.   Yes.

10  Q.   I would like to talk with you next about opiate blood

11  levels.

12  A.   Okay.

13  Q.   Opioid blood levels.   And when I say that term, what does

14  that mean?

15  A.   Are you speaking about premortem or postmortem?

16  Q.   Because there's a difference, right?

17  A.   Yes.

18  Q.   What is antemortem?

19  A.   Antemortem is before death.

20  Q.   Okay.   And what is postmortem?

21  A.   After death.

22  Q.   All right.   Now, you would agree that prescribed opioids is

23  an aggressive drug therapy, right?

24  A.   According to the World Health Organization for pain

25  management, yes, it is at a stepwise progression.

1  Q.   And like any other area of medicine or therapy, there must

2  be a method of measuring the effectiveness and proper usage of

3  prescribed opiates, correct?

4  A.   Yes.

5  Q.   And determining blood levels is a primary way of doing

6  that?

7  A.   No.

8  Q.   No?  What's a primary way of doing that?

9  A.   It is one of the ways.  I would not necessarily say it is

10 the primary way.  If you have multiple drugs that you're taking

11 simultaneously, a single concentration would not be indicative

12 of toxicity.

13 Q.   So determining blood levels is a way --

14 A.   It is a way.

15 Q.   -- of determining or measuring the effectiveness and the

16 proper usage of opiate therapy?

17 A.   I don't know about effectiveness nor the proper usage.  It

18 is a way of measuring.

19 Q.   Okay.  And the factor of the blood level has to be taken in

20 consideration with the patient's condition, right?

21 A.   As well as other drug therapy, correct.

22 Q.   So you do look at the age and the sex of the person and the

23 weight and the cause of pain and things like that, right?

24 A.   Yes.

25 Q.   You also look at how long they've been on the opioid drug

therapy?

A.    Yes.

Q.    And when you look at all of those factors, you can determine tolerance, can't you?

A.    It is one of the potential mechanisms for determining tolerance, yes.

Q.    And you would agree with me that looking solely at prescription amounts without blood level information to determine tolerance is inadequate, right?

A.    No.

Q.    So is it your testimony that you can determine tolerance by either just looking at blood levels or solely looking at prescription amounts?

A.    No.

Q.    You have to use both, right?

A.    You assert that the blood level is the only mechanism by which to determine tolerance outside of the prescription.  The blood level is the blood level.  If there's other multiple medications simultaneously with it, that blood level value in isolation does not mean much.

Q.    So I am not sure that you answered my question, which was: You would agree that looking solely at prescription amounts without the blood levels to determine tolerance is inadequate?

A.    I can't answer your question the way you phrased it.  If you're asking me, for example, with the oxycodone, if you have

1  an oxycodone blood level and you're on four other medications,

2  does that single oxycodone value show tolerance?  No.   Does

3  that value -- can it be interpreted, even if it is high or low,

4  as toxic?  No, because there's multiple mitigating factors with

5  that.

6  Q.   You also need to look at the person's entire medical file,

7  right?  To determine tolerance, that's what we're talking

8  about.

9  A.   It is significantly helpful, yes.

10  Q.   The medical records?

11  A.   Yes.

12  Q.   Now, chronic pain patients can function and they may

13  function well if they are tolerant to high dosages of opioids,

14  right?

15  A.   Are they only on opioids?

16  Q.   Well, let's just -- in my question, yes.

17  A.   Yes.

18  Q.   And they can tolerate high dosages of opioids, we're

19  talking about chronic pain patients, if they're on other

20  medication, too, correct?

21  A.   Yes.

22  Q.   Why did you make me separate those out?

23       All right.  Now, comparing chronic pain patients to, let's

24  say, opioid naive patients, people who are not tolerant to high

25  dosages, are you familiar with Forest Tennant's blood study on

1   opiate blood levels?

2   A.   I read it.

3   Q.   And that study deals with high dosages of opioids for

4   chronic pain patients, right?

5   A.   First -- yes, it does.

6   Q.   And in that study, the opioid blood concentrations clearly

7   showed that patients become tolerant to high opioid drug

8   dosages and can physically function well?

9   A.   I would not use the word "clearly."

10  Q.   Okay.  Let me take that word out and just say that that

11  study showed that opioid blood concentrations show that

12  patients who were tolerant -- and let me just rephrase that,

13  because my question is becoming jumbled.

14       Tell me what that study showed.

15  A.   First off, the study was conducted -- it was a horrible

16  study.

17  Q.   Why?

18  A.   Well, several reasons:  Number one, it is a nonindexed

19  journal.  It was not necessarily peer reviewed, per se.  It was

20  subjective reports by a few pain physicians who subjectively

21  pulled data on a few patients.

22       There was no specific control for laboratory values, there

23  was no specific single control on where they were sent.  There

24  was no characteristics and comparisons to other patients.  They

25  were subjective reports, asked for submission by the author of

1    that paper.

2    Q.   And you've said that the author of the paper was a pain

3    specialist?

4    A.   I didn't say what he was.  I didn't know.  It is not an

5    indexed journal.  Until I received it, it was --

6    Q.   Is it your testimony that Forest Tennant is not --

7    A.   I don't know who he is.

8    Q.   So I thought you just said that this was a paper and a

9    study done by pain specialists.

10   A.   Correct.

11   Q.   Okay.  And you're just saying you don't know who Forest

12   Tennant is?

13   A.   I'm saying that he was the author of the paper, if he was a

14   pain physician, because he requested other pain physicians,

15   yes.  I don't know his training, background.  It was not

16   submitted in the paper.

17   Q.   Okay.

18   A.   But the paper asserts subjective conditions in subjective

19   patients with isolated blood concentrations with a single drug.

20   Q.   But it was a study done?

21   A.   It was a study, yes.  It was a subjective study written in

22   a nonpeer reviewed journal that's not indexed in the National

23   Library of Medicine.  I could not pull that paper up at all.

24   Q.   So obviously you didn't rely on it, correct?

25   A.   Well, you can't compare the plasma concentrations of a

1  living person to a postmortem concentration.

2  Q.   That's not my question.

3  A.   I did not rely upon it, no.

4  Q.   Now, you testified that various toxic levels or fatal blood

5  concentration levels were indicated for various patients here,

6  correct?

7  A.   I reported the values that were obtained in the literature

8  that I reviewed, and I reported what the concentrations were

9  from the toxicology reports.

10  Q.   I'm sorry.  I'm trying to figure out, was that a yes?

11  A.   Yes.

12  Q.   And those levels, those toxic levels, you said, you know,

13  in your report, and we're going to get to it, that the levels

14  were toxic for certain individuals, right?

15  A.   I stated that they were within the spectrum that was

16  reported for toxic concentrations for that drug.

17  Q.   And those levels, though, that were reported don't take

18  into account dosage regimes for chronic pain patients, right?

19  A.   Not all of them.  The studies that I looked at did not

20  necessarily differentiate between acute and chronic pain

21  patients.  The article by Spiller, et al., looked at findings

22  specifically with regards to the hydrocodone and oxycodone

23  concentrations.  A subcategorization of those patients included

24  therapeutic misadventure, which means they were prescribed this

25  for a period of time.  I don't know the chronicity of that.  It

was not asserted in any of the papers, chronicity versus acute.

Q.   So when you looked at the information that you researched

to determine whether or not these levels were toxic or

therapeutic, you can't say whether these levels involved or

spoke to chronic pain patients, right?

A.   I cannot exclude them nor include them completely.  They

were values reported for a range of patients that died as a

result of suspected oxycodone or hydrocodone toxicity.

Q.   So, Doctor Policastro, when you say you can't exclude them

or include them, is that a fancy way of just saying I don't

know?

A.   Meaning exactly that, yes.

Q.   So the comparative levels that you described in your

testimony about what was toxic and what was therapeutic may

actually be therapeutic levels for chronic pain patients or

drug-tolerant patients, right?

A.   Yes.

Q.   Turning your attention to the toxicology reports.

A.   Yes.

Q.   You didn't examine any of the worksheets of the labs that

wrote out the reports, correct --

A.   No.

Q.   -- that produced the results?

A.   No, all I had was the report.

Q.   So you basically accepted the report at face value, right,

1  because that's all you had?

2  A.   Yes.

3  Q.   Now, correct me if I'm wrong.   Did I understand your

4  testimony to be that while you looked at toxicology reports,

5  they weren't significant in making your -- giving your opinion?

6  A.   I didn't say they were significant or insignificant.   I

7  said they were one of the tools that I listed in evaluating the

8  patients.   There was a value reported, I reported what the

9  value was.   I showed when there was postmortem redistribution,

10  I asserted that, and where was the sample if it was not a

11  known sample site, which could also create artificial

12  elevation.

13  Q.   But it is true that you gave an opinion in some cases where

14  you didn't even have a toxicology report, correct?

15  A.   If there were factors --

16  Q.   Is that a yes?

17  A.   Yes.

18  Q.   And, again, that's because your opinion is based on the

19  qualitative synergistic effect of the drugs?

20  A.   Yes.

21  Q.   So the tox reports, since you didn't have them in some of

22  the cases, really weren't your main focus, then, correct?

23  A.   They were a component of them.   They were not main or

24  diminutive or excessive.   They were there.

25        MS. CROSS:   Your Honor, I think I'm good on time.

1        THE COURT:   Okay.

2   Q.   In the course of caring for living patients --

3   A.   Yes.

4   Q.   -- you often interpret hospital lab tests?

5   A.   Yes.

6   Q.   And in doing so, you can easily find out the normal value

7   of a particular drug, right?

8   A.   I'm not understanding your question.

9   Q.   Well, when you interpret hospital lab reports, you can

10   determine what the value of a particular drug is?

11   A.   That doesn't mean it's toxic or not toxic.

12   Q.   No, I'm just saying that you can determine what the -- you

13   can have an accurate assessment of what the value is, that's

14   all I'm asking.

15   A.   They may report a range, they may not.  But yes, most often

16   time they report a range of normalcy.

17   Q.   But when someone dies, the blood is not circulating,

18   correct?

19   A.   Correct.

20   Q.   And so the noncirculating blood after death is not the same

21   as the circulating blood when someone is alive, correct?

22   A.   Correct.

23   Q.   And a single blood concentration level in a living body can

24   be different postmortem, correct?

25   A.   Yes, yes.

1  Q.   In other words, a single blood concentration level in a
2  living person can be different than when they are dead?
3  A.   Yes.
4  Q.   And oftentimes those levels are different, correct?
5  A.   Yes.
6  Q.   In fact, studies have shown that postmortem blood, blood
7  after you die, noncirculating blood, concentration levels don't
8  correlate directly with blood concentrations before the person
9  died?
10 A.   Correct.
11 Q.   Now, a lot goes into the interpretation of postmortem blood
12 concentration levels, right?
13 A.   Yes.
14 Q.   And there's a phenomenon called postmortem redistribution?
15 A.   Yes.
16 Q.   And postmortem redistribution can actually distort to
17 toxicology results, right?
18 A.   Yes.
19 Q.   And when we talk about postmortem redistribution, what
20 we're talking about is drugs moving in the body when you're
21 dead?
22 A.   Yes.
23 Q.   So drugs being in a certain place in the body when you're
24 alive, but as soon as you decease, they move?  That's what
25 we're talking about, postmortem redistribution, right?

1  A.   Yes.

2  Q.   And you would agree with me that there is no proven

3  mechanisms for determining postmortem redistribution?

4  A.   Yes.

5  Q.   It could be because of lividity or some other cause, right?

6  A.   The factors that have been attributed to postmortem

7  redistribution are dependent upon the characteristics of the

8  drugs themselves is what has been assumed.  I mean, yes,

9  dependent positions and shifts in fluids could also create that

10  and there's no specific single mechanism associated with it,

11  correct.

12  Q.   And so without adequate evaluation of, I guess, kinetic

13  data, movable -- how drugs move, without any information about

14  that, investigative information and consideration of postmortem

15  changes, you could have misinterpretation, couldn't you?

16  A.   Yes.

17  Q.   It's important, you would agree, that -- it's important to

18  interpret correctly those types of blood levels and postmortem

19  redistribution, take that into consideration because it can

20  just skew the results totally of toxicology reports, right?

21  A.   Yes.

22  Q.   Now, with chronic drug use or tolerance, tolerance cannot

23  be measured or estimated after death, can it?

24  A.   No.

25  Q.   You can only determine tolerance when someone is alive,

1    right?

2    A.   Yes.

3    Q.   So if the blood concentration at the time of someone's

4    death can't be known, then how is it possible to extrapolate

5    the time and amount of drug ingested before death?

6    A.   You cannot.

7    Q.   You can't?

8    A.   Correct.

9    Q.   Can a medical examiner do that?

10   A.   No one can do that.  It is inaccurate to.

11   Q.   Why?

12   A.   Because the concentration plasma of an agent is equal to

13   the amount of drug divided by the volume of distribution times

14   the weight in kilograms.  The volume of distribution drug

15   postmortem is unknown.  So therefore the plasma concentration

16   before death cannot be accurately determined.

17   Q.   Okay.  And say that in layman's terms.

18   A.   The characteristics of the drug that make the drug move

19   around, that number is unknown at death.  As a result of that,

20   you cannot make an accurate determination of what that blood

21   concentration would be before death.

22   Q.   So this postmortem redistribution phenomenon is pretty

23   important when you're trying to determine cause of death and

24   you have drug blood levels, correct?

25   A.   Yes.

1  Q.  And in fact, after death, this phenomenon, postmortem

2  redistribution, can elevate levels that are on basically the

3  toxicology reports, right?

4  A.  Yes.

5  Q.  They can be skewed?

6  A.  Yes.

7  Q.  You would agree that most of the opioids prescribed by

8  Doctor Volkman undergo postmortem redistribution, right?

9  A.  Yes.

10  Q.  Now, also in determining cause of death and, in

11  conjunction, considering this postmortem redistribution, site

12  sampling is important, too, right?

13  A.  Yes.

14  Q.  And when we say site sampling, we're talking about where

15  the blood is drawn from out of the body, right?

16  A.  Yes.

17  Q.  And site sampling is very important too, because it can

18  affect toxicology interpretation as well?

19  A.  Yes.

20  Q.  Just like postmortem redistribution?

21  A.  Yes.

22  Q.  And the closer you get to the heart with the site sample,

23  the higher the blood level can be?

24  A.  Correct.

25  Q.  Right?

A.   Yes.

Q.   So without knowing the site sample, the place where the sample of blood was taken from on the body, without knowing that, you can't make a wholly accurate interpretation of the toxicology results, can you?

A.   You can note the concentration and note the concerns for elevation, correct.

Q.   So I understand you can note the concentration levels, but when you're interpreting the toxicology results, you can't be 100 percent accurate because you don't know where in the body the sample was taken from, right?

A.   Yes.

Q.   And in this case, the site sampling is unknown for James Estep, correct?

A.   I would have to review my report.  If you could provide me a copy, I could state that.  But if I noted it in my report, if it was sample site unknown, I noted it.

Q.   Okay.  And if you noted it in the case of Steve Heineman, if it is in your report, then that's correct, right?

A.   Yes.

Q.   And if you noted it with regard to Charles Jordan, that the site sampling was unknown, if it is in your report, that would be correct?

A.   Yes.

Q.   Same thing with Dwight Parsons and Ernest Ratcliff, too,

1   right?

2   A.   Yes.

3   Q.   Now, you mentioned the vitreous fluid.

4   A.   Yes.

5   Q.   And you said that was the fluid behind the eye?

6   A.   In simplistic terms, yes, that's why I said it that way,

7   yes.

8   Q.   Thank you, because I'm real simple.

9   A.   I don't know about that.

10  Q.   And so vitreous fluid concentration levels, well, you

11  mentioned that on some of the deceased patients, right?

12  A.   Correct.

13  Q.   And the importance of testing it -- it is important to test

14  vitreous fluid?

15  A.   It provides another matrix for evaluation of a drug

16  concentration.

17  Q.   And it is important to test the vitreous fluid levels

18  because that concentration level kind of lags behind the other

19  sampling sites?

20  A.   Yes.

21  Q.   And it actually can give you a clearer picture in some

22  instances because it does lag behind, the concentration level

23  of vitreous fluid can, in some cases, give you a clearer

24  picture?

25  A.   It is a useful adjunct, so, yes.

1  Q.   I mean, you do know that vitreous concentration levels are

2  good or proven with alcohol studies, right?

3  A.   Alcohol concentrations are 10 to 15 percent higher in the

4  vitreous compared to whole blood samples because the percentage

5  of water of the vitreous is 99 percent.  So, the alcohol lags

6  behind in the vitreous sample by approximately two hours, and

7  it is 10 to 15 percent higher.

8  Q.   So taking the concentration in the vitreous fluid for

9  alcohol cases is a good idea or not?

10  A.   It's present.  As I just mentioned to you, it lags behind

11  by approximately up to two hours.  It is 10 to 15 percent

12  higher because of the water weight.  Whole blood has a specific

13  factor difference compared to other fluid, plasma, vitreous,

14  CFS.  So to have a complete comparison analysis from the

15  vitreous to blood is different.

16  Q.   Okay.  Now, there have been no studies that compare

17  vitreous fluid concentrations to blood concentrations, right?

18  A.   False.

19  Q.   No?  There are?

20  A.   Yes.

21  Q.   Tell me about them.

22  A.   Well, there are several.  It depends on the drugs that

23  you're speaking of.

24  Q.   We're talking about pain medication.

25  A.   Okay.  So in the Journal of Analytical Toxicology in 2009,

1  October, a comparison was made between oxycodone vitreous and

2  oxycodone femoral, correlation factor was 1.17.

3  Q.   Okay.   1.17, correlation factors.   Is that what you said?

4  A.   Vitreous to plasma, that value equals 1.17.

5  Q.   What does that mean?

6  A.   It means that they felt that they were to be equivalent --

7  when you have a numeric value of one and divide into two

8  samples, it means that they're equivalent.   There have been

9  other studies that I can't recall off the exact top of my head,

10  that have been performed and compared -- that evaluated

11  vitreous oxycodone levels.   That is the more recent study that

12  I noted.

13      An article came out, and I don't recall the exact journal

14  nor the date, on meprobamate concentrations that compared

15  vitreous to femoral blood.   So there are studies that compare

16  vitreous to femoral, correct.

17  Q.   And are they all fairly consistent with each other, the

18  studies?

19  A.   No.   Because, again, the specific drug characteristics are

20  different.   Cocaine is higher in the vitreous compared to the

21  blood.

22  Q.   Before we go to the Power Point, I want to ask you, there

23  are no interactions or contraindications for oxycodone 30,

24  Xanax 2, and Soma, correct?

25  A.   What do you mean there's no contraindications?

1    Q.    Well, have you ever asked for a drug interaction result

2    from a pharmacist?  Or you don't need to do that because you're

3    a toxicologist?

4    A.    I would not specifically ask a pharmacist:  Does Soma,

5    Xanax and oxycodone interact?  The answer to that is yes, they

6    do.

7    Q.    Okay.  But do they -- is there a proven reference that they

8    interact negatively?

9    A.    Yes.

10   Q.    And where do we get that, from your 34 references?

11   A.    Yes.

12   Q.    Okay.

13   A.    The combination of opiates and sedatives produce an

14   increase in risk for respiratory depression.  This is a well

15   recognized phenomenon.

16   Q.    And so when you say respiratory depression, are you talking

17   about immediate death?

18   A.    It could or could not be.  It depends on, as you mention,

19   their level of tolerance, dosing frequency, intervals,

20   individual genetic factors, multiple factors.  But a

21   combination of sedative and opiate dramatically increases their

22   risk for adverse effect.  When you look at patients that

23   overdose, epidemiologically, those patients that died had most

24   often combined effects.

25   Q.    Now, when you speak about adverse effect, it appears that

1   you're only talking about death.  But adverse effect could be

2   something from a mild irritation or --

3   A.   What do you mean, irritation?

4   Q.   I'm trying to understand what you mean by adverse effect.

5   A.   I mean an increase in likelihood for respiratory

6   depression, sedation, mental clouding, one of those, in

7   addition to other factors.

8   Q.   So we've heard already that you would not prescribe

9   oxycodone 30, Xanax and Soma together, right?

10  A.   Correct.

11  Q.   But you're not telling this jury that if anybody did that

12  that it would automatically lead to respiratory depression?

13  A.   No, I'm saying that the risk is dramatically increased

14  versus those agents separate.

15          MS. CROSS:   I would like to turn to the Power Point,

16  Your Honor, if I may have assistance from the U.S. Attorney.

17          THE COURT:   Okay.

18  Q.   Doctor Policastro, is there any FDA contraindications for

19  that combination of the drugs, Soma, oxycodone and Xanax?

20  A.   I can't speak to what the FDA would list as a combination

21  risk.  They do not evaluate the combination of those agents.

22  Q.   You don't know?

23  A.   I do not know of any specific literature from the FDA

24  regarding prescribers, do not prescribe those agents together.

25  Q.   Yes, sir.  Now, this Power Point that you testified as an

1   aid from, did you create it?

2   A.   It was created with assistance of the U.S. Attorney.   It

3   was the information that I had.

4   Q.   So what was your role in the Power Point?

5   A.   What was my role in it?

6   Q.   Yeah.

7   A.   Talking about the information that was contained in it was

8   a summation of my report.

9   Q.   And then it was created for you?

10  A.   Correct.

11  Q.   Okay.

12              MS. CROSS:   Now, can we turn to slide number seven.

13  Q.   Doctor Policastro, you remember seeing this and testifying

14  about this?

15  A.   Yes.

16  Q.   Now, you were talking in reference to this slide that if

17  you dose the drug before the half-life, then you're putting

18  what, more drug into the body before it can excrete it?

19  A.   Yes.

20  Q.   And is there some FDA rule or principle that you cannot

21  prescribe that way?

22  A.   It is pharmacologic principles.

23  Q.   Okay.

24  A.   I mean, it is the way you would dose medications.   So

25  there's no FDA rule per se, but it's pharmacologic principles

1  of the drugs.

2          MS. CROSS:   May we have slide nine?

3  Q.   You remember testifying about the effects of opiates on the

4  bowels?

5  A.   Yes.

6  Q.   And you said that the bowels slow down as drugs come in?

7  A.   No.   I said the side effects of opiates cause bowel

8  slowing.

9  Q.   So it is a side effect?

10  A.   Correct.

11  Q.   And it is true, though, that the body has ways of

12  compensating for this, though, right?

13  A.   No.

14  Q.   Not at all?

15  A.   Not the constipation, no.   There is no tolerance for

16  constipation.

17  Q.   Now, even though on this slide, still -- even though, I

18  guess, material would go through the intestines slower, this

19  doesn't change the total absorption of the drug, though,

20  correct?

21  A.   No.

22  Q.   In fact, oxyContin is designed to be slowly released as it

23  passes through the gastrointestinal system or bowel system?

24  A.   Yes.

25          MS. CROSS:   Slide 10.

1  Q.   Now, if you wouldn't mind, explain what you meant by the

2  bullet point that says, But cannot do anything about it.   Can

3  you just explain that, please?

4  A.   Yes.   So even patients that have tolerance continue to have

5  elevations in their carbon dioxide level.

6  Q.   The air that comes out?

7  A.   Correct.   As you accelerate dosing of narcotics, the

8  capacity to respond to that change in carbon dioxide increases.

9  The body can only make so much change in response to its carbon

10 dioxide level.

11 Q.   Okay.   So you're talking about what the body can do, the

12 effect that the body -- it has on the body, right?

13 A.   Correct.

14 Q.   But you do agree that in situations like that, more oxygen

15 can be given to the patients, right?   The patient could be put

16 on oxygen?

17 A.   That doesn't change the carbon dioxide level or the other

18 risks for respiratory depression.   Oxygenation and ventilation

19 are separate.   They are also interdependent, but they're

20 separate.   The problem is that as patients' carbon dioxide

21 level increases and as they have continued respiratory decline,

22 that oxygenation will drop.   Their capacity to respond to a

23 triggered event, if that oxygen level goes down, to kickstart

24 the breathing, is gone as the opiate dosing increases.   So just

25 because you oxygenate someone does not get rid of their carbon

1    dioxide level.

2    Q.   And have you heard of Narcan?

3    A.   Of course.

4    Q.   What is that?

5    A.   It is an opioid antagonist.

6    Q.   So basically when that is administered --

7    A.   It reverses the effects.

8    Q.   -- it reverses the effect of the opiates, right?

9    A.   Correct.

10   Q.   So when we look at this and when you were testifying, you

11   were testifying about what the body cannot do, not what other

12   methods can be employed by medical personnel --

13   A.   Correct, correct.

14   Q.   -- to reverse this?

15   A.   Correct.

16   Q.   Okay.  Because there are other things that can be done to

17   reverse respiratory depression?

18   A.   To a point, correct.

19        MS. CROSS:  If we could look at slide 17.

20   Q.   This is in regard to, I believe it is, Dwight Parson --

21   A.   Yes.

22   Q.   -- you testified about.  And you were looking at the -- you

23   called it a toxicological chaos?

24   A.   I did.

25   Q.   And that was because of the dosage regime?

1    A.   Yes.

2    Q.   Now, this is a prescription -- or not a prescription, but a

3    progress note for what date?

4    A.   I would have to review my records.  If you provide them to

5    me, I can --

6    Q.   If you can just look on there, do you see the date on the

7    top of one of the pages?

8    A.   5/12/04, I'm sorry.

9    Q.   So that's a progress note for May 12th, '04, right?

10   A.   Yes.

11   Q.   If Dwight Parsons had been on this dosage regime since

12   April of '03, then why is it a problem now?

13   A.   He still died.

14   Q.   So if he was on the same regime a year earlier, you would

15   be saying he's going to die?

16   A.   I'm saying did he take all of those medications in that

17   exact order?  Was he compliant with that schedule?

18   Q.   So what you need to know is if he actually took those

19   medicines?

20   A.   Correct.

21   Q.   And you don't know?

22   A.   Correct.

23   Q.   But yet, you said that the medicines killed him?

24   A.   I'm stating that that schedule of medicines that was

25   prescribed like that, with the combination of those agents,

1  could produce adverse effects, yes.

2  Q.  So it is important in each of the cases that you have

3  opined about death to know whether or not the person even took

4  the medication, right?

5  A.  Correct.

6  Q.  And you don't know, do you?

7  A.  Well, if there was a toxicology analysis that showed that

8  they had the drug present, then they took the drug.

9  Q.  You don't know how many pills, though, right?

10  A.  Correct.

11      MS. CROSS:  Looking at slide 19.

12  Q.  This is in regard to red flags you said for Paul Crum?

13  A.  Yes.

14  Q.  And you noted that he had several medical issues that made

15  him vulnerable to respiratory depression?

16  A.  Yes.

17  Q.  So looking at someone like this, who is vulnerable, if they

18  are an established chronic pain patient, do you not treat their

19  pain?

20  A.  I never suggested not to treat their pain.  What I

21  suggested is that the combination of the agents dramatically

22  increases his risk for further respiratory decline.

23      MS. CROSS:  Turning to slide 20.

24  Q.  This was a prescription you testified given by Doctor

25  Volkman in December of '05, right?

A.   Yes.

Q.   And you looked at Mr. Crum's medical chart, didn't you?

A.   I did.

Q.   And you know that he was on the same regimen, dosage regimen, for several months before this one, correct?

A.   Correct.   What I don't recall, I would have to look at the records, was the amount and dosing per day, if that had changed.

Q.   If it were the same for several months prior, it is your testimony that this is the prescription, if he took the medication, because we don't know, right?  We don't know what he took?

A.   Correct.

Q.   That this is what killed him?

A.   I'm stating that when you accelerate the dosages and the combination of those agents, that that would produce respiratory depression.

Q.   What if the regime was the same, the same dosages, the same amount, the same type of medication months earlier?  Would that still be your opinion?

A.   I'm saying that he has severe oxygen dependency, COPD, he has a significant lung disease, those would be a contributing factor towards his risk for respiratory depression.

Q.   Turning to slide 30, Aaron Gillespie.  You were not given any investigative reports to look at, were you, Doctor

1  Policastro?

2  A.   Whatever was noted, then I noted.  I don't recall any other

3  additional investigative reports.

4  Q.   Okay.  And so you looked at the prescription history for

5  Aaron Gillespie, right?

6  A.   Yes.

7  Q.   And you noted the number of pills that he was prescribed on

8  that day, correct?

9  A.   May I see a copy of my report?

10 Q.   Do you have one in the courtroom?

11 A.   I was told that I had to ask the clerk to have one.

12        THE COURT:   Mr. Wright apparently has one.

13        MS. CROSS:   May I?

14        THE COURT:   You may.  I just note that it is 4:30 and

15 maybe it would be a wiser use of our time to give the doctor an

16 opportunity to review over the evening hours.

17      Ladies and gentlemen, let's break for the day.  And I

18 remind you not to discuss the case among yourselves or with

19 anyone else or permit anyone to discuss it with you or in your

20 presence.  Report any violation to Ms. Brown.  Make no attempt

21 to do any research or investigation on the case, persons

22 involved in the case or any of the issues in the case over the

23 evening hours.  And no Internet chitchat of any kind regarding

24 the case.

25      We'll see you back at 9:00 tomorrow morning.

1              THE COURTROOM DEPUTY:  All rise.

2         (The jury left the courtroom at 4:30 p.m.)

3         (The following transpired out of the presence of the jury.)

4              THE COURT:  Doctor Policastro, you're excused for the

5    evening.

6              THE WITNESS:  Okay.

7              THE COURT:  See you back at 9:00 tomorrow morning.

8              THE WITNESS:  Yes, ma'am.

9              THE COURT:  No discussion of your testimony with

10   anyone over the evening hours.

11             THE WITNESS:  Yes, ma'am.

12             THE COURT:  Counselors, anything you would like to put

13   on the record in the absence of the jury before we take the

14   break?

15             MR. WRIGHT:  No, Your Honor.

16             MS. CROSS:  No, Your Honor.

17             THE COURT:  All right.  See you back here at 8:30

18   tomorrow.

19             THE COURTROOM DEPUTY:  All rise.

20        (Proceedings concluded at 4:34 p.m.)

21                        - - -

22

23

24

25

I N D E X

GOVERNMENT'S WITNESS:                PAGE:

MICHAEL POLICASTRO

Direct by Mr. Wright              2

Cross by Ms. Cross:              42

C E R T I F I C A T E

I, Jodie D. Perkins, RMR, CRR, the undersigned, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


                                    s/Jodie D. Perkins
                                    Jodie D. Perkins, RMR, CRR
                                    Official Court Reporter