**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, | . CRIMINAL NO. 1:07-cr-60(3) |
| | . |
| Plaintiff, | . Cincinnati, Ohio |
| | . |
| - v - | . Wednesday, March 16, 2011 |
| | . |
| PAUL H. VOLKMAN, | . *Day 10 of Jury Trial* |
| | . |
| *Defendant.* | . 3:30 p.m. |

. . . . . . . . . . . . .

**TRANSCRIPT OF EXCERPT OF PROCEEDINGS**
**BEFORE THE HONORABLE SANDRA S. BECKWITH, SENIOR JUDGE,**
**and JURY**

<u>**APPEARANCES**</u>

For the Plaintiff:   UNITED STATES ATTORNEY'S OFFICE
                     BY:  Timothy D. Oakley, Esq. (AUSA)
                          Adam L. Wright, Esq. (AUSA)
                          221 East Fourth Street, Suite 400
                          Cincinnati, Ohio  45202


For the Defendant:

W.C. CROSS & ASSOCIATES, LLC       STRAUSS & TROY, LPA
BY:  Wende C. Cross, Esq.          BY: Candace C. Crouse, Esq.
3460 Reading Road                  The Federal Reserve Building
Cincinnati, Ohio  45229            150 East Fourth Street
                                   Cincinnati, Ohio  45202

Also Present:      Agent Christopher Kresnak (DEA)

Law Clerk:         Laurie J. Nicholson, Esq.

Courtroom Deputy:  Mary C. Brown

Court Reporter:    Maryann T. Maffia, RDR
                   U.S. Potter Stewart Courthouse
                   100 E. Fifth Street
                   Cincinnati, Ohio 45202

1                          **P R O C E E D I N G S**

2          (BEFORE THE JURY at 3:30 p.m.)

3               MR. WRIGHT:  The United States calls George Pettit.

4               THE COURT:  Stand and stretch moment, folks, if you

5     want to.

6          (The witness was duly sworn by the courtroom deputy.)

7                              GEORGE PETTIT

8     a witness herein, testified as follows:

9                          DIRECT EXAMINATION

10    BY MR. WRIGHT:

11    Q.   Good afternoon.

12    A.   Good afternoon.

13    Q.   Could you state your name and spell your last name for the

14    record.

15    A.   George Patrick Pettit, P-e-t-t-i-t.

16    Q.   And what is your current position?

17    A.   I'm the Chief of Obstetrics and Gynecology at Southern

18    Ohio Medical Center, and I'm also the deputy coroner of Scioto

19    County.

20    Q.   So does that mean in addition to being a coroner you are

21    also a doctor?

22    A.   That is correct.

23    Q.   Walk me through your educational background, if you would.

24    A.   I graduated from Piketon High School.  I went to The Ohio

25    State University, got a bachelor's degree in pathogenic

1    bacteriology.  I went to The Ohio State University College of

2    Medicine, graduated *cum laude* from there, took a residency at

3    Madigan Army Medical Center, and then returned.  I was in the

4    army for the Chief of OB/GYN at the U.S. Military Academy.

5    Then I returned to Portsmouth Ohio in 1976, and I have been in

6    the private practice of obstetrics and gynecology since that

7    time.

8    Q.   So are you originally from the Portsmouth area?

9    A.   Yes, from Piketon.

10   Q.   Okay.  Once you got back to Portsmouth, when did you

11   become the coroner?

12   A.   The deputy coroner.  I started that about 1977, and I've

13   been a deputy ever since.

14   Q.   Explain to the jury what a deputy coroner does.

15   A.   A deputy coroner fills in for the coroner when he's out of

16   town or away.  The deputy coroner investigates deaths.  If a

17   person is not having an attending physician, the deputy

18   coroner determines the cause of death.

19   Q.   And what kind of training do you need to be able to make

20   that kind of a determination?

21   A.   Well, I've done a lot of study on my own as far attending

22   post-graduate courses, reading medical journals and textbooks.

23   Q.   Now, could you explain if an autopsy is done for every

24   death?

25   A.   No, an autopsy is not done for every death.

1    Q.   Why is that?

2    A.   The reason is cost.  An autopsy costs our county

3    approximately a thousand dollars for every one we do.  Our

4    budget for autopsies is probably about 25- to $30,000 for the

5    entire year, so we usually only do autopsies when there is a

6    murder or something where there is -- we expect someone is

7    going to be charged with a crime.

8    Q.   Now, do you actually perform autopsies, Dr. Pettit, or

9    does someone else do that?

10   A.   I don't.  We refer the autopsies to a forensic pathologist

11   usually here in Cincinnati or sometimes in Columbus or Dayton.

12   Q.   I'd like to ask you about the death certificate relating

13   to Kristi Jo Ross.

14           MR. WRIGHT:  And I wanted to see if the witness could

15   be shown Government's Exhibit 34a.

16       (The courtroom deputy assisted the witness)

17   A.   Dr. Pettit, I just want you to draw your attention to the

18   first page.  There is actually two extra pages behind it that

19   I'm probably not going to ask you questions about.

20       Do you recognize that document, Dr. Pettit?

21   A.   Yes.

22   Q.   What is it?

23   A.   It's a death certificate that I completed on Kristi Jo

24   Ross.

25   Q.   And did you complete that in your capacity as the deputy

1    coroner?

2    A.  Yes.

3            MR. WRIGHT:  Your Honor, the United States moves to

4    admit Government's Exhibit 34a, just the first page.

5            MS. CROSS:  No objection.

6            THE COURT:  It will be admitted.

7            MR. WRIGHT:  Your Honor, permission to publish the

8    document?

9            THE COURT:  You may.

10   (The first page of Government's Exhibit Number 34a was

11   admitted into evidence.)

12   Q.  Explain to me, Dr. Pettit, the steps that go into a

13   Certificate of Death.

14   A.  Well, it depends on where the person dies.  This person

15   died in the hospital, so she was being attended to by an

16   emergency room physician.  If a person dies within 24 hours of

17   admission to the hospital, the coroner is notified.

18       So I was notified, and the emergency room physician who

19   was working stated that he felt this person had died of a drug

20   --

21           MS. CROSS:  Objection.

22           THE COURT:  Overruled.

23   Q.  Continue.

24   A.  The emergency room physician and I discussed this case,

25   and it was his opinion the person had died of a drug overdose.

1  Q.  Did he explain the basis of that opinion?

2  A.  Yes, but I don't recall what he said at the time.  It's

3  been 2004, I think.

4  Q.  So where are you when you get involved with trying to

5  determine her cause of death?  I mean, how do you first learn

6  that someone has died?

7  A.  Well, depending on how the person has died.  If a person

8  dies at home, often the emergency squad or a policeman will

9  call me.  But in this case, she was in the emergency room, so

10  the emergency room physician called me and discussed the case

11  with me.

12  Q.  And there is some information at the top here that talks

13  about the Southern Ohio Medical Center.  Is that where Miss

14  Ross died?

15  A.  Yes.

16  Q.  And then it also has other information regarding Miss

17  Ross.  For example, was she married at the time of her death?

18  A.  Yes.

19  Q.  And how old was she?

20  A.  39.

21  Q.  And what was her usual occupation?

22  A.  She was a bartender.

23  Q.  So it sounds like you talked to the emergency room

24  physician in an attempt to understand what caused the death.

25  What other steps do you take in order to determine what killed

1  Miss Ross?

2  A.  I ordered some toxicology studies.  I ordered a urine test

3  for drugs.

4  Q.  And explain to me how that works.  Is that something that

5  you are able to do in Scioto County?

6  A.  No.  We sent this one to the Mayo Clinic.

7  Q.  Okay.  And so what is the purpose in requesting a

8  toxicology report?

9  A.  Well, to see if the person has any drugs in her body that

10  might have contributed to their death.

11  Q.  And what did the toxicology report show, to the best of

12  your recollection?

13  A.  I believe it showed opiates and -- I'm not sure.  I think

14  there is a copy somewhere in the record here, but --

15  Q.  Would seeing a copy help you?

16  A.  Yes.

17  Q.  Okay.  If you could take a look at -- I believe it's 34b

18  in your book.

19  A.  There is a report in here from the Hamilton County Crime

20  Laboratory.  It showed meprobamate, carisoprodol, which is

21  Soma, and benzodiazepines, opiates and oxycodone present.

22  Q.  What is meprobamate?

23  A.  It's a tranquilizer.  Miltown is the old trade name for

24  it.

25  Q.  Okay.  So you received this toxicology report from

1   Hamilton County, and you spoke with the emergency room

2   physician.  Is there any other information that you considered

3   in determining the cause of death for Miss Ross?

4   A.   Yes.  I received a police report from the detective who

5   went to the scene listing the medications that were present at

6   the patient's home.

7   Q.   And how did that -- I'm just going to cut to the chase

8   here.  You've got the cause of death here listed at the bottom

9   of the death certificate.  I had wondered if you could just

10  explain what your decision was based on the information you

11  had available to you at that time?

12  A.   Basically, I thought it was a drug overdose, and I said

13  that the patient had -- it says, you know, "Other Significant

14  Conditions."  The patient had chronic pain and was being

15  treated at a local pain management clinic.  That was all I put

16  down there.

17  Q.   Now, how were you able to make that determination without

18  doing an autopsy?

19  A.   It was a clinical diagnosis just like we make most of the

20  diagnoses --

21       You know, when you come into the -- if you come into the

22  hospital with chest pain and you're, say, 45 years old and

23  obese, you make a clinical diagnosis of a heart attack.

24       If a person comes to the emergency room and the emergency

25  room doctor looks at them, you do some studies, you find out

1    they've got some drugs in their body, you do an inventory of

2    their home and you find a lot of medication.  It was my -- and

3    the person is otherwise in fairly good health, it was a

4    clinical diagnosis I made that she had a drug overdosage.

5    Q.   Now, wasn't Miss Ross also obese?

6    A.   I don't recall.

7    Q.   How many drug overdoses have you seen in your role as

8    deputy coroner in Scioto County?

9    A.   Several.

10   Q.   And was this death, in your mind, consistent with those

11   other overdoses that you've seen?

12   A.   Yes.

13   Q.   How long have you been the deputy coroner?

14   A.   Since 19 -- oh, about 30 years.

15            MR. WRIGHT:  Nothing further, Your Honor.

16                   CROSS-EXAMINATION

17   BY MS. CROSS:

18   Q.   Good afternoon, Dr. Pettit.

19   A.   Good afternoon.

20   Q.   You said that you are currently in obstetrics and

21   gynecology?

22   A.   That's correct.

23   Q.   And you are not a forensic pathologist?

24   A.   No.

25   Q.   And you -- did you even examine Kristi Jo Ross?

1   A.   No.

2   Q.   You never looked at her body?

3   A.   No.

4   Q.   So that's why you can't remember if she was obese or not?

5   A.   That's correct.

6   Q.   You said you relied in making your opinion on talking to

7   the emergency room physician; correct?

8   A.   Who treated the patient, yes.

9   Q.   And the police report?

10  A.   Yes.

11  Q.   And the toxicology study that was done?

12  A.   Right.

13  Q.   Okay.  Let's talk about those three things.  With regard

14  to the police, you know she was found at 6:45 p.m.?

15  A.   I'd have to look at the report here.

16       MS. CROSS:  May I show you what has been admitted

17  into evidence as 34c?

18       THE COURT:  You may.

19     (The courtroom deputy assisted the witness.)

20  Q.   Are you looking at 34c?

21  A.   Yes, I am.

22  Q.   And is that a copy of -- the second page, a copy of the

23  Portsmouth Police Department report, incident report?

24  A.   Yes.

25  Q.   And do you see at the bottom the date that says 3/9 of

1    2004?

2    A.   Yes.

3    Q.   And you see the time occurred, 1845 hours?  1845?

4    A.   I see a 2220 for time.  I don't see an 1845.

5         MS. CROSS:  Your Honor, may I approach?

6         THE COURT:  You may.

7         MS. CROSS:  I'm sorry, you're looking at the wrong

8    page.

9         THE WITNESS:  Oh, okay.

10        MS. CROSS:  This is the incident report.

11        THE WITNESS:  Okay.

12        MS. CROSS:  And may I display it, Your Honor?  It

13   might be easier to see.

14        THE COURT:  That's fine.

15   Q.   This is one of the things that you relied on; right?

16   A.   Yes.

17   Q.   And this is the Portsmouth Police Department incident

18   report?

19   A.   That's correct.

20   Q.   And the time that's recorded that the investigation was

21   6:45 p.m.; right?  1845 hours?

22   A.   I think that's when the incident is supposed to have

23   occurred.

24   Q.   Meaning that's when she was found?

25   A.   I think so.  I'm not sure about that.

1  Q.  Okay.  Do you know that 1845 hours is 6:45 p.m.?

2  A.  Yes.

3  Q.  Now, will you turn to Government's Exhibit 34a, the death

4  certificate?

5  A.  Okay.

6  Q.  Is that your death certificate?

7  A.  Yes.

8  Q.  I'm going to put it up on the screen.  That's the death

9  certificate you signed; right?

10 A.  Yes.

11 Q.  I'm just going to try to hone in here.  If you would

12 direct your attention to this area, you put the time of death

13 as 7:35 p.m.; correct?

14 A.  Yes.

15 Q.  So between the time she was found at 6:45 p.m. and

16 7:35 p.m., it was determined that she -- this was an overdose;

17 correct?

18 A.  No.  If you look down further, you'll see when I signed

19 the death certificate down in the coroner there --

20     Move over to the right a little bit on the death

21 certificate there.

22     -- I signed the death certificate.

23 Q.  On the 16th?

24 A.  On the 16th.  So I had a copy of the police report.  I

25 didn't get this police report until --

1    Q.   Afterwards.

2    A.   -- the next day.  I talked to the emergency room physician

3    on that day, but I didn't complete the death certificate until

4    several days later.

5    Q.   Okay.  So you had several days to do an investigation;

6    correct?

7    A.   To receive all the information and evaluate it, yes.

8    Q.   Okay.  And it was determined that this was, in your

9    opinion, an overdose; right?

10   A.   Yes.

11   Q.   But you had not looked at the body; right?

12   A.   That's right.

13   Q.   And there was no autopsy performed?

14   A.   That's right.

15   Q.   You didn't know this persons's medical history; correct?

16   A.   That's correct.

17   Q.   Now, you did say you relied on the toxicology report;

18   right?

19   A.   Yes.

20   Q.   All right.  I'm going to ask you to --

21           MS. CROSS:  Your Honor, if I just may take this off?

22           THE COURT:  Fine.

23   Q.   And the pages you have right there -- I just want to keep

24   everything together.  You relied on the toxicology report,

25   too, in making your assessment?

1    A.   There are actually two toxicology reports.  One is a urine

2    report that was done at Southern Ohio Medical Center, and this

3    one here which was done at Cincinnati.

4    Q.   Okay.  And when you testified on direct examination, you

5    said that meprobamate is a tranquilizer?

6    A.   Yes.

7    Q.   And the specimen that was taken was vitreous fluid; right?

8    A.   Yes.

9    Q.   And that's the fluid in the eyes; right?

10   A.   Yes.

11   Q.   And are you familiar with the concept of post-mortem

12   redistribution?

13   A.   Yes.

14   Q.   In simple terms, that's a phenomenon where drugs move in

15   the body after the person dies; correct?

16   A.   Yes.

17   Q.   And so post-mortem redistribution can elevate various drug

18   levels in the body post-mortem; correct?

19   A.   Elevate or lower, either one, yes.

20   Q.   And so this is what you got, you looked at this, the

21   vitreous level fluid; right?

22   A.   Yes.

23   Q.   And you saw that number; right?

24   A.   Right.

25   Q.   But you know that -- you understand about post-mortem

1  redistribution?

2  A.  Yes.

3  Q.  Now, you said that this person, there was no autopsy

4  performed?

5  A.  That's correct.

6  Q.  And you didn't know the person's medical history?

7  A.  That's correct.

8  Q.  Have you heard of a condition called pulmonary embolus?

9  A.  Yes.

10  Q.  Do you know what -- can you explain what that is?

11  A.  It's a condition that occurs where a blood clot may go

12  from the leg or some other part of the body to the lungs.

13  Q.  And that is common in obese people; correct?

14  A.  It's not common, but it does occur in obese people, yes.

15          MS. CROSS:  Your Honor, may I have a moment?

16          THE COURT:  You may.

17     (Ms. Cross confers privately with Ms. Crouse.)

18          MS. CROSS:  No further questions.  Thank you.

19          THE COURT:  Redirect?

20          MR. WRIGHT:  Yes, Your Honor.

21              REDIRECT EXAMINATION

22  BY MR. WRIGHT:

23  Q.  Dr. Pettit, in your investigation regarding the cause of

24  death for Miss Ross, did you see any indication that she had

25  died from anything other than a drug overdose?

1  A.  No.

2  Q.  Can you say to a reasonable degree of medical certainty

3  that she died of a drug overdose?

4  A.  That's my clinical judgment, yes.

5          MR. WRIGHT:  Nothing further, Your Honor.

6      Actually, we would move to enter 34b.

7          MS. CROSS:  No objection.

8          THE COURT:  All right.  It will be admitted.

9  (Government's Exhibit Number 34b was admitted into evidence.)

10          THE COURT:  Recross?

11          MS. CROSS:  No, Your Honor.  Thank you.

12          THE COURT:  All right.  Counselors, is there any

13  reason for the doctor to remain available for recall?

14          MR. WRIGHT:  No, Your Honor.

15          THE COURT:  Miss Cross, any reason?

16          MS. CROSS:  No, Your Honor.

17          THE COURT:  Okay.

18      Thank you, Doctor.  You may step down.  You're excused.

19          THE WITNESS:  Thank you.

20      (The witness was excused.)

21          MR. WRIGHT:  The United States calls John Walker to

22  the stand.

23  (The witness was duly sworn by the courtroom deputy.)

24                      JOHN WALKER

25  a witness herein, testified as follows:

**DIRECT EXAMINATION**

BY MR. WRIGHT:

Q.  Good afternoon, Mr. Walker.

A.  Good afternoon.

Q.  Could you tell us where you used to work before you retired?

A.  Hamilton County Coroner's Laboratory.

Q.  And what was your position at the Hamilton County Coroner's Laboratory?

A.  Chief of Toxicology.

Q.  How long had you worked as a toxicologist for Hamilton County?

A.  Approximately 25 years.

Q.  And how did you come to be a toxicologist?

A.  I have two degrees in chemistry.  I was working as an industrial chemist for two and a half years, was laid off from that position and heard about an opening at the Hamilton County Coroner's Crime Laboratory, so I applied for that position and was hired as a drug analyst.

I analyzed drugs that were seized during drug arrests by police departments to document what the materials actually were.  After working in that situation for several years, I started helping out with the analysis of body fluids in the coroner cases, and I gradually evolved into spending full time as an analytical toxicologist analyzing body fluids from the

1  deceased for drugs and poisons, and eventually was named Chief

2  of Toxicology.

3  Q.  What kind of education do you need to become a

4  toxicologist?

5  A.  Anywhere from formal degrees in toxicology, clinical

6  toxicology, forensic toxicology to years and years and years

7  of experience in working in that environment, essentially

8  picking up the knowledge and skills to perform those duties on

9  the job.

10 Q.  So what kind of toxicologist were you when you were

11 working for Hamilton County?

12 A.  A forensic toxicologist.

13 Q.  And what does that mean?

14 A.  It means the practice of toxicology relating to matters of

15 law.

16 Q.  During the time that you were at the Hamilton County Crime

17 Laboratory, did you perform a toxicology report relating to

18 Kristi Ross?

19 A.  Yes, I did.

20     MR. WRIGHT:  If the witness could please be shown

21 Government's Exhibit 34b, which has been previously admitted

22 into evidence?

23     (The courtroom deputy assisted the witness.)

24     MR. WRIGHT:  Permission to publish, Your Honor?

25     THE COURT:  You may.

1  Q.  Mr. Walker, there are three results there and I wanted to

2  walk through kind of what each one was.  If you could first

3  tell us how you would receive a blood sample sent from Scioto

4  County?

5  A.  Because of the distance separation, usually samples from

6  that jurisdiction are received in the mail.  In this case, it

7  was a sample of vitreous humor, which is the fluid of the eye,

8  and that was received by mail.

9  Q.  Are there any concerns in shipping blood like that?

10 A.  Number one, this was vitreous humor, not blood.  In some

11 instances, those specimens will be refrigerated or frozen.  In

12 most cases, they are not.  The shipment only takes a day or

13 two.  That is not that significant as far as the degradation

14 of blood or body fluids in the mail, so normally they are not

15 refrigerated or frozen.

16 Q.  Okay.  So it looks like the first test that was done is

17 the E-L-I-S-A test; is that right?

18 A.  That is correct.

19 Q.  What is that test?

20 A.  This is a form of testing referred to as immunoassay.

21 This is a very preliminary superficial form of testing.  It

22 relies on a material which contains antibodies that are

23 designed to respond to particular classes of drugs.

24     We will put the antibodies in the biological fluid, and if

25 any of the materials related to the drug that antibody works

1  on is detected, then it will give a positive result.

2      There are different antibodies for different classes of

3  drugs.  There will be one form for opiates or morphine

4  derivatives.  There will be one for amphetamines, one for

5  barbiturates, one for cocaine.  There is about ten different

6  antibodies that you can add to a specimen, and you can do

7  those all at once.  Then the instrument will detect responses

8  for any particular ones that there is a reaction for.

9      It is not highly specific.  It is not totally dependable

10 on its own.  It's a screening technique, so that if you expose

11 a body fluid to all these different antibodies and nothing

12 comes up positive, you can be pretty sure there are none of

13 those drugs present in that sample.

14     If one, two or three come up positive, then it usually

15 involves a follow-up analysis which will confirm the initial

16 finding and be much more conclusive and specific than the

17 initial screening test.

18     But it is instrumental, it's automated, it's very quick

19 and inexpensive to cover a large number of drugs.  So it's a

20 very, very valuable screening technique to narrow down the

21 possibilities of what kind of drugs might be present in a

22 particular sample.

23 Q.  So what did you find based on that first test that was in

24 Miss Ross's blood?

25 A.  There were three positives:

1  One for benzodiazepines, which are a family of

2  tranquilizers, Valium, Librium, Xanax, things of that

3  nature;

4  The second positive was opiates, which are derivatives of

5  morphine.  That covers morphine itself, codeine, oxycodone,

6  hydrocodone and any other morphine-related drugs;

7  The third one was for carisoprodol meprobamate.  That is a

8  mixture of drugs.  Carisoprodol is a muscle relaxant.  When

9  you take it, in the body it breaks down into meprobamate.  So

10  if you take carisoprodol, you will have both present in the

11  fluid, and the antibody will react to both of them.

12  So we got a positive result for that combination of drugs

13  and their metabolites.

14  Q.  So what was the second test then that you ran?  Was it the

15  opiate confirmation, the GC/MS?

16  A.  Yes.  The first -- the confirmation that was conducted was

17  for opiates.  I personally conducted that analysis, and I

18  found a positive result for oxycodone.  The level of .106

19  milligram per liter was the concentration.

20  Q.  Now, is your role to calculate the numbers or to interpret

21  the numbers?

22  A.  To actually detect and quantify the drug and not interpret

23  the results.

24  Q.  Are you familiar with the phenomenon of post-mortem

25  redistribution?

1    A.    Yes.

2    Q.    And how could that affect a result of one like this that

3    found oxycodone in the blood?

4    A.    The concept of post-mortem redistribution means that when

5    a person takes a drug, it starts being distributed throughout

6    the body in the blood system and will eventually migrate into

7    various organs, including the fluid of the eye.

8        Post-mortem redistribution is a phenomenon that happens

9    after death where the blood levels will increase as the drug

10   materials migrate or diffuse from the tissue back into the

11   blood.

12       At one point in time, a simpler understanding was that

13   once you die, your drug levels are frozen at those levels; and

14   when you measure post-mortem blood, that is an indication of

15   what the drug levels were when you passed away.

16       Now they are learning that drug levels can go up or they

17   can go down depending on the drug and the circumstances of the

18   body after death.

19       It's getting to the point where it's being much, much more

20   complicated than we originally suspected.

21   Q.    And you mentioned that PMR could either increase or

22   decrease the level that is a result from the tests such as

23   this one that you ran for oxycodone; is that right?

24   A.    Correct.

25   Q.    So in this particular case, that concentration could be

1    .08, it could be .12.  Do you have any sense about the

2    deviation or the range that could be affected by PMR?

3    A.  Most information relating to post-mortem redistribution

4    relates to blood.  The level reported here is the vitreous

5    humor, which is the eye fluid.  I do not know if that

6    phenomenon has been investigated to any great extent at this

7    point.  Again, that phenomenon of post-mortem redistribution

8    is more related to blood and less known as far as other

9    organs, including the eye fluid.

10   Q.  Okay.  So you ran an initial screen, and then there was an

11   opiate confirmation.  What was the third test that was run by

12   the Hamilton County Crime Laboratory?

13   A.  It's referred to as a general drug screen.  This is

14   actually an extraction procedure whereby we extract drug

15   materials from the blood and separate it from the cells and

16   the lipids and the fats and other blood components.

17        A lot of our analyses are carried out on instruments.  If

18   we didn't extract the drugs from the blood before injecting

19   them into the instrument, it would cause a lot of

20   contamination and problems with the cleanliness of the

21   instrument.  It's a lot more accurate to test a solvent with

22   just the drugs in it than it is to detect a sample that's

23   whole blood with all the lipids and fats and other materials.

24        So this general drug screen is intended to detect and

25   measure a very wide range of drug substances.  Our particular

1   drug extraction procedure was quite superior to most other

2   ones used in most laboratories because it covered such a wide

3   range of materials.  It doesn't cover everything, but it does

4   cover a wide range of materials.

5       Carisoprodol and meprobamate are two of those materials

6   which can be detected with the general drug screen extraction

7   procedure.  Since we had the initial indication from the ELISA

8   screen that these materials could be present, this was a

9   logical procedure to follow up and confirm that initial

10  screening procedure.

11  Q.  And what did that third test show you?

12  A.  It identified both carisoprodol and meprobamate being

13  present.  The meprobamate was at the level of 5.299 milligrams

14  per liter, and the carisoprodol was 1.985.

15      Again, when you consume carisoprodol, you get the

16  meprobamate as a metabolite or break-down product.

17  Q.  Now, I know notice on that first screen it was positive

18  for opiates, which was confirmed; it was positive for

19  carisoprodol; it was positive for meprobamate.

20      What happened to the benzodiazepines which were shown, at

21  least in the first test, to be present?

22  A.  The general drug screen will detect and measure some of

23  the benzodiazepines, but not all of them.

24      I don't actually have the medical -- or the analytical

25  records with me at this moment, but I don't believe any

1  benzodiazepines were detected.  If they were, we would have

2  reported them.

3      We do have a special extraction procedure just for

4  benzodiazepines, but I believe the submitting coroner did not

5  request that.  Also, the amount of sample we receive when we

6  receive vitreous humor, the eye fluid, is usually not a lot of

7  material to work with.  It could have been we did not do the

8  benzodiazepine confirmation just because we only had so much

9  sample and we focused on the most significant ones.

10 Q.  Mr. Walker, based on the tests that you performed relating

11 to the blood of Kristi Ross, are you able to say to a

12 reasonable degree of medical certainty that oxycodone,

13 meprobamate and carisoprodol were present in her blood at the

14 time of death?

15 A.  Yes.

16      MR. WRIGHT:  Nothing further, Your Honor.

17                    CROSS-EXAMINATION

18 BY MS. CROSS:

19 Q.  Good afternoon.

20 A.  Good afternoon.

21 Q.  Vitreous level is not equal to -- vitreous fluid is not

22 equal to blood; correct?

23 A.  That is correct.

24 Q.  And this sample that we're talking about is eye fluid;

25 right?

1    A.   That is correct.

2    Q.   Not blood?

3    A.   That is correct.

4    Q.   And you weren't asked to actually interpret the levels or

5    the results, but you can; correct?

6    A.   To some extent.

7    Q.   And you do know that when we look at this exhibit, just

8    looking at the opiate oxycodone level, vitreous level, what is

9    the result?

10   A.   .106 milligram per liter.

11   Q.   And you do know that a level of .106 milligrams per liter

12   is below the range or level associated with deaths?

13   A.   Yes.

14   Q.   And looking at the vitreous level for meprobamate, do you

15   see what the number is?

16   A.   Yes.

17   Q.   And that number is?

18   A.   1.985 for the carisoprodol, 5.299 for the meprobamate.

19   Q.   And you do know that for meprobamate that the zero to nine

20   milligrams per liter is a therapeutic level for people;

21   correct?

22   A.   In blood, yes.

23   Q.   And post-mortem redistribution can affect levels of drugs

24   in peoples' bodies after they die; correct?

25   A.   Correct.

1    MS. CROSS:  Your Honor, may I have a moment?

2    THE COURT:  Yes.

3  (Pause in proceedings.)

4    MS. CROSS:  Nothing further.  Thank you.

5    REDIRECT EXAMINATION

6  BY MR. WRIGHT:

7  Q.  Mr. Walker, you were asked about the presence of these

8  various drugs, and I wanted to see if you could explain what

9  benzodiazepines, opiates and carisoprodol do together in the

10  body.

11  A.  They are all classified as central nervous system

12  depressants.  When you have a combination like this, they tend

13  to be additive, which means the effect of the three are more

14  than if each one was in there individually.

15    There is such a thing that's called a synergistic effect

16  where the effect between two or three different drugs is more

17  than additive; in other words, it's not one versus two versus

18  three.  It looks like it's more like one versus ten.

19    But that's not involved here.  To the best of my

20  knowledge, they would all be additive but not synergistic.

21  Q.  And what would the effect be of these three classes of

22  drugs in the body, whether it's additive or synergistic?

23  A.  I believe it takes you out of the realm of looking at

24  individual levels and therapeutic levels and toxic levels and

25  that type of thing, but I really don't consider myself an

1  expert in this kind of interpretation.  Although I do have

2  some knowledge of it, I do not claim to be an expert in that

3  area.

4  Q.  You said they were all central nervous systems

5  depressants, and I wanted to see if you could explain what

6  that meant.

7  A.  A central nervous system depressant tends to depress the

8  response to nerves by these chemicals.  They tend to depress

9  the responsive nerves to pain, anxiety, things of that nature.

10      A more understandable term might be a downer versus an

11  upper, which is a drug that stimulates you, makes you a little

12  hyper, nervous that type of thing.  These are the kinds of

13  drugs that make you drowsy and high, to some extent, where

14  you're relaxed and essentially make you less sensitive to

15  stimulus.

16          MR. WRIGHT:  Nothing further, Your Honor.

17                  RECROSS-EXAMINATION

18  BY MS. CROSS:

19  Q.  But the amount of benzodiazepine wasn't even enough to

20  analyze; correct?

21  A.  The levels were not high enough to detect, or they were

22  one of the ones or some of the ones that do not show up

23  readily on that particular test that we did.  Like I said,

24  from what I can tell from the records, we did not specifically

25  try to confirm benzodiazepine.  Had they been there in high

1  levels, probably most of them would have shown up on the

2  general drug screen.

3  Q.  And it would have been detected on the report; correct?

4  A.  That's correct.

5          MS. CROSS:  Thank you.

6          THE COURT:  Counselors, is there any reason for

7  Mr. Walker to remain available for recall?

8          MR. WRIGHT:  No, Your Honor.

9          MS. CROSS:  No, Your Honor.

10          THE COURT:  Thank you, sir.  You may step down.  You

11  are excused.

12      (The witness was excused.)

13          MR. WRIGHT:   The United States calls Darrel Pack.

14  (The witness was duly sworn by the courtroom deputy.)

15                      DARRELL PACK

16  a witness herein, testified as follows:

17                   DIRECT EXAMINATION

18  BY MR. WRIGHT:

19  Q.  Good afternoon.

20  A.  Hi.

21  Q.  Could you state your name for the record, please?

22  A.  Darrel Pack.

23  Q.  And where do you work, Mr. Pack?

24  A.  I'm retired as of right now.

25  Q.  And where -- did you used to serve as the deputy coroner?

1   A.   Yes, of Lawrence County, Kentucky.

2   Q.   Of what county?

3   A.   Lawrence County.

4   Q.   Okay.  And how long were the deputy coroner for Lawrence

5   County?

6   A.   Seven years.

7   Q.   And what is the job of a deputy coroner?

8   A.   To go out to death scenes and make a ruling, investigate.

9        THE COURT:  Mr. Pack, could you speak into the

10  microphone and maybe keep your voice up a little?

11       THE WITNESS:  Okay.

12       THE COURT:  Thank you.

13  Q.   Did you do that for an individual named Charles Jordan?

14  A.   Yes.

15       MR. WRIGHT:  If the witness could be shown Exhibit

16  40a?

17      (The courtroom deputy assisted the witness.)

18  Q.   Mr. Pack, do you recognize that document?

19  A.   Yes, I do.

20  Q.   What is it?

21  A.   It's a death certificate.

22  Q.   And did you sign that death certificate in your capacity

23  as deputy coroner for Lawrence County?

24  A.   Yes, I did.

25       MR. WRIGHT:  Your Honor, we now move to admit Exhibit

1    40a.

2              MS. CROSS:  No objection.

3              THE COURT:  It will be admitted.

4    (Government's Exhibit Number 40a was admitted into evidence.)

5    Q.  Just to back up a bit, Mr. Pack, how does somebody become

6    a deputy coroner?

7    A.  Of course the coroner has to choose his own deputy, and

8    then you take a course that's provided by the state.  As long

9    as you pass this course.

10   Q.  What kinds of things are taught in that course?

11   A.  Like death scenes, what to look for, maybe just several

12   different kinds of deaths.

13   Q.  I'm going to ask you about the death of Charles Jordan.

14   A.  Uh-huh.

15             MR. WRIGHT:  Permission to publish Government's

16   Exhibit 40a?

17             THE COURT:  You may.

18   Q.  What do you remember about the death regarding -- well,

19   what was the cause of death that you determined for

20   Mr. Jordan?

21   A.  Acute opiate oxycodone toxicity.

22   Q.  And how did you go about making that determination?

23   A.  I had an autopsy performed on this gentleman.

24   Q.  And what was it about that autopsy that led you to have

25   the conclusion that he had died of acute opiate toxicity?

1   A.   I found prescription pills at his residence where he

2   passed away.

3   Q.   So wait.  In addition to the autopsy, did you actually go

4   to the scene?

5   A.   Yes, I did.

6   Q.   What do you remember about what you saw there?

7   A.   If I'm not mistaken, which I'm -- it's been several years

8   ago -- he died in bed.  He just died in his sleep.  But in the

9   bathroom, it was either three or four prescription pill

10  bottles that I found at the scene.

11  Q.   How did you find out that Mr. Jordan had died; do you

12  remember?  Did you just receive a call?

13  A.   Yes.  Dispatch 911 called me.

14  Q.   And you said that you found Mr. Jordan in his bed; is that

15  right?

16  A.   Yes.

17  Q.   And then where did you see the pills?

18  A.   They were in his bathroom.

19  Q.   Did you also talk with family members while you were at

20  the scene?

21  A.   Yes, I did.

22  Q.   Did you learn anything else that assisted you in reaching

23  a conclusion that Mr. Jordan died of a drug overdose?

24  A.   His mother lived next-door to him, and that's the family

25  member I spoke with.  She said that he --

1          MS. CROUSE:  Objection.

2          THE COURT:  Overruled.

3  Q.  Go ahead.

4  A.  She said that, you know, he had taken, had trouble -- I

5  think it was back trouble, if I remember correctly.

6  Q.  Did she say anything about the medications that Mr. Jordan

7  was taking?

8  A.  She was an elderly lady.  I don't remember.

9  Q.  In looking at the death certificate, what was the time of

10  death?

11  A.  I pronounced him at 8:38 a.m.

12  Q.  And where -- it looks like up top there is an address in

13  Louisa, Kentucky; is that right?  Is that the location where

14  you found Mr. Jordan?

15  A.  It's not in town, but he lived in the country.

16  Q.  Okay.  And was Mr. Jordan divorced or married?

17  A.  Divorced.

18  Q.  What was his occupation?

19  A.  It says "disabled on" here.

20  Q.  And then what was his age?

21  A.  I believe it was 40.

22  Q.  Going down to the bottom, there is obviously the cause of

23  death that I asked you about earlier.

24  A.  Mm-hmm.

25  Q.  And then it looks like right down here, they are

1    describing how the nature of the injury occurred.  What does

2    that say there?

3    A.  "Ingested toxic amount of listed opiate."

4    Q.  How were you able to make that conclusion?

5    A.  By the Medical Examiner's report.

6    Q.  And who performed the autopsy, if you remember?  Or how

7    was an autopsy performed in your county?  Do you do it

8    in-house or you --

9    A.  No.  We send them to Frankfort.

10   Q.  Okay.  And is that the situation that happened here?

11   A.  Yes.

12   Q.  Okay.  I'd like to just direct your attention to the last

13   page of 40b, which is in front of you.

14   A.  Mm-hmm.

15   Q.  The next exhibit.  Do you recognize this document?

16   A.  Yes.

17   Q.  What is it?

18   A.  It's a certification of autopsy, the report of it.

19   Q.  And what's the purpose of issuing a document like this?

20   A.  It has to be somebody that's licensed by the state to

21   perform these duties.

22   Q.  Is it a way to request an autopsy to be performed?

23   A.  Yes.

24   Q.  How do you make that decision about whether or not an

25   autopsy is necessary?

1   A.   Is it 40b?  I'm --

2   Q.   Yes.  I'm sorry.  It's the last page of 40b.  There is the

3   autopsy in front, and at the back is a Coroner's Authorization

4   For Post-Mortem Examination.

5   A.   Okay.  Okay.

6   Q.   Do you recognize this document?

7   A.   Yes.

8   Q.   And what is a Coroner's Authorization For Post-Mortem

9   Examination?

10  A.   This is what I have to fill out in order to -- and it's

11  supposed to be with the body when I transport it.  It's just

12  what I find at the scene and what I suspect the cause of death

13  is.

14  Q.   Based on what you've seen?

15  A.   At the scene.

16  Q.   Okay.  How do you decide whether or not an autopsy is

17  done?

18  A.   The reason that I took Mr. Jordan was because of his age,

19  and he really didn't have anything, medical history, you know,

20  such as heart or anything like that after I spoke with his

21  mother.

22       MR. WRIGHT:  Permission to publish this page, Your

23  Honor, or move to admit and then permission to publish?

24       MS. CROUSE:  No objection.

25       THE COURT:  It will be admitted and you may publish.

1   (The last page of Government's Exhibit Number 40b was admitted

2   into evidence.)

3   Q.  You have here on the line "Type of Death That Is

4   Suspected," it's "Overdose," question mark.  Why did you write

5   it that way?

6   A.  You know, the bottles of pills that I found.  The question

7   mark, I wasn't sure.

8   Q.  Okay.

9   A.  And that was my reason for taking him for the autopsy.

10  Q.  And then there is also a notation regarding "History (What

11  Happened."  Could you read that for us?

12  A.  He was drinking heavy last night, last seen approximately

13  3:30 to 4:00 p.m., he was asleep, snoring loud, checked on at

14  approximately 7 a.m. that morning, and that's when they found

15  him dead.

16  Q.  Wait.  Is that an "a.m." or a "p.m."?  I obviously don't

17  know.  Is that a "p.m."?

18  A.  I believe it is an "a.m."

19  Q.  An "a.m."?

20  A.  Yes.

21  Q.  And where did you get this information?  Was this from his

22  mother?

23  A.  I believe it was from either his aunt or sister.  Like I

24  said, it's so long, I'm not sure.

25  Q.  Was this someone that you talked to at the scene of the

1  death?

2  A.  Yes.

3  Q.  Okay.  And then it looks like at the bottom here there is

4  a list of medications.

5  A.  Mm-hmm.

6  Q.  What were those medications?

7  A.  You want me to read them?

8  Q.  Well, are these four medications the ones that you

9  referred to earlier?

10  A.  Yes, that I found in the bathroom.

11  Q.  And what was the -- who was the physician that had issued

12  those medications, from what you could tell from the scene?

13  A.  Dr. Paul Volkman.

14  Q.  Based on the autopsy report and your investigation at the

15  scene as well as the toxicology report --

16      Did you review a toxicology report?

17  A.  Yes, but it's been a while since I looked at it.

18  Q.  And based on that review, what was your assessment

19  regarding the cause of death for Mr. Jordan?

20  A.  An overdose.

21          MR. WRIGHT:  Nothing further, Your Honor.

22                  CROSS-EXAMINATION

23  BY MS. CROUSE:

24  Q.  Good afternoon, Mr.  Pack.

25  A.  Hi.

1   Q.  Are you a Medical Doctor?

2   A.  No.

3   Q.  Okay.  You said you reviewed a tox report?

4   A.  Yes.

5   Q.  Do you review these reports and make a determination, or

6   do you have somebody with medical training look at the

7   reports?

8   A.  The Medical Examiner sends me his findings, also sends his

9   assessment of the case, and then I make the final decision.

10  Q.  Based upon the Medical Examiner's assessment?

11  A.  Right.

12  Q.  Okay.  So are you qualified to interpret toxicology

13  reports?

14  A.  I must be on account the State of Kentucky says I was at

15  that time.

16  Q.  Okay.  Now, one of the things that you do as a deputy

17  coroner is you go to the scene of the death and make

18  observations; right?

19  A.  Right.

20  Q.  And you said that you found a number of prescription pills

21  in a bathroom at the residence?

22  A.  Yes.

23  Q.  Okay.  And did you inventory those pills?

24  A.  Yes.  That's what this last paper that was up there.

25  Q.  Okay.  And that would be the Coroner's Authorization For

1   Post-Mortem Examination?

2   A.   Correct.

3        MS. CROUSE:   Your Honor, may I publish?

4        THE COURT:   You may.

5   Q.   So there is the listing of pills on that sheet.  Did you

6   do a pill count?

7   A.   No.

8   Q.   So you just put the types of pills that were found in the

9   bathroom, but you didn't count out the pills and see how many

10  were left in the bottles?

11  A.   No, not on this report it's not, no.

12  Q.   Okay.  Now I wanted to ask you about Exhibit 40a that you

13  were shown, the death certificate?

14       MS. CROUSE:   May I publish, Your Honor?

15       THE COURT:   You may.

16  Q.   And on this exhibit, you have as the time of death --

17  there is a "PRO" in front of that.  What is that?

18  A.   PRO means "pronounced."

19  Q.   Pronounced.  Okay.  You had testified that based on your

20  investigation, Mr. Jordan was found at seven o'clock in the

21  morning?

22  A.   Yes.

23  Q.   And then you went to the location and conducted your

24  investigation; right?

25  A.   Correct.

1  Q.  So when death is pronounced, what does that mean?

2  A.  Someone goes and checks for a pulse or whatever, and they

3  are pronounced.  I say, "Yes, he's dead."

4  Q.  So that doesn't mean necessarily that that's when the

5  person died?

6  A.  No, no.

7  Q.  In fact, he could have died hours before?

8  A.  Well, he -- according to the witness or the -- whoever I

9  spoke to, it was either an aunt or a sister, he was seen

10  between 3:30 and four o'clock, I believe it said, a.m., so

11  somewhere between there.  I believe that he was dead at seven

12  o'clock, whenever they found him.

13  Q.  So somewhere in that time?

14  A.  Yeah.  And it was like 25 miles from the coroner's office

15  to his home, so it took me some time to get there.

16  Q.  Okay.  Now, you stated in your investigation in addition

17  to interviewing people that you look at the scene, you count

18  the pills.  Do you request medical records of the person?

19  A.  Yes, if necessary.  Most of the time, the Medical

20  Examiner, if they need them, they'll ask us for them and we

21  try to accommodate them however we can.

22  Q.  Did you do that in this case?

23  A.  I don't have the records, so I couldn't tell you if I did

24  or not.

25  Q.  So the medical history that you received about Mr. Jordan

1  came from his family members; correct?

2  A.  Yes.  I would have to say yes because I'm not sure if I

3  did request any other medical records or not for him.

4          MS. CROUSE:  Can I have one moment, Your Honor?

5          THE COURT:  Yes.

6      (Pause in proceedings.)

7          MS. CROUSE:  Thank you.  Nothing further.

8      Thank you, sir.

9          THE COURT:  Redirect?

10         MR. WRIGHT:  Nothing further, Your Honor.

11         THE COURT:  All right.  Thank you.  Counsel, is there

12 any reason for Mr. Pack to remain available for recall?

13         MR. WRIGHT:  No, Your Honor.

14         MS. CROUSE:  No, Your Honor.

15         THE COURT:  Thank you, sir.  You may step down.

16 You're excused.

17     (The witness was excused.)

18         THE COURT:  Ladies and gentlemen, it is 4:30 and time

19 to recess, not only for the day but for the week.  You'll be

20 reminded there is no session tomorrow, no session on Friday,

21 so it will be a long recess.

22     As tempting as it might be, please do not discuss the case

23 among yourselves or with anyone else, including family or

24 friends, over the long recess.  Make no attempt to do any

25 research of any kind regarding any issue or person involved in

the case.  Don't share your thoughts or anything else about

the issues or the persons involved in the case by Internet,

Facebook, Youtube, et cetera, et cetera, et cetera.

So have a nice break, and we'll see you Monday morning at

9 a.m.

(The jury left the courtroom at 3:35 p.m.)

(BEFORE THE COURT)

THE COURT:  Counselors, is there anything that you'd

like to put on the record in the absence of the jury before we

recess for the week?

MR. OAKLEY:  Not from the United States, Your Honor.

MS. CROSS:  No, Your Honor.  Thank you.

THE COURT:  Okay.  And just a reminder that we will

not have a morning session next Thursday, the 24th.  We'll

begin at one o'clock.  To the extent you're doing scheduling,

you are reminded of that.

And then, Miss Brown, what is taking place in this room on

the 18th?  Are we having the sentencings that are scheduled?

COURTROOM DEPUTY:  Yes.

THE COURT:  All right.  So while you don't have to

pack up everything and take it back to your offices, if you

can at least leave a little space for counsel?

COURTROOM DEPUTY:  We can move, if you'd like.

THE COURT:  Is Judge Black's courtroom in use?

COURTROOM DEPUTY:  It should be available because I

know that he's out of town.

THE COURT:  I just noted on the calendar that one of the conferences is scheduled for his jury room, and I assume that's because of the cast of thousands that will be involved.

COURTROOM DEPUTY:  Right.  We usually meet in our jury room.

THE COURT:  Since we'll be adjacent to Judge Black's courtroom, perhaps we could spend the day there, and counsel won't have to move anything.

COURTROOM DEPUTY:  Yes.

THE COURT:  All right.  You have a reprieve from tidying up.  You can leave as much as you'd like.  Miss Brown will lock up and do bodily harm to anyone who wants to come in and go through your things.

So have a pleasant weekend, long weekend, and we'll see you Monday.

MR. OAKLEY:  Are we starting at one o'clock on the 24th?

THE COURT:  Yes, sir.

COURTROOM DEPUTY:  This court is in recess until March 21st at nine o'clock.

(The proceedings concluded at 4:40 p.m.)

1               **I N D E X**

2

3                        **W I T N E S S E S**

4

5   <u>George Pettit, M.D.</u>        <u>Direct</u>    <u>Cross</u>    <u>Redirect</u>    <u>Recross</u>

6   **Examination by Mr. Wright    3**                    **15**

7   **Examination by Ms. Cross                9**

8

9   <u>John Walker</u>

10  **Examination by Mr. Wright    16**                   **27**

11  **Examination by Ms. Cross                25**                      **28**

12

13  <u>Darrel Pack</u>

14  **Examination by Mr. Wright    29**

15  **Examination by Ms. Crouse                37**

16

17

18                     **E X H I B I T S**

19

20  <u>GOVERNMENT'S</u>:                                **Admitted**

21  **Exhibit 34a, first page**                        **5**

22  **Exhibit 34b**                                    **16**

23  **Exhibit 40a**                                    **31**

24  **Exhibit 40b, last page**                         **36**

25

1                    C E R T I F I C A T E

2

3      I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

4 THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

5

6 S/MARYANN T. MAFFIA, RDR

7 Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25