UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


UNITED STATES OF AMERICA,　　　　.　CRIMINAL NO. 1:07-cr-60(3)
　　　　　　　　　　　　　　　　　.
　　　　　　Plaintiff,　　　　　　.　Cincinnati, Ohio
　　　　　　　　　　　　　　　　　.
　　　　- v -　　　　　　　　　　 .　Monday, April 11, 2011
　　　　　　　　　　　　　　　　　.　Morning Session
PAUL H. VOLKMAN,　　　　　　　　 .
　　　　　　　　　　　　　　　　　.
　　　　　　Defendant.　　　　　　.　*Day 19 of Jury Trial*
. . . . . . . . . . . . . . . . .


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SANDRA S. BECKWITH, SENIOR JUDGE, and a
JURY

<u>APPEARANCES</u>:

For the Plaintiff:　　　UNITED STATES ATTORNEY'S OFFICE
　　　　　　　　　　　　　BY: Timothy D. Oakley, Esq. (AUSA)
　　　　　　　　　　　　　and  Adam L. Wright, Esq. (AUSA)
　　　　　　　　　　　　　221 East Fourth Street, Suite 400
　　　　　　　　　　　　　Cincinnati, Ohio  45202


For the Defendant:

W.C. CROSS & ASSOCIATES, LLC　　　STRAUSS & TROY, LPA
BY: Wende C. Cross, Esq.　　　　　BY: Candace C. Crouse, Esq.
3460 Reading Road　　　　　　　　 The Federal Reserve Building
Cincinnati, Ohio  45202　　　　　 150 East Fourth Street
　　　　　　　　　　　　　　　　　　Cincinnati, Ohio  45202


Also present:　　　　　　Agent Christopher Kresnak (DEA)

Law Clerk:　　　　　　　 Laurie J. Nicholson, Esq.

Courtroom Deputy:　　　 Mary C. Brown

Court Reporter:　　　　 Luke T. Lavin, RDR, CRR
　　　　　　　　　　　　　838 Potter Stewart U.S. Courthouse
　　　　　　　　　　　　　100 East Fifth Street
　　　　　　　　　　　　　Cincinnati, Ohio  45202



*Proceedings recorded in stenotype;
transcript prepared by computer.*

1                        P R O C E E D I N G S

2        (In open court at 9:03 AM, with jury present.)

3        (L. Douglas Kennedy, M.D. resumes the witness stand.)

4            THE COURT:  Good morning, everyone.  Welcome back.

5        And I think we are ready to resume with cross.  Yes?

6            MS. CROSS:  Thank you, Your Honor.

7            THE COURT:  Good morning.

8                   CROSS-EXAMINATION (Continued)

9    BY MS. CROSS:

10   Q.  Good morning, Dr. Kennedy.

11   A.  Good morning.

12   Q.  If you wouldn't mind, we're going to be talking about John

13   Huffman, Exhibit Number 28a.  Now, you reviewed a file for John

14   Huffman; right?

15   A.  Yes.  Yes, I did, I believe.  I need to -- if you could

16   show me the -- I have to look through my list.  Yeah, John

17   Huffman.  That was the second of the four reports, yes.

18   Q.  And how many pages of medical chart did you review?  Do you

19   have that in your notes?

20   A.  No.

21   Q.  So you don't remember?

22   A.  No.  That was the -- one of the preliminary reviews where I

23   reviewed those, I believe, in the DEA office and I wasn't given

24   any records to keep or that I could take away and look at.

25   Q.  So in your analysis of John Huffman's file, you have not

1  looked at any medical records?

2  A.  No.  I looked at the medical records at the DEA office when

3  I did the review, the second of four reports, so that was six

4  years ago.  Well, five and a half years ago.

5  Q.  My question is, do you remember how many pages that you

6  reviewed?  Do you have a notation as to how many pages of the

7  record you reviewed?

8  A.  Not specifically in his case, no.

9  Q.  Okay.  John Huffman became a patient of Dr. Volkman's on

10 May 19th, 2003; right?

11 A.  Yes.  I have, "Dates seen:  5/19/03 to 5/16/05."

12 Q.  And did you know that he had been a patient at Tri-State

13 before that time period?

14 A.  No, I don't recall that specifically.  I'd have to see the

15 records.

16         MS. CROSS:  Your Honor, may I publish various pages

17 out of Government Exhibit 28a?

18         THE COURT:  I believe that you can.

19     You may.

20 Q.  I'm going to show -- do I have the right page?

21     I'm going to show you page 346 of that exhibit.  Do you see

22 the date on here?  Is that a notation for John Huffman?

23 A.  I'll take your word for it.  It's redacted so --

24 Q.  Does it appear to be a progress note?

25 A.  Yes.

1    Q.   What's the date?

2    A.   9/25/04.

3    Q.   And that's not '02?

4    A.   What?

5    Q.   Excuse me.  This is not an "02"?

6    A.   It might be an "02."  It looks like an "02," I guess.

7    Q.   And this is a progress note for John Huffman in 2002;

8    correct?

9    A.   If you say so.

10   Q.   Do you see on this record where he's been prescribed any

11   pain medication?  Percocet?

12   A.   Yes.  That's by Dr. Sherfey.  That would probably have been

13   at Tri-State in South Shore, Kentucky.

14   Q.   Okay.  And so had you seen this record in your review of

15   the records of John Huffman?

16   A.   I don't recall.  I just have the dates when Dr. Volkman saw

17   him.  I very well could have seen that, but I specifically

18   listed just on my summary, since this was a summary report,

19   when Dr. Volkman first saw him.

20   Q.   So do you know if you reviewed any other medical records

21   outside of the time period that Dr. Volkman saw Mr. Huffman?

22   A.   No.  I just know I reviewed the records that was given to

23   me that day that I did the review on September -- around

24   September 1st, 2005.

25   Q.   Okay.  So you have no independent recollection as to

 1  whether or not you reviewed any records outside of May '03 to

 2  May '05; correct?

 3  A.  I don't have a specific recall of that, no.

 4        MS. CROSS:  Okay.

 5     Your Honor, if I may go back to the Elmo and publish more

 6  pages out of Exhibit 28a.

 7        THE COURT:  You may.

 8  Q.  I'm going to show you page 334 --

 9        MR. OAKLEY:  Your Honor, if I may object.  I believe

10  it's actually 28b.

11        THE COURT:  Ah, that explains something.  Okay.

12        MS. CROSS:  That is correct.  Thank you.

13        THE COURT:  All right.

14  Q.  This is page 334, 28b; is that correct?  Do you see that

15  page number?  Is that right?

16  A.  It says 334 at the bottom.

17  Q.  Okay.  Was John Huffman seen and treated by Dr. Sherfey in

18  September of 2002?

19  A.  I don't know.  You're only showing me part of the page.

20  Q.  Do you have the page in front of you?

21  A.  No.

22  Q.  28b.

23  A.  No.  I'm running out of room here.

24     28d, as in David?

25  Q.  "b," as in boy.

1  A.  Okay.

2  Q.  Page 334.

3  A.  Okay.

4      Yes, that I have.

5  Q.  And are you looking at page 334?

6  A.  Yes.

7  Q.  Okay.  And looking at page 334, was John Huffman treated by

8  Dr. Sherfey in September of 2002?

9  A.  Yes.

10  Q.  This appears to be a progress note from that treatment;

11  correct?

12  A.  Yes.

13  Q.  And looking at page 343 -- I'll put page 343 on the

14  screen -- this is from the same treatment day; correct?

15  A.  Yes.  9/25/02.

16  Q.  And Dr. Sherfey discusses MRI, right, of the hip?

17  A.  Yeah.  It looks like it's dated -- I'm sorry.

18  Q.  Dated April 4th, 2001, right, in the middle of the page?

19  A.  April 4th, 2001.

20  Q.  And he discusses with -- or he discusses in this record MRI

21  of the congenital hip.  It shows congenital hip dysplasia, the

22  MRI?

23  A.  Yes.

24          THE COURT:  What page are you on?

25          MS. CROSS:  343.  I believe it's 28b.

1    THE COURT:  All right.  Thank you.

2    Q.  And do you see the notation, Dr. Kennedy, kind of the

3    bottom of the page there, April 3rd, 1997?

4    A.  Yes.

5    Q.  And was it recommended that Mr. Huffman have both of his

6    hips replaced?

7    A.  Yes.  That was what it says in the note.

8    Q.  Will you look at page 281 of that same exhibit.

9    A.  Okay.  I have it.

10   Q.  Are you looking at page 281?  Do you recall whether or not

11   you reviewed this report in the Huffman file during your

12   analysis?

13   A.  I don't specifically recall, no.

14   Q.  But this appears to be a consultation report from Dr. Herr;

15   correct?

16   A.  Yes, it does.

17   Q.  March 17th, 1997?

18   A.  Yes.

19   Q.  And you don't recall whether or not you reviewed that

20   record, specific record when you made your analysis; correct?

21   A.  The answer's still yes.

22   Q.  I'm going to show you page 238, if you wouldn't mind

23   turning to page 238.  Page 238.

24   A.  Okay.

25   Q.  Does this appear to be an MRI of the lumbar spine for John

1  Huffman?

2  A.  Yes.

3  Q.  This is an MRI of the -- can you pronounce this word here?

4  A.  Lumbosacral spine, yeah.  It's a normal MRI of lumbosacral

5  spine, pretty much.

6  Q.  Okay.  Will you please read what it says here.

7  A.  Where?

8  Q.  (Indicating.)

9  A.  "Examination is performed because of history of low back

10  pain radiating to right and left hips and legs."

11      Do you want me to keep going?

12  Q.  What's the conclusion?

13  A.  "Minimal bulging at L1-2 and L2-3.  Otherwise normal MRI of

14  the lumbosacral spine."

15  Q.  Do you know if you reviewed this record when you made your

16  analysis?

17  A.  No, I don't specifically recall.

18  Q.  I'm going to show you, if you wouldn't mind turning to page

19  246 of the same record.

20  A.  Okay.  I have it.

21  Q.  Okay.  Is this page 246 we have on the screen?

22  A.  Yes, it is.

23  Q.  Okay.  Does this appear to have been completed by nurse

24  Elizabeth Madden?

25  A.  Yes, and a nursing assistant before that as well.

1    Q.  But it's signed here.  I mean, the name here is Elizabeth

2    Madden; right?

3    A.  Well, it's hard to -- it looks like there's a "CRNA" or

4    something.  So I'm not sure whether there's two people or

5    whether -- usually their degree goes in front of their name, so

6    I don't know.  It's Elizabeth Madden.  I don't know who she is

7    or whether she's a CRNA or whether there's another person who's

8    a CRNA.

9    Q.  My question was not what her capacity was.  My question

10   was, is Elizabeth Madden's name there?

11   A.  Yes, Elizabeth Madden's name is there.

12   Q.  Okay.  And do you have any recollection as to whether or

13   not you reviewed this document, it appears to be three pages,

14   when you completed your analysis for John Huffman?

15   A.  I don't specifically recall.

16   Q.  Do you see what the complaints were?

17   A.  It says, "Stomach pain.  Bleeding with most NSAIDs" --

18   non-steroidal anti-inflammatories -- "taken.  NSAID use since

19   industrial injury 3/14/87."

20   Q.  I'm going to show you page 297 of the same record, 28b.

21   A.  297?

22   Q.  Yes, sir.

23   A.  Okay.

24   Q.  297.  Can you tell us what that is when you get to it?

25   A.  It's a page of records.

1   Q.   What is it entitled?

2   A.   "Tri-State Health Care and Pain Management, Portsmouth,

3   Ohio, Summary for Chronic Pain Treatment."

4   Q.   Is this a record signed by Dr. Volkman?

5   A.   Yes, it appears to be.

6   Q.   And it's three pages; right?

7   A.   Yes.

8   Q.   And this is the summary of his treatment for John Huffman,

9   the summary dated what date?

10  A.   6/24/03.

11  Q.   And it lists pain history; correct?

12  A.   Yes.

13  Q.   It lists -- what's the next category listed there?

14  A.   Family History.

15  Q.   The next?

16  A.   Exam.

17  Q.   And the exam goes on to page two; right?

18  A.   Yes.  Yeah, exam is just listed on page one.  So, yeah, the

19  body of it, four lines on page two.

20  Q.   And then the next category?

21  A.   Prior Consultations.

22  Q.   The next category?

23  A.   Laboratory Data.

24  Q.   Then Diagnosis?

25  A.   Yes.

```
1   Q.  What's the next category?

2   A.  Coexisting Diseases.

3   Q.  Did you miss Pain Effect under G?

4   A.  Yes.  That was a paragraph.  That was indented, so I missed

5   that.  Yeah, Pain Effect.

6   Q.  The next category?

7   A.  Effect of pain on Psychological function.

8   Q.  The next category?

9   A.  Treatment Prior to Tri-State Health Care.

10  Q.  And then on the final page, will you just list the

11  categories.

12  A.  Medical Indication for Controlled Substance Use.

13      Do you just want the main headings?

14  Q.  Yes, sir.

15  A.  And M would be Management Plan.

16  Q.  Do you know if you reviewed that record in coming to

17  your -- in your reviewing the records for John Huffman?  Do you

18  recall?

19  A.  I don't recall this record specifically, no.

20  Q.  You would agree that is a summary of his treatment and the

21  plan for John Huffman; correct?

22  A.  That's what it says at the beginning of the document.

23  Q.  May I show you page 166 of Exhibit 1 -- I'm sorry, Exhibit

24  28a.

25  A.  What was the page number between?
```

1  Q.  166.

2  A.  Okay.

3     Okay, I have that.

4  Q.  Are we still talking about John Huffman's file?

5  A.  Can I see the bottom of the page, please, on yours?

6  Q.  Yes.  Do you want to see the whole page or just the bottom?

7  A.  No, just the bottom.  I just need to -- yes, that's the one

8  I have.

9  Q.  Okay.

10  A.  Thank you.

11  Q.  Now, what does this document appear to be?

12  A.  It looks like a letter to the industrial commission of

13  Ohio, bureau of workers' compensation.

14  Q.  Written on behalf of John Huffman?

15  A.  Yes.

16  Q.  By whom?

17  A.  It looks like a -- the signature, it looks like it's on the

18  third page, so it's a three-page document.

19  Q.  Who's the signature by?

20  A.  Dr. Volkman.

21  Q.  Do you know if you reviewed that record in making your

22  analysis of this case?

23  A.  No, I don't specifically recall.

24  Q.  Now, John Huffman was a patient and an employee of Dr.

25  Volkman's; correct?

1  A.  I didn't know he was an employee.  I don't recall.

2  Q.  Okay.  You testified last week that it's not a good

3  practice to treat employees as patients as well because there's

4  no checks and balances.  Do you remember saying that?

5  A.  Well, that was in reference to prescribing controlled

6  substances on a long-term basis, I believe.

7  Q.  But a doctor is not prohibited from doing so; right?

8  A.  Correct.

9  Q.  That was just your opinion?

10  A.  No.  It's been by every medical board or every body that

11  I've been in contact with over my years.  So, no, it's not just

12  my opinion.

13  Q.  Well, it's not a prohibited act to do so; right?

14  A.  Right.  It's not a prohibited act, but it's not something

15  that is recommended.

16  Q.  But many doctors do it?

17  A.  I don't know how many doctors do it, so I can't answer

18  that.

19  Q.  Do doctors do it?

20  A.  We know one doctor that did.

21  Q.  Well, do other doctors do it?  Do you know of more than one

22  doctor that's done it?

23  A.  Done what?

24  Q.  Treated a patient who was an employee.

25  A.  With controlled substances on a long-term basis?

1    Q.  Yes.

2    A.  No, I don't know of any others.

3    Q.  Do you know Dr. Severyn at The Ohio State University

4    Medical Center?

5    A.  Dr. Severyn, no.

6    Q.  I'm going to show you a document.  I'll give the government

7    a copy of this to see if -- ask you just to read the high-

8    lighted portion to yourself.  Just --

9            THE COURT:  Oh.

10           MS. CROSS:  I'm sorry, Your Honor.

11           THE COURT:  That's all right.

12   Q.  Doctor, if you'll just read it to yourself.

13   A.  Okay.

14   Q.  The highlighted portion of that letter.

15   A.  Sorry.  You had me trained to read out loud.

16       Okay.

17   Q.  Now I'm just going to ask you to identify the document.

18   Does it appear to be a document written by Dr. Severyn?

19           MR. OAKLEY:  Your Honor, I'm going to object.

20           THE COURT:  Sustained.

21   Q.  I'll take it back.

22   A.  Thank you (handing document).

23   Q.  Can you turn to Exhibit 31.

24   A.  28a?

25   Q.  31.

1   A.   Yeah.   31 in 28a still?

2   Q.   Exhibit 31.

3   A.   Oh, Exhibit 31.  That's why I asked.  Thank you.

4          COURTROOM DEPUTY:  That's all right, I'll get it.

5   Q.   Now, you reviewed the file of Grover Russell; right?

6   A.   I have to look.

7      Yes.  Grover Russell, yes.  That was on, also, my second

8   report five and a half years ago.

9   Q.   Do you recall, or do you have any notation as to how many

10  pages you reviewed?

11  A.   No, it doesn't say specifically how many pages.  I do have

12  some notes on Grover Russell, though.

13  Q.   Okay.  Now, Grover Russell, that was a patient of yours at

14  one time; correct?

15  A.   I don't recall.

16  Q.   You don't recall in 1999 him being a patient of yours?

17  A.   No.  No, I don't recall that specifically.

18          MS. CROSS:  Okay.  Your Honor, I'm asking permission

19  to publish various pages out of Exhibit 31.

20  A.   That is in my notes, though, that I have here.  I just saw

21  it.

22          THE COURT:  Yes, you may.

23          MS. CROSS:  Thank you.

24  Q.   The first page I'd like to show you is page 23 out of

25  Exhibit 31.  If you'll turn to page 23, Doctor.

1   A.   Okay.

2        Okay.

3   Q.   Does this appear to be a letter written by you on your

4   letterhead?

5   A.   May I see the bottom of the page, please.

6   Q.   (Complies with request.)

7   A.   Yes, it appears to be.

8   Q.   Your treatment of Grover Russell?

9   A.   Yes.  A letter to Dr. Smith in Paintsville, Kentucky.

10  Q.   1999?

11  A.   Yes, June 16th of 1999.

12  Q.   And will you please read out loud the next-to-last para-

13  graph that's highlighted.

14  A.   The whole paragraph, or just the line that's highlighted?

15  Q.   Just the part that's highlighted.

16  A.   Okay.  "I believe the patient is 100 percent occupationally

17  disabled for any job for which he has experience or training or

18  physical ability to carry out."

19  Q.   Will you turn to page 21 of the same record.  Page 21.

20  A.   Okay.

21  Q.   Do you want to look at the screen to make sure this is page

22  21.

23  A.   Yes.

24  Q.   The same page you're looking at?

25  A.   Let me see the top, please.  That's it.  That appears to be

 1   the same thing.

 2   Q.   And this is still for Grover Russell; right?

 3   A.   Yes.

 4   Q.   And you diagnosed him with lumbar spondy-- can you say that

 5   word?

 6   A.   Spondylosis.

 7   Q.   Thank you.

 8   A.   No problem.

 9   Q.   And the next sentence?

10   A.   Compression.

11   Q.   Can you -- the next sentence.

12   A.   Oh, I'm sorry.  I apologize.  "He had a compression

13   fracture previously in upper lumbar vertebrae."

14   Q.   And you also prescribed him medication; correct?

15   A.   Yes.

16   Q.   What did you give him?

17   A.   Oxycodone, five milligrams twice a day; Elavil, 50 milli-

18   grams at nighttime; oxyContin, ten milligrams three times a

19   day; Paxil, 60 milligrams; Celebrex, 200 milligrams twice a

20   day; and he also received Zestril, a blood pressure medicine.

21   Q.   Now, did the patient make any comments to you that you

22   noted in the record?

23   A.   "He states the pain is not really any better.  He has pain

24   all over."

25   Q.   Will you look at page 19.  Page 19.

1   A.   Yeah.  Could you kind of make it smaller so I can --

2   Q.   See the whole page?

3   A.   Yes.  I just want to make sure I have the right thing.

4   Q.   The whole page?

5   A.   Almost there.  I think that's it.  That appears to be the

6   same thing.

7   Q.   Now, if you look at the second paragraph, does it indicate

8   that you had performed an epidural injection at the end of last

9   year in 1998?

10  A.   Yes.

11  Q.   And what is your comment after that?

12  A.   "These did not help."

13  Q.   And did you also perform a lumbar facet injection initially

14  that helped but on repeat didn't help?

15  A.   Correct.

16  Q.   And did you also note that you're considering doing a

17  rhizotomy, but that is not an option at this point?

18  A.   Yes.

19  Q.   What's a rhizotomy?

20  A.   That's when you deaden up the nerves that go to the facet

21  joints, the small nerve.  It doesn't create any paralysis or

22  anything; it just deadens up the joint for pain.

23  Q.   And did you also indicate that he's not an operative

24  candidate at that time?

25  A.   Dr. Stephens had determined that, orthopedic surgeon.

1   Q.  But you noted that in your record; right?

2   A.  Yes.

3   Q.  Can you turn to page 34 in the same report.  And page 34 is

4   still your record; correct?  Page 34, is this still your

5   record?

6   A.  Can I see the top?

7   Q.  Is that your signature?

8   A.  Well, it's a signature on a piece of paper.  You're still

9   not showing me.  I want to match the documents up, if I could.

10  Q.  I will.  Is that your signature?

11  A.  It looks like mine, yeah.

12  Q.  Is that the page you're looking at?

13  A.  Yes, that's the same page I'm looking at.

14  Q.  Will you read the highlighted portion of this document.

15  Let me try to make it a little bit better.

16  A.  "He is not able to walk but about a one-half mile every

17  couple of days or so.  He has decreased ability to have sex

18  with his wife due to the persistent pain.  It hurts so bad that

19  he does not have any desire."

20  Q.  And then the highlighted portion at the bottom, you put him

21  on what, what medication?

22  A.  Oh.  We bumped his oxyContin up to every eight hours.

23  Q.  Will you turn to page 18, the same record.

24  A.  Sorry.  It has three paper clips on it.

25  Q.  And I'll ask you if page 18 is your still your record.

1   A.   Page 18 is.

2   Q.   Looking at the whole document, is that your record?

3   A.   That looks like the same thing.

4   Q.   And we're still talking about Mr. Groover Russell; right?

5   A.   Yes.  Russell Grover.

6   Q.   Russell Grover, excuse me.

7        Now, in looking at this record, you were treating his wife

8   as well; correct?  Or she was being treated at your clinic?

9   Here do you see on the -- what does that say in the pink?

10  A.   "He was accompanied by his wife today."

11  Q.   And then after that?

12  A.   "She is in for pump refill today."

13  Q.   Does that mean you were also treating his wife?

14  A.   Someone in the office was, apparently.

15  Q.   In your office?

16  A.   Yes.  There are other doctors in the office too.

17  Q.   Will you see -- okay.  That's all I wanted to ask you about

18  that.  Thank you.

19  A.   You're welcome.

20  Q.   Now, Mr. Russell started going to Tri-State Health Care in

21  June 2002.  Is that what your notes reflect?

22  A.   Oops.  Sorry.

23       Yes, Tri-State Health Care.  It looks like the South Shore

24  office.  Dr. Sherfey saw him on that date.

25  Q.   I'd like for you to turn to page 132.

1   A.   Okay.

2   Q.   Page 132.  Is that what we have on the screen here?

3   A.   Yeah, that's most of it.  Yep, I believe that's it.

4   Q.   Okay.  I'm moving it up a little bit so you can see the

5   whole page so we make sure we have the entire record that

6   you're looking at.

7   A.   Yes.

8   Q.   Now, you said he started going there in 2002 to Tri-State;

9   right?  That is a record for what date?

10  A.   6/11 of '02.

11  Q.   And it indicates that this patient had had previous

12  epidural injections with Dr. Hasshim in Lexington?

13  A.   Yes.

14  Q.   Turn to page 141-142, if you wouldn't mind.

15  A.   Okay.  I have that.

16  Q.   Is this the page you're looking at?

17  A.   Yes, that appear -- yeah, that's the page.

18  Q.   And what is this?

19  A.   It's an MRI scan of the lumbar spine without gadolinium, or

20  contrast media, for Grover CR.

21  Q.   And the date?

22  A.   June 28th, 2002.

23  Q.   And do you know if you had an opportunity to look at this

24  record in your analysis of Mr. Russell?

25  A.   No, I don't specifically recall.

1   Q.  Turn to the next page, 142.  Can you look at page 142.

2   A.  Yes.

3   Q.  Do you know what that appears to be?

4   A.  Those are some -- a Xerox copy of some MRI images.

5   Q.  MRI images?

6   A.  Yes.

7   Q.  And Dr. Volkman began treating Mr. Russell on April 22nd,

8   2003; right?

9   A.  Yes, April 22nd, 2003.

10  Q.  And I'm going to show you a few pages, starting with page

11  91.  If you'll just keep the book in front of you, we're just

12  going to skim through a couple of pages.

13  A.  Yes, ma'am.  I'm sorry.  The page?

14  Q.  91.

15  A.  Thank you.

16      Okay.

17  Q.  Looking on the screen, does this appear to be what you

18  have?

19  A.  Yes.

20  Q.  Now, this is a progress note from Dr. Volkman; right?

21  A.  I don't know.  There's --

22  Q.  Was this in the file of Grover Russell?

23  A.  Yes.  There's no signature on this.

24  Q.  What's the date?

25  A.  4/22/03.

1   Q.   And that's the first date that Dr. Volkman saw Mr. Russell;

2   correct?

3   A.   Correct.

4   Q.   And does this appear to be a physical exam on this progress

5   report?

6   A.   Of sorts.

7   Q.   Will you read it.  What's highlighted?

8   A.   "Tender C5-6.  Left trapezius, arrow, left arm.  Tender

9   L5-S1," which is the low back.  C5-6 is the lower part of the

10  neck.  L5-S1 is the lower part of the back.

11       "Both glutes" -- which are the buttock muscles, the gluteal

12  muscles -- "right greater than left.  Straight leg raise," it

13  says "P," probably for positive -- "right 20, left 20 degrees,"

14  I suppose, "hip 60 lateral, 70 degrees left," and I guess

15  that's "lateral bending," probably, "ten" and "five" degrees,

16  would be my guess.

17  Q.   Okay.

18  A.   "Left ankle tender without swelling.  Full range of

19  motion."

20  Q.   Does that appear to be a physical exam on April 22nd, 2003?

21  A.   For the -- for the initial first visit, yes, that's a very

22  limited exam.

23  Q.   The next visit, will you turn to page 86.

24  A.   Okay.

25  Q.   Page 86, does that look like the bottom of page 86 that

1  you're looking at?

2  A.  Yes.

3  Q.  All right.  And this is, again, for Mr. Grover Russell?

4  A.  Yes, I guess.

5  Q.  It appears to be a -- do you want to see the whole page?

6  A.  Yeah.  Yeah, I'd prefer.  I just want to make sure we're on

7  the same page.

8  Q.  Is that what you're looking at?

9  A.  Yes, it is what I'm looking at.

10  Q.  All right.  Now, is this for May 2003 office visit?

11  A.  Yes.

12  Q.  Which would be the very next month from the last exhibit we

13  saw?

14  A.  Yes.

15  Q.  And does it appear to be a physical exam?

16  A.  Of sorts.  Very, very minimal, limited.

17  Q.  Will you please read what it says.

18  A.  "Tender L5-S1.  Right greater than left glute."  Right and

19  left, again it has a series of numbers without being indexed as

20  far as what they were.  I suppose that's still -- the 20s are

21  probably straight leg raise.  The other is whatever he called

22  it the previous time, and the zero would be what he called it

23  the previous time.

24  Q.  Looking at page 81 --

25  A.  Yes, that's it.

1  Q.  -- is this for the very next month, June 2003, progress

2  note?

3  A.  Yes.

4  Q.  Does this appear to be a physical exam?

5  A.  Yes.

6  Q.  Can you please read that, what's highlighted.

7  A.  "Tender C5-6."  Something "radiates."  I suppose radiates.

8  Maybe to the right arm.  "No numbness."

9     "Tender L5-S1.  Low back.  Right greater than left glute,"

10  or toward over the buttocks, and then the same series of

11  numbers, right and left.

12  Q.  Will you please turn to page 76.  Is this the very -- is

13  this a progress note for the same patient, Grover Russell?

14  A.  That's hard to say.  It almost looks like the first name's

15  Connor.  I guess that could be Grover Russell, yeah.

16  Q.  And is this a progress note for office visit July 2003?

17  A.  Yes, about a month later.

18  Q.  Is there a physical exam noted?

19  A.  Just the series -- yes.  Yes, there is a physical exam

20  noted.

21  Q.  Can you turn to page 63.  Is this another progress note for

22  patient Grover Russell?

23  A.  Yes, that looks like.

24  Q.  What's the date?

25  A.  8/19/03, or a month later.

1   Q.   One month later?

2   A.   Yes.

3   Q.   And does this appear to be a physical exam?

4   A.   There's a series of numbers there.

5   Q.   Does that appear to be --

6   A.   It appears to be some type of physical exam.

7   Q.   And this particular record, will you please read what's

8   highlighted here.

9   A.   "Patient agrees that all information provided is true and

10  factual to their knowledge.  That they understand and are

11  compliant with our narcotic agreement and that they have been

12  given a copy and understand our privacy policy pertaining to

13  HIPAA regulations."

14  Q.   Does this appear to be a "G" and an "R" --

15  A.   Yes.

16  Q.   -- as an initial by the patient?

17  A.   Yes, it appears to be a "G" and an "R."

18  Q.   Does it appear to be a patient initialing that the

19  information on this record is true?

20  A.   It appears to be a G and an R, so that's all I can say.

21  Q.   And is the diagnosis bilateral sciatica?

22  A.   Yes, that's the diagnosis.

23  Q.   Now, Dr. Volkman saw Grover Russell every month for the

24  next three months; correct?

25  A.   For which three months?

1    Q.  Well, we've already looked at on the screen April, May,

2    June, July and August; correct?

3    A.  Yes.  Yes, and I have down that he saw Mr. Russell

4    September 18th of '03, a month later, then another month later

5    10/20/03, and then another month later 11/21/03.

6    Q.  So he saw him for the next three months; right?

7    A.  Yes.

8    Q.  Now will you turn to page 21 of that same record.

9    A.  Yes.

10   Q.  We're still with Exhibit 31.

11   A.  Okay.

12       Yes.

13   Q.  Will you please read what's on the screen on page one of

14   the record.

15   A.  "Left when I announced it was drug test day 12/18/03."

16   Q.  Will you turn to Government Exhibit 38a, please.

17   A.  Government Exhibit page -- oh, 38a.  I'm sorry.

18   Q.  We'll have to give you the exhibit binder.

19   A.  Okay.

20   Q.  38a.

21       Well, let me ask you before we give that to you, did you

22   review the medical file for Velva Thurman?

23   A.  Yes.

24   Q.  Do you recall or have any notations, Dr. Kennedy, as to how

25   many pages of record that you had to review when you made your

1  analysis?

2  A.  Yeah.  It will just take me a second.  Tim Thurman.

3      Velva Thurman, yes.  I don't have the specific number of

4  pages written down, though.  I have the dates.

5  Q.  But you did note that the treatment was from May 13th,

6  2003, to June 3rd, 2005, for Ms. Thurman, the treatment by Dr.

7  Volkman?

8  A.  Yes.

9  Q.  Do you recall or have any notations as to whether or not

10 you had any records outside of that time period that you

11 reviewed in your analysis?

12 A.  Yes.  I had the 12/17/99 MRI of the cervical and lumbar

13 spine, the February 11th, 2002, Dr. Cox Tri-State Health Care.

14 Q.  Okay.  Let me ask you that since you just mentioned it.

15      MS. CROSS:  Your Honor, may I publish page 210 of

16 Exhibit 38a?

17      THE COURT:  You may.

18 Q.  Now, Velva Thurman was an established patient long

19 before -- well, she was an established patient at Tri-State

20 long before Dr. Volkman got there; correct?

21 A.  I don't know when he got there.  This would have been

22 Tri-State in South Shore, Kentucky, I suppose, but I don't have

23 that written down specifically.

24 Q.  Do you have any information that Dr. Volkman came to

25 Tri-State in April 2003?

1  A.  I have Dr. Volkman.  It looks like the first visit was May

2  13th of '03, but I don't know if it was in the same office or

3  not, based on my notes.

4  Q.  Okay.  But --

5  A.  It might have been the South Shore or the Portsmouth

6  office.  I can't tell.

7  Q.  Okay.  But Velva Thurman was an established patient at

8  Tri-State in 2002; correct?

9  A.  Yes.  It appears at least at the South Shore, Kentucky,

10  office.

11  Q.  Will you look at page 210 of the record.  Do you have 38a?

12  And it's on the screen, Dr. Kennedy.  I'll have you confirm

13  this is what is in the book.  But if you wouldn't mind taking a

14  look at, does this appear to be page 210?

15  A.  Yes, ma'am.

16  Q.  And if you wouldn't mind taking a look at 210 in your book

17  and looking at the screen to confirm that we have the same

18  record up.

19  A.  38a.  Yes, I see that.  That appears to be the same thing.

20  Q.  Now, when you said that you had reviewed a February 11,

21  2002, record from Dr. Cox, is this what you were referring to?

22  A.  I don't recall specifically, but that's the same date.

23  Q.  Okay.  And you see at the bottom where it says high-

24  lighted --

25  A.  Yeah.  There's a -- there's more 2011 notes from that day,

1   so I suspect I looked at both pages.

2   Q.  Okay.

3   A.  There's a form that has some handwritten notations and then

4   this one.

5   Q.  Okay.  Do you know that, in reviewing the records that you

6   reviewed for Velva Thurman, did you know that she had been

7   treated 15 times before Dr. Volkman treated her, 15 times at

8   Tri-State?

9   A.  I'll have to look.  Let's see.  I think I had about at

10  least 12 times.

11  Q.  Did you review -- other than this February 11, 2002, record

12  that we have displayed today, did you review any other

13  Tri-State records on this patient before May 13th, 2003?

14  A.  Yes.  Do you want the dates?

15  Q.  Yes.

16  A.  April 11th of '02, May 9th of '02, June 10th of '02, July

17  9th of '02, August 13th of '02, October 2nd of '02, December

18  4th of '02, January 16th of '03, February 20th of '03, and

19  March 18th of '03.  And then it looks like some -- an April

20  date of '03.

21  Q.  Now I'm going to show you, ask you to look at three pages

22  out of this record:  page 124, 131 and 144.  And I'll give them

23  to you again.  The first page is 124.

24  A.  Okay.

25          MS. CROSS:  Your Honor, may I publish those three

1   pages out of 38a exhibit?

2          THE COURT:  You may.

3   Q.  Is this a progress note for Velva Thurman?

4   A.  Yes.

5   Q.  What date?

6   A.  That's August 13th of '03.

7   Q.  And can you please describe, if you see on there, what

8   medications she was prescribed.

9   A.  Current medications are Lortab, 10 milligram.

10  Q.  I'm sorry.  Give me one second.

11      What's the date?

12  A.  8/13 of '03.

13  Q.  What medication was she prescribed?

14  A.  Well, do you want the ones that she was taking when she

15  came in the office or the ones she was prescribed at the bottom

16  of the page?

17  Q.  I would like the ones that she was prescribed at the bottom

18  of the page.

19  A.  Do you want me to check those against the paper prescrip-

20  tions that were written?

21  Q.  I want you to read page 124.

22  A.  I'm sorry.  I was just going through the same process I

23  followed when I reviewed the charts.

24  Q.  Right here, sir.

25  A.  Yes, I can read that off to you.

1   Q.   Okay.

2   A.   Okay.  Disalcid, D-i-s-a-l-c-i-d, 500 t.i.d.

3   Q.   Okay.

4   A.   Soma 350, one b.i.d.; Lortab 10/500, eight per day; Valium

5   10, one q.h.s.; oxycodone 5 milligrams, eight per day.  Return

6   in one month.

7   Q.   All right.  Will you turn to page 131.

8   A.   Okay.

9   Q.   Does that appear to be a progress note for visit the month

10  before?

11  A.   Yes.

12  Q.   July?

13  A.   Yes, it does.

14  Q.   Was she prescribed medication?

15  A.   Yes.

16  Q.   If you wouldn't mind telling me the date and what she was

17  prescribed.

18  A.   On 7/14 of '03 it was Lortab 10/500.  It doesn't say how

19  many she should take per day or how often.  Soma 350 b.i.d.,

20  twice a day; Disalcid, an aspirin-like drug, 500 t.i.d., three

21  times a day.  Return in one month.

22  Q.   Is that it?

23  A.   Yes.

24  Q.   Okay.

25  A.   It's the bottom of the page.

1   Q.  Will you look at page 144.  This appears to be a progress

2   note for Velva Thurman in April 2003?

3   A.  May I see the page, please.

4   Q.  (Complies with request.)

5   A.  Yeah.  Your memory's better than mine.

6   Q.  Is that right?

7   A.  I can't see the whole page.

8       Thank you.  Yes, that appears to be the same thing.

9   Q.  For April 15th, 2003?

10  A.  Yes, ma'am.

11          MS. CROSS:  I don't know what happened to this.

12  Q.  Can you tell me what she was prescribed?  This is April

13  15th, '03.

14  A.  Yes, ma'am.  It says D/C, or discontinue, Celebrex, which

15  is a non-steroidal anti-inflammatory.

16  Q.  So Celebrex was discontinued?

17  A.  Yes.  And D/C, or stop, Deseryl.

18      D-e-s-y-r-e-l -- D-e-s-e-r-y-l, I'm sorry.

19      Deseryl, which is an antidepressant.  And then the actual

20  prescription is for ibuprofen, 600 t.i.d. with food; Lorcet 10,

21  one q.i.d.  It says, "Back ex.  Return one month."  And Soma

22  350 q.i.d.

23  Q.  Okay.  Doctor, I'm going to have you look at Government

24  Exhibit 37a.  You reviewed the medical file for Tim Thurman as

25  well; correct?

 1   A.  I'm working on it.  37a, that's in another chart.  They're

 2   getting it, though.

 3          COURTROOM DEPUTY:  (Handing exhibit binder.)

 4          THE WITNESS:  Thank you.

 5   A.  Yes.  Tim Thurman, I did review that as well.

 6   Q.  Do you recall or have any independent recollection, sir, as

 7   to whether or not you -- how many pages you reviewed in this

 8   record?

 9   A.  No, I don't have the specific number of pages.  It must

10   have been a few, though.

11   Q.  Now, last week you were shown a page out of Exhibit 37c,

12   which was the physical exam for Tim Thurman dated September

13   14th, '05.

14          MS. CROSS:  Your Honor, may I publish?

15          THE COURT:  You may.

16   Q.  You may or may not remember that you were shown this last

17   week.  Do you have any recollection?

18   A.  May I see the whole page, please.

19   Q.  (Complies with request.)

20   A.  No, I don't recall.

21   Q.  Okay.  This appears to be a physical exam on 9/14/05 for

22   Tim Thurman, though; correct?

23   A.  I guess.  I don't -- yes, it appears to be.  If you say so.

24   Q.  And by your records and your review of the record of Tim

25   Thurman, by September 14th, 2005, he was not a new patient;

1  correct?

2          MR. OAKLEY:  Your Honor, I'm going to object.  We've

3  gone over Tim Thurman last week.  These questions have been

4  asked and answered.

5          MS. CROSS:  May we be heard, Your Honor?

6          THE COURT:  Yes.  Sidebar, please.

7  SIDEBAR CONFERENCE

8          MS. CROSS:  Your Honor, we have reviewed our notes and

9  I do recall asking some questions about Tim Thurman, but I did

10  not ask the questions I'm asking today about Tim Thurman.  And

11  I don't think I'm prohibited from asking additional questions

12  on Tim Thurman since I do have this witness on cross-

13  examination and I did not conclude my cross-examination.

14          MR. OAKLEY:  Your Honor, as far as Mr. Thurman goes,

15  we've gone through page after page of these medical records

16  with him last week.  This is just duplicative of what we did

17  last week.

18          THE COURT:  Well, to the extent that it's different,

19  I'll overrule the objection.  But obviously, Mr. Oakley, if you

20  think the questions or the documents that Ms. Cross is

21  inquiring about are redundant or duplicative, it might be a

22  different response.

23          MR. OAKLEY:  Then we would ask that at least the pages

24  be identified by number.

25          THE COURT:  Okay.

1          MR. OAKLEY:  And they're put up onto the screen.

2          MS. CROSS:  Unfortunately, this page does not have a

3    number.  That's why I didn't identify it, Your Honor.  I can

4    only identify page numbers when there's a page number on it.

5          MR. OAKLEY:  I have pages identified from last week,

6    pages 42 and a number of other pages that just simply were

7    already marked, so -- under 37a.  Whether it's counted forward

8    or --

9          MS. CROSS:  This is 37c, Your Honor.  This record I

10   have up on the board is 37c, and it does not have a page

11   number.  We got it directly out of the government exhibit book.

12         THE COURT:  Okay.  I accept your representation.  I

13   know that there hasn't been a hundred percent consistency on

14   numbering pages.

15      No offense to the government.  Okay?

16         MR. OAKLEY:  None taken.

17   CONCLUSION OF SIDEBAR CONFERENCE

18   BY MS. CROSS:

19   Q.  Dr. Kennedy, I'm showing you that record just as a

20   reference from last week.  Do you remember being shown that

21   page?

22   A.  Not specifically.

23   Q.  Okay.  But by September 14th, 2005, Mr. Thurman was not a

24   new patient at Tri-State; correct?

25   A.  Correct.

1  Q.  He had been a patient of Tri-State's since 2002; right?

2  A.  Yes, it looks like since 2002.

3  Q.  And a patient of Dr. Volkman since April 2003; right?

4  A.  Let me make sure.  I've got the pages out of order.

5      Yeah, it looks like 4/22/03 for Dr. Volkman.

6  Q.  So September 14th, '05, the record we're looking at right

7  now on the screen --

8  A.  Yes, ma'am.

9  Q.  -- that's a follow-up visit; correct?

10  A.  Yeah, I --

11      May I see the whole page, please.

12  Q.  (Complies with request.)

13  A.  Yeah, that appears to be.  I don't know if it's a -- I

14  guess it's a follow-up.  There's a blood pressure on it.  That

15  means he had to have been physically present.

16  Q.  Well, my point is, it's a follow-up visit.  He's not a new

17  patient at this time because Dr. Volkman had at least seen him

18  since 2003.

19  A.  That's correct.

20  Q.  Okay.  And, in fact, it documents that he's a continuing

21  patient at least; correct?

22  A.  Yes.

23  Q.  Now, this record sets out his current medication, right,

24  from his previous appointment?

25  A.  Yes.

1   Q.  It records a pain level?

2   A.  Yes.

3   Q.  And spasms?

4   A.  Yes.

5   Q.  And it has a plan, doesn't it?

6   A.  Let me ask -- it has a plan.  I can't see the bottom of the

7   page.  May I see it all, please.

8   Q.  Uh-huh (complies with request).

9   A.  Thank you.  Yes, it has a plan:  Add Oxy 5, eight per day.

10  Q.  Will you turn to page 131.

11  A.  Which section, 37a?

12  Q.  Yes, sir.

13  A.  131.  Yes, ma'am.

14  Q.  Excuse me for being confusing.

15  A.  No, you're not.

16      Okay.  37a, page 131.  I have it.

17  Q.  What date do you have on page 131, sir?

18  A.  8/19 of '03.

19          MS. CROSS:  Okay.  That's the one I'm looking for.

20      Your Honor, may I publish?

21          THE COURT:  You may.

22  Q.  What is this, sir, that we're looking at?

23  A.  May I see the whole page, please.

24  Q.  (Complies with request).  I'll zoom it in.  This is the

25  whole page.

1  A.  Okay.  Thank you.

2  Q.  And then this is the --

3  A.  Yes, ma'am.  That's what I have.

4  Q.  -- top.  Is this for Tim Thurman?

5  A.  Yes, ma'am.

6  Q.  What's the date?

7  A.  8/19 of '03.

8  Q.  Does this appear to be a follow-up exam, visit?

9  A.  Yes, ma'am, it's a follow-up visit.

10  Q.  And does this appear to be a physical exam of some sort?

11  A.  Yes, of sorts.

12  Q.  And at the bottom is there some prescribed medication?

13  A.  Yes, there is.

14  Q.  Can you tell us, in August 2003, is that the record we're

15  looking at?

16  A.  Yes, ma'am, August 19th.  Yes, Tim Thurman, August 19th,

17  2003.

18  Q.  Can you tell us the medications he was prescribed?

19  A.  Lorcet 10, six per day; Xanax 2 milligrams t.i.d., three

20  times a day; Soma t.i.d.; methadone 10 milligrams, it looks

21  like q.h.s., maybe once a day; Tagamet 800 q.h.s.

22  Q.  Tagamet?

23  A.  Yes.  And oxycodone 5 milligrams, six per day.

24  Q.  Turning your attention to page 125, that same record --

25  A.  Yes.

1   Q.   -- can you tell me what date it is?

2   A.   4/22/03.

3   Q.   What date do you have, sir?

4   A.   4/22/03.

5          MS. CROSS:   Your Honor, may I publish?

6          THE COURT:   You may.

7   Q.   Is that a record that you see in front of you that appears

8   to be for Tim Thurman?

9   A.   Yes.

10  Q.   We're looking at the whole page here.  Is that what you're

11  looking at?

12  A.   Yes.

13  Q.   And the date on it is 4/22/03?

14  A.   Yes.

15  Q.   Does it appear to be a physical exam?

16  A.   Of sorts.

17  Q.   And he was prescribed medication on that day; right?

18  A.   Yes.

19  Q.   Can you tell us what they are?

20  A.   Disalcid, 500 q.i.d.; Soma q.i.d.; Xanax 2 milligrams

21  b.i.d.; methadone 10 milligrams, it looks like, q.i.d.; Lorcet

22  10 b.i.d.; and Zanaflex.

23  Q.   Zanaflex?

24  A.   Yes.

25  Q.   Is that with a Z?

1  A.  Yes.  Yes, ma'am, Z-a-n-a-f-l-e-x.  That's a non-narcotic

2  muscle relaxant.

3  Q.  Page 138.

4  A.  I have it.

5  Q.  Is that a progress note for Tim Thurman?

6        MS. CROSS:  May I publish, Your Honor?

7        THE COURT:  You may.

8  A.  Yes, it is.

9  Q.  And that's for May 2003; right?

10  A.  May 21st, 2003.

11  Q.  Does it appear to have an exam, physical exam?

12  A.  May I see the whole page, please.

13  Q.  Yes.

14  A.  It looks like the same page without my glasses.

15  Q.  Does that appear to be the page you're looking at?

16  A.  Yes, ma'am, it is.

17  Q.  Does it appear to be a physical exam recorded for May 21st,

18  '03?

19  A.  Yes.

20  Q.  And then he was prescribed medication; correct?

21  A.  Yes.

22  Q.  And I'm going to ask you one last time to read the

23  medication that he was prescribed.  We're talking about May

24  2003; right?

25  A.  May 21st, 2003.  It would be methadone, 10 milligrams

 1  q.i.d.; Lorcet 10 b.i.d.; Soma b.i.d.; Xanax 2 milligrams

 2  b.i.d.; and Disalcid 500, it looks like, q.i.d.

 3  Q.  Is that it?

 4  A.  Yes, that's it for medications.

 5  Q.  Now, I've written on the board the medications that you

 6  have -- I've asked you to read off with not only Velva Thurman

 7  but also Tim Thurman; correct?

 8  A.  Yes.

 9  Q.  And in black is the Velva Thurman medications that were

10  prescribed for her by Dr. Volkman for these dates; right?

11  A.  Yes.

12  Q.  And in the red, I took the red pen and wrote what you said

13  Tim Thurman was prescribed by Dr. Volkman; correct?

14  A.  Yes.

15  Q.  And when you look at August 2003, are they on the exact

16  same medication?

17  A.  No.

18  Q.  Comparing Velva in July and Tim in May 2003, close in time,

19  are they on the same medication?

20  A.  Some.

21  Q.  Some of the same medication?

22  A.  Lortab and Soma.

23  Q.  But it's not exactly the same, is it?

24  A.  No, it's not exactly the same.

25  Q.  And then in April 2003, they're both on medication, aren't

1  they?

2  A.  Yes.

3  Q.  But are they exactly the same?

4  A.  They're not exactly the same.

5  Q.  Velva's taking ibuprofen, Lorcet, and Soma?

6  A.  Yes.

7  Q.  And Tim is taking Disalcid, Soma, Xanax, methodone, Lorcet,

8  and Zanaflex; right?

9  A.  Yes.  The Lorcet and Soma are still in common.

10  Q.  But they're not exactly the same, are they?

11  A.  No, ma'am, they're not exactly the same.

12  Q.  Sir, if you wouldn't mind turning your attention to Exhibit

13  Number 24.

14      As we get Exhibit 24, do you recall reviewing records for a

15  Mary Staten, S-t-a-t-e-n?

16  A.  Yes, I do.  I have it on my list.

17  Q.  And I'll ask you if you have any independent recollection

18  or any notations as to how many pages of her record you

19  reviewed.

20  A.  Let's see.  I don't have the exact number of pages down,

21  but I do have some notes here.

22  Q.  And last week or the week before you were shown two pages

23  by the government out of this record.

24          MS. CROSS:  Your Honor, if I may publish pages 95 and

25  132 out of Exhibit 24.

1          THE COURT:  You may.

2  Q.  Sir, if you would turn to page 132 first.

3  A.  Yes, ma'am.

4      Okay.  I have page 132.

5  Q.  Does that appear to be the same as what you're looking at?

6  A.  Well, except for the -- I can't see the whole page.  132,

7  yes, that appears to be it.

8  Q.  Okay.  Now, do you have an independent recollection that

9  you saw this last week, you were shown this last week on direct

10  examination?

11  A.  No, I don't recall specifically.

12  Q.  Okay.  Do you recall that you testified that this doesn't

13  tell you what the diagnosis is, it only describes symptoms?

14  A.  I don't recall that specifically.

15  Q.  Is that the case, though?

16  A.  Obesity would be a diagnosis and hypertension would be a

17  diagnosis.  But there's no blood pressure listed, so I guess

18  that may be long-standing.

19  Q.  Okay.  And --

20  A.  And nervousness is a symptom.

21  Q.  Does this appear to be a record for 2/5/03?

22  A.  Yes.

23  Q.  Did you know that that was Dr. Sherfey's note for this

24  patient?

25  A.  Yeah, that looks like his handwriting.

1    Q.   Now, you did discuss the notation of obesity as a

2    diagnosis; right?

3    A.   Yes.

4    Q.   And obesity can contribute to pain or cause pain, can't it?

5    A.   Yes.

6    Q.   And untreated pain can cause an elevated blood pressure;

7    right?

8    A.   It can.

9    Q.   Will you look at page 130.

10   A.   I have it.

11        MS. CROSS:  Your Honor, may I publish?

12        THE COURT:  You may.

13   Q.   Page 130 is a progress note for Mary Staten in March 2003;

14   correct?

15   A.   May I see the whole page, please.

16   Q.   (Complies with request.)

17   A.   Yes, that looks like the same thing.

18   Q.   And the date on this is March 4th, 2003; right?

19   A.   Yes.

20   Q.   Did you know that Dr. Volkman didn't come to Tri-State

21   until April 2003?

22   A.   I have to look up his first visit.

23        Yes, April 7th, 2003, was the first visit with Dr. Volkman.

24   Q.   So this wouldn't be a record by Dr. Volkman?

25   A.   That's correct.  It looks like Dr. Sherfey's signature

1  again.

2  Q.  And do you see on this record a physical exam of this

3  patient:  Ms. Staten?

4  A.  Yes.

5  Q.  Can you read it to the best of your ability.

6  A.  "NAD" -- no acute disease, in other words -- "Alert.

7  Oriented.  Tender" L5-S --

8      Lumbosacral, I guess.  That's just the low part of the

9  back.

10     -- "and bilateral SI joints," which is in low back again,

11  and I don't know what that other part is.  And "Tender right

12  knee and right lower leg below knee," and that's it.

13  Q.  Okay.

14  A.  And there's a blood pressure above, and --

15  Q.  Elevated blood pressure?

16  A.  Yes.  That's just part of the physical exam.  Five four, no

17  weight, and elevated blood pressure.

18  Q.  And that's in March '03; right?

19  A.  Yes.

20  Q.  Will you please turn to page 127 of the same record.  And

21  I'll ask you if that appears to be the very next month's

22  progress note in April '03 for Mary Staten.

23  A.  Yes.  I believe that was the first visit with Dr. Volkman.

24  Q.  So this is a record, this progress note is made by Dr.

25  Volkman?

1   A.   Yes.   That's the date that he saw her for the first time.

2   Q.   And would you note what the blood pressure is in April of

3   2003.

4   A.   It's 190 over 116.

5   Q.   Is that high?

6   A.   Yes.

7   Q.   That's extremely high, isn't it?

8   A.   Yes.   That's very high.

9   Q.   And do you note in the plan that he prescribed Ziac?

10  A.   Yes.

11  Q.   What is Ziac?

12  A.   That's an antihypertensive, so to help the blood pressure.

13  Q.   To help the blood pressure?

14  A.   Yes.

15  Q.   And is there a notation on this record that you see where

16  it says the patient is using a walker?

17  A.   Yes.

18  Q.   Turning your attention to page 102 --

19  A.   Okay.

20  Q.   -- is that what you have in front of you, sir?

21  A.   May I see the -- I couldn't quite see the bottom.   Yes,

22  that appears to be what I have too.

23  Q.   And this is a record for October 3rd, 2003?

24  A.   Yes.

25  Q.   Does it appear at this time in October 2003 the patient is

1   still -- blood pressure is high?

2   A.   A bit.   There's a "114" in parentheses.   I don't know what

3   that means.   The blood pressure is 130 over 106.   The diastolic

4   is still somewhat elevated.

5   Q.   And do you see on this record where she's prescribed

6   Diovan?

7   A.   Yes.

8   Q.   What is Diovan?

9   A.   It's also a blood pressure medicine.

10  Q.   So that's the second blood pressure medicine given to this

11  patient?

12  A.   It looks like she may have been taken off of the other one

13  and put on that one.

14  Q.   But that's another, a second blood pressure medicine --

15  A.   Yeah.   It's one --

16  Q.   -- that we see from the record?

17  A.   It's one to replace the other, I guess, since the other one

18  is not prescribed.

19  Q.   Will you look at page 95.

20  A.   Yes.

21  Q.   And does this appear to be what you have in front of you as

22  page 95?

23  A.   Yes, it does.

24  Q.   And that's a record for what date?

25  A.   November 7th, 2003.

1   Q.  Last -- the week before last you noted when you were shown

2   this record on direct examination the blood pressure was 150

3   over 92; correct?

4   A.  Correct.

5   Q.  That's high; right?

6   A.  Still a little high, yes.

7   Q.  But has it changed from the October 2003 visit?

8   A.  The October 2003 visit.  Yes, it's a different blood

9   pressure.

10  Q.  How has it changed?  Has it gone up or has it gone down?

11  A.  It was 130 over 106.  This one is 150 over 92.  So the

12  systolic is elevated.  And the diastolic is elevated in this

13  one and just the diastolic was elevated in the other one.

14      And I figured out what the parentheses are there.  That's

15  the mean, the mean or average blood pressure, diastolic plus

16  one-third the difference between the two.

17  Q.  So in October we had a mean of 114?

18  A.  Yes.

19  Q.  And then in November we have a mean of 111?

20  A.  Yes.

21  Q.  Does that mean that the blood pressure decreased some?

22  A.  By the -- by the measurement of the mean, calculated mean

23  arterial pressure.

24  Q.  Does this record in November 2003 indicate that she's still

25  using a walker to walk?

1   A.  Yes, still using a walker.

2   Q.  I ask you to turn to page 20 of the same record.

3        MS. CROSS:  Your Honor, may I publish?

4        THE COURT:  You may.

5   Q.  Do you have it, sir?

6   A.  Yes.

7   Q.  Is that what we're looking at on the screen, the first page

8   of it?

9   A.  Yes.

10  Q.  How many pages?

11  A.  Three pages.

12  Q.  And what does that appear to be?

13  A.  This says, "Summary for Chronic Pain Treatment.  Patient

14  Evaluation."

15  Q.  And what's the date?

16  A.  4/7/03, the date of the first visit for Dr. Volkman.

17  Q.  For Mary Staten?

18  A.  Yes.  I think they misspelled her name, but yes.

19  Q.  Okay.  And you said there are three pages; right?

20  A.  Yes, three pages.

21  Q.  I'm going to ask you to look at the last page, page 22.

22  A.  May I see the whole page, please.

23  Q.  (Complies with request.)

24  A.  That's it, yes.

25  Q.  And under the Management Plan, it indicates that Dr.

1  Volkman recommended strengthening exercises as tolerated and

2  yoga classes for stress reduction and relaxation; correct?

3  A.  That's what's listed here, yes.

4  Q.  Let me ask you this, Dr. Kennedy.  Over the course of Mary

5  Staten's 11 Tri-State visits with Dr. Volkman, did he change or

6  adjust one or more of her medications, from your review of the

7  records?

8  A.  Yes.

9  Q.  I want to turn your attention to Exhibit 66.  You reviewed

10  the file of Bryan Brigner; correct?

11  A.  Yes.

12  Q.  And again I need to ask you, do you have any independent

13  recollection or notations as to how many pages of Bryan

14  Brigner's file you reviewed when you made your analysis?

15  A.  Which analysis are you speaking of?

16  Q.  Do you have any recollection or notation of the number of

17  pages you reviewed in any of your analysis made on Bryan

18  Brigner?

19  A.  Yes.  He was reviewed twice, I believe, at least.  It could

20  be three times.  So, yes, I have looked at Bryan Brigner as

21  well.

22  Q.  Do you recall, have any notations how many pages you would

23  have reviewed?

24  A.  Yeah.  There are 29 pages of actual chart records from Dr.

25  Volkman.

1  Q.  Is that your first review or your second review?

2  A.  That was my second review.  I can check for the first one

3  here for you if you want.

4      It doesn't look like I looked at him on the second review.

5  Maybe it was the third.  I guess it was just the fourth review.

6  Q.  Just one review?

7  A.  Yes.  Bryan Brigner, that would have been the fourth time.

8  Q.  Okay.

9  A.  The fourth -- the most recent report, November 27th, 2006.

10     No, that's incorrect.  It's the third one.  October 26th,

11  2010.  So 29 pages of Dr. Volkman's chart records.

12  Q.  So in your analysis, you only had 29 pages of records from

13  Dr. Volkman?

14          MR. OAKLEY:  Your Honor, I'm going to object to the

15  form of the question.  That's not what he said.

16          THE COURT:  Sustained.

17  Q.  Excuse me.  Can you say that again.

18  A.  Dr. Volkman's records, I have here 35 total pages, but that

19  includes duplicates.  There was a few duplicates and different

20  things.  I excluded those.  So there would have been around 29

21  actual pages of actual information and not from other patients

22  or not duplicates.

23  Q.  So that I get it right, you reviewed 29 pages of records

24  for Bryan Brigner in reviewing for your analysis; correct?

25  A.  Yes.

1  Q.  And would you turn to Exhibit 66.

2     Now, you wrote a report as a result of your analysis;

3  correct?

4  A.  Yes.

5  Q.  That was in October 2010?

6  A.  Yes.

7  Q.  And do you have your report in front of you?

8  A.  Yes, I do.

9         MS. CROSS:  Your Honor, this probably would be a good

10 time.

11        THE COURT:  All right.  Let's take the mid-morning

12 break, folks, from now until 10:45.  And since it's been a

13 while, I'll remind you not to discuss the case among yourselves

14 or with anyone else or permit anyone to discuss it with you or

15 in your presence.  Report any violation to Ms. Brown.  Make no

16 attempt to do any research or investigation about the trial,

17 the issues, or the people involved during the break.  And no

18 Internet chitchat of any kind regarding the trial, the issues,

19 or the people involved.

20    We'll you see back in 15 minutes.

21        COURTROOM DEPUTY:  All rise.

22    (Jury out at 10:32 AM.)

23 BEFORE THE COURT

24        COURTROOM DEPUTY:  Please be seated.

25        THE COURT:  Okay.  Doctor, you can step down and take

1  your own break until quarter of.

2          THE WITNESS:  Thank you.

3          THE COURT:  And don't discuss your testimony with

4  anyone over the break.

5          THE WITNESS:  Yes, ma'am.

6          THE COURT:  Thank you.

7      (Witness temporarily excused.)

8          THE COURT:  Counselors, anything that you would like

9  to bring up in the absence of the jury?  I'm aware of the

10  motions pending, and I should be prepared to discuss those

11  later today.  Time to be announced.

12      Anything else?

13          MR. OAKLEY:  Nothing else, Your Honor.

14          MS. CROSS:  No, Your Honor.

15          THE COURT:  Okay.  Thank you.  I'll see you back in 15

16  minutes.

17          COURTROOM DEPUTY:  All rise.  This court is in recess

18  until 10:45.

19      (Recess taken:  10:32 AM - 10:50 AM.)

20      (L. Douglas Kennedy, M.D. resumes the witness stand.)

21      (Jury in at 10:50 AM.)

22          THE COURT:  Please be seated.

23                  CROSS-EXAMINATION (Continued)

24  BY MS. CROSS:

25  Q.  Doctor, you indicated on direct examination that in your

1   expert opinion as to Bryan Brigner, his treatment was not

2   within legitimate medical practice; correct?

3   A.  Correct.

4   Q.  Now, part of your concluding that, in your report dated

5   October 25th, 2010, part of your analysis of the records, you

6   indicated on page two of your report that some initial forms in

7   the medical file were either not signed or not witnessed

8   properly; correct?

9   A.  That's correct.

10  Q.  Is it your testimony that all of the initial forms were not

11  signed and witnessed?

12  A.  No, just some.

13  Q.  Okay.  I'm going to show you Government Exhibit 66, a few

14  pages.

15          MS. CROSS:  Your Honor, may I publish various pages

16  out of Government Exhibit 66?

17          THE COURT:  You may.  But can you help us out?  There

18  are a number of subsections to 66.

19          MS. CROSS:  Okay.  Page 15, 16 and 17 is from Exhibit

20  66d, I believe.

21          THE COURT:  You may.

22  Q.  I'll show you the whole exhibit first.  Do you have that in

23  front of you, Doctor?

24  A.  No.

25          COURTROOM DEPUTY:  Do you want him to have it?

1          MS. CROSS:  Exhibit 66.

2          THE COURT:  And again, this is page?

3          MS. CROSS:  Page 15, 16 and 17.

4          COURTROOM DEPUTY:  66a?

5          MS. CROSS:  66d.

6          COURTROOM DEPUTY:  (Handing exhibit binder.)

7          THE WITNESS:  Thank you.

8     Q.   Doctor, if you'll turn to page 15.

9     A.   66b, as in boy?

10    Q.   "d," as in dog.

11    A.   I hope I don't run out of pages.

12    Q.   Does this appear to be a medical record for Bryan Brigner?

13    A.   Yes, it appears to be that page.

14    Q.   Okay.

15    A.   I can't see the top of it, but -- there.

16    Q.   And this is the narcotic --

17    A.   Yes.  That's it.

18    Q.   -- pain medication agreement?

19    A.   Yes.

20    Q.   Okay.  Turn to page 17.  Now, when you indicated that some

21    of the initial forms were not signed, this is one of them you

22    were referring to; correct?

23    A.   Yes.

24    Q.   Will you turn to page three.  Do you recall when Bryan

25    Brigner first started treating with Dr. Volkman?

1  A.  Yes.  We only have one office note, but due to a pharmacy

2  profile, we were able to determine -- I was able to determine

3  that 7/6/05, sometime around there, then the second 8/4/05, and

4  then we have an office note for 9/30/05.

5  Q.  So in reviewing this record you reviewed medical records

6  for July, August and September '05?

7  A.  No.  Only for September 30th of '05, because we had no

8  medical records for any other date.

9  Q.  Okay.

10 A.  But I did have a -- on the chart, Dr. Volkman's chart,

11 there was a pharmacy readout for three dates from the medicine

12 shop in Paintsville, Kentucky.

13 Q.  Okay.

14 A.  Yes, ma'am.

15 Q.  This is a record appearing for Bryan Brigner; correct?

16 A.  Yes, ma'am.

17 Q.  And can you tell us what page three is of 66d?

18 A.  It says "Patient Information Sheet," and that says 7/5/05.

19 Q.  So when you were reviewing this file you didn't have this

20 at the time to review; correct?

21 A.  I will have to look back through my records to make sure.

22     No, I don't believe I had that.

23 Q.  Does this appear to be signed by the patient Bryan Brigner?

24 A.  Yes.

25 Q.  If you'll look at page five, the same record.

 1  A.  Uh-huh.

 2  Q.  This is the whole page.  Does that appear to be what you're

 3  looking at?

 4  A.  That's almost the whole page, yeah.  That looks like it.

 5  Q.  And this is --

 6  A.  That's good.

 7  Q.  What is this?

 8  A.  It says a "Treatment Attestation for Pain Management

 9  Services."

10  Q.  For Bryan Brigner?

11  A.  Yes.

12  Q.  Does it appear to have his signature at the bottom?

13  A.  Yes.

14  Q.  Looking at page six, the same record?

15  A.  Page six.  It's funny.  The one in my records, that

16  attestation page, I have a copy that says -- it's got a date on

17  it 9/30/05, and this one has no date.  That's interesting.

18          MR. OAKLEY:  Your Honor, may we approach?

19          THE COURT:  Yes.

20  SIDEBAR CONFERENCE

21          MR. OAKLEY:  I think we need to be a little clearer on

22  which file that we're looking at.  The 9/30/05 would have been

23  a Center Street file, which I believe may be at --

24      (Mr. Oakley and Mr. Wright confer privately.)

25          MR. OAKLEY:  We're looking at a Center Street file.  I

1   think it may be best to go through it from the dates as opposed

2   to just simply a page.

3           MS. CROSS:  Okay.  I will do that.

4           MR. OAKLEY:  Because we have multiple files and

5   clinics.

6           THE COURT:  Okay.  A friendly amendment.  Thank you.

7   CONCLUSION OF SIDEBAR CONFERENCE

8   BY MS. CROSS:

9   Q.   Dr. Kennedy, so I won't confuse you or the record --

10  A.   Yeah.

11  Q.   -- page six of 66d --

12  A.   Yes.

13  Q.   -- does that appear to be what is on the screen right now?

14  A.   Yes.

15  Q.   Okay.  So we're on the same page?

16  A.   Yes.

17  Q.   And what is that?

18  A.   That's a consent for chronic opioid therapy.

19  Q.   And that record is actually a two-page document; correct?

20  A.   Yes.

21  Q.   Page seven -- is that page seven?

22  A.   Yes.

23  Q.   What's the date?

24  A.   7/5/05.

25  Q.   Does that appear to have Bryan Brigner's signature on it?

1  A.  Yes, it does.

2  Q.  Turn to page eight of the same record, 66d.

3  A.  I have it.

4  Q.  Will you look on the screen and see if that appears to be

5  the record that you're looking at.

6  A.  Yes.

7  Q.  And that is entitled what?

8  A.  "Understanding Chronic Pain."

9  Q.  And at the bottom, does it appear that the patient

10  initialed it?

11  A.  There are initials "BAB" there.

12  Q.  Are we talking about Bryan A. Brigner?

13  A.  Those are the same initials, yes.

14  Q.  Will you turn to page ten of the same record.

15  A.  Yes.

16  Q.  And I'll ask you to look on the screen to see if that is

17  also coming from 66d.

18  A.  Yes.

19  Q.  Are we still in the record of Bryan A. Brigner?

20  A.  Yes.

21  Q.  Does this appear to be his signature on 7/5/05?

22  A.  Yes.

23  Q.  Page 12, the same record.

24  A.  Yes.  I've got that.

25  Q.  Is that the right page we're looking at on the screen, 66d,

1    page 12?

2    A.   Yes.

3    Q.   What is that called?

4    A.   That is called a patient history of over-the-counter pain

5    medication.

6    Q.   And is it signed by Bryan Brigner --

7    A.   Yes.

8    Q.   -- on July 5th, '05?

9    A.   Yes, ma'am.

10   Q.   And then, finally, page 13, I hope we have the same record,

11   66d.

12   A.   Yes.

13   Q.   Is that what's on the screen?

14   A.   Yes.

15   Q.   What does that record appear to be?

16   A.   We do random drug screens, it talks about drug screens, and

17   we also do random pill counts.  This looks like a drug monitor-

18   ing policy.

19   Q.   Notification to the patient?

20   A.   Yes.

21   Q.   Does it appear that Bryan Brigner initialed it?

22   A.   Those are his initials, yes.

23   Q.   Okay.

24   A.   I don't know whether he did it or not.  There's -- those

25   are his initials, BAB, though.

1   Q.  Thank you.

2   A.  You're welcome.

3   Q.  Now, you also indicated when you reviewed this file for

4   Bryan Brigner and wrote a report about it that there was an

5   August 18th, '04, MRI in the file that you saw; correct?

6   A.  Yes.

7   Q.  And you indicated that it didn't show a cause for Mr.

8   Brigner's stated pain complaints, based on your review; right?

9   A.  If you could point me to where that's located.

10  Q.  Page two of your report.

11  A.  Yes.  Where are you referring to?

12  Q.  Do you see that on page two anywhere of your report?

13  A.  Yeah, toward the bottom.

14  Q.  Speaking about the August '04 MRI?

15  A.  Right.  I see that.

16  Q.  And you indicated that it didn't show a cause for Mr.

17  Brigner's stated pain complaints?

18  A.  Correct.

19  Q.  Now, there is a difference between an MRI and an X-ray,

20  isn't there?

21  A.  Yes.

22  Q.  And an X-ray shows, what, bones in the body?

23  A.  Yes.

24  Q.  And the MRI shows, what, soft tissue in the body?

25  A.  Yes.  It can show the soft tissue part of bone, so it can

1   show different -- what's physiologically going on with bone

2   too, but it doesn't actually show pictures of the bone.

3   Q.  Okay.  And you know from the review of this file that Mr.

4   Brigner complained of back pain, neck pain, and shoulder pain;

5   correct?

6   A.  Yes.

7   Q.  Do you recall or have any notation as to whether or not you

8   saw an MRI of his back in the file?

9   A.  Yes, MRI of the lumbar spine.  That was 8/20 of '02, done

10  some years before.

11  Q.  Did you have that at the time you made your analysis?

12  A.  Yes.

13  Q.  Okay.  That's page 47 of the record, isn't it?

14  A.  Yes.

15          MS. CROSS:  Your Honor, may I publish?

16          THE COURT:  You may.

17  Q.  And we're looking at 66d, page 47.

18  A.  66.

19  Q.  Is that what you have in front of you, sir?  Exhibit 66d,

20  as in dog, page 47.

21  A.  Yes, I have it.

22  Q.  And is this the MRI of the lumbar spine for Bryan

23  Brigner --

24  A.  Yes.

25  Q.  -- that you referred to in August 2002?

1    A.  Yes.

2    Q.  And what does it show?  "Prominent posterior," do you see

3    that?

4    A.  "Disk protrusion at L5-S1 that impinges upon the anterior

5    thecal sac and appears to impinge upon the exiting L5 nerve

6    root and possibly impinges upon on the exiting L4 nerve root."

7    Q.  Is that enough to cause pain, sir?

8    A.  It can.

9    Q.  And would that show up on an X-ray?

10   A.  No.

11   Q.  Turning your attention to page 25, I believe, of Exhibit

12   66d.

13   A.  Okay.  I have page 25 of 66d.

14   Q.  And that record, page 25, does it have a next page, 26?  Is

15   it a two-page document?

16   A.  Yes.

17        MS. CROSS:  Okay.

18      Your Honor, may I publish?

19        THE COURT:  You may.

20   Q.  Dr. Kennedy, is that a physical exam note from July 5th,

21   2005, for Bryan Brigner?

22   A.  Yes.

23   Q.  Are we looking at the same thing that you have in front of

24   you?

25   A.  Yes.

1    Q.  And it's a two-page document; right?

2    A.  Yes.

3    Q.  Looking at the first page, do you see a physical exam --

4    A.  The first page.

5    Q.  -- noted?

6    A.  On the first page?

7    Q.  Yes, sir.

8    A.  No.

9    Q.  Do you see a detailed history --

10   A.  I see a history.

11   Q.  -- or any history?

12   A.  I see a history.

13   Q.  Will you read what you -- is that on the first page?

14   A.  It's on page 25.

15   Q.  Okay.  Which is the first page of this record; right?

16   A.  Yes.

17   Q.  Okay.  And will you read the history, please.

18   A.  All of it?

19   Q.  Yes, sir.

20   A.  Okay.  "1995, MVA," motor vehicle accident.  "Was a

21   passenger and hit telephone pole eight feet in air.  Broke his

22   nose and injured his back.  December 2001 MVA.  Injured upper

23   and lower back, nerve damage.  On job injury about seven times,

24   mostly at mills.  Surgeries:  Epidural injection in lumbar

25   spine, King's Daughters Medical Center.  Referred to Holzier

1    Pain Clinic.

2        "Previously prescribed meds.:  Stagesic, Lorcet five per

3    day, Percocet 10, oxyContin 40 five per day, Vicodin, Lortab,

4    Soma three per day, Valium three times per day, Xanax 1

5    milligram, slash, 2 milligrams.  Has not had any meds. for

6    about eight months.

7        "Previous jobs:  Carpenter/construction ten years.  Mills

8    Pride (factory), two years.  Sawmills, logging.  Father has had

9    him working since he was six years old.

10       "Currently on social security disability last six years.

11   MRI in chart.  L-spine, C-spine, shoulder."

12   Q.  And then the second page?

13   A.  "MRI C-spine 8/18/04.  Bulging at C3-4, effusion at C2-3.

14   MRI L-spine 8/18/04.  Rudimentary disk at S1-2.  Protrusion at

15   L5-S1 impinging on L5 nerve root as well as L4 nerve root.

16   Shoulder (left) MRI 8/18/04."  Patient says he -- "Normal.

17   Patient says he pulled tendon and had cortisone injection for

18   about five months.  Has had physical therapy without success.

19       "Symptoms:  Neck pain, occasional pain and soreness.

20   Decreased left shoulder and arm with numbness to fingers.  Low

21   back pain, decreased right leg.  Patient has had EMG with pain

22   and numbness at times.  Back pain is constant and severe.

23       "Married with four children 10, 11, 12, 17 years old.

24   Married three years to current wife.  No other contributing

25   illness or diseases.

1    "Pain nine out of ten.

2    "Spasm:  legs.

3    "Sleeps:  Six hours.  Up, decrease, varies.

4    "Disalcid, six per day.  Plan:  Soma three per day, Valium

5    three per day, oxycodone 30 milligrams eight per day, Lortab

6    eight per day."

7    Q.  Now, you concluded with this patient Bryan Brigner that

8    there was no doctor-patient relationship; correct?

9    A.  Repeat that, please.

10   Q.  You concluded, based on your review of all the records you

11   had, that there was no doctor-patient relationship; correct?

12   A.  Yeah, based on all the records I reviewed.

13   Q.  And was this one of the records that you had?

14   A.  No.

15   Q.  And do you know that Bryan Brigner was given a drug screen?

16   A.  Yes.

17   Q.  And drug screens are usually used to monitor the patient's

18   compliance with the narcotic agreement; correct?

19   A.  Yes, that's one way.

20   Q.  And the patient in this case, Bryan Brigner, did have the

21   test, didn't he?

22   A.  Yes.  That was on the chart that I reviewed.

23   Q.  And the results were evaluated on his second visit; right?

24   A.  It was evaluated -- let's see.  It was done on 7/19/05.

25   Q.  And on the second visit it was evaluated by Dr. Volkman

1  with him; right?

2  A.  I don't know.  I didn't have the second visit notes.

3  Q.  So that wasn't a part of your review, right, because you

4  didn't have it?

5  A.  That's correct.

6  Q.  Now, I believe you testified, correct me if I'm wrong, that

7  Mr. Brigner would have lost his tolerance to the opiates that

8  he was prescribed, the oxycodone and the hydrocodone, by the

9  time he saw Dr. Volkman on September 30th, 2005; right?

10  A.  Did we look at that in the report?  And where are you

11  referring?

12  Q.  Well, I'll show it to you.  Sir, would you mind turning to

13  66f and then looking at page 18.  Well, there are actually two

14  numbers at the bottom of that page, but -- I'm going to show it

15  to you.

16  A.  Okay.

17  Q.  Does that appear to be an office visit for Bryan Brigner

18  and the physical exam note, third visit?

19  A.  Yes.

20  Q.  Okay.  Does that appear to be what you're looking at?

21  A.  Yes.

22  Q.  All right.  Now, it does say September 30th, '04, right,

23  but it is indicating third visit; right?

24  A.  Yes.

25  Q.  Okay.  And that really should be '05, shouldn't it?

1  A.  I don't know.

2  Q.  Okay.

3  A.  I put in my report that I assumed it was '05.

4  Q.  Okay.  And that was because you looked at the prescriptions

5  corresponding to the medications prescribed and it was '05?

6  A.  Yes.  And I wanted to be clear in the report that that was

7  an assumption on my part, but the reason for my assumption was

8  because I had the pharmacy profile.

9  Q.  Okay.  And so this record, which we're assuming is for '05,

10  the third visit for Bryan Brigner, it lists his current

11  medication, doesn't it?

12  A.  Yes.

13  Q.  And what is his current medication?

14  A.  Oxycodone 5 milligrams 180, which would imply six per day.

15  Soma 350 90, which would imply three per day.  Valium 10

16  milligrams 90, which would imply three per day.  Hydrocodone

17  10/325s 180, which would imply six per day.

18  Q.  Okay.  And then what was the plan?

19  A.  The plan -- what was the plan?

20      Oh.  Give more drugs.

21  Q.  What was the plan there, listed there?  What did he

22  actually --

23  A.  Oh.  Oxycodone 30 milligrams eight per day, Valium 10

24  milligrams three per day, Soma three per day, and Lortab eight

25  per day.

1  Q.  Now, you did review the tox. report in this case, right, in

2  reviewing the whole file?

3  A.  Which tox. report are you referring?

4  Q.  Bryan Brigner, the person we're talking about.

5  A.  Well, which one?

6  Q.  Did you review a toxicology report?

7  A.  Yeah.  The drug screen is a toxicology report.

8  Q.  Did you review the postmortem toxicology report?

9  A.  Yes.

10  Q.  And just for your reference, it's at 66c in front of you if

11  you want to look at it.

12  A.  Okay.  66c.

13  Q.  Yes, sir.

14  A.  Okay.

15  Q.  Is that the toxicology, postmortem toxicology report for

16  Bryan Brigner?

17  A.  Well, it's two pages.  I don't believe that's all that I

18  looked at, though.

19  Q.  Does that appear to be the toxicology report?

20  A.  No.  It's just two pages of an 11/4/05 toxicology report.

21  So that's --

22  Q.  Let me put on the screen what we have, and I'll ask you if

23  that's what you have in front of you.  Okay?  We're looking at

24  66c, as in cat.

25  A.  Yes.  I had one more page than you did that was dated

1  11/3/05, toxicology report on another -- oh, I guess that's on

2  another patient.  So that was put in there by mistake.  That's

3  why you don't have it, was because there's a wrong patient

4  record in Dr. Volkman's chart, I guess.

5  Q.  But you have --

6  A.  I have 114.

7  Q.  -- 66c?

8  A.  Yes.  I have those two pages plus an additional one.

9  Q.  Okay.  So you have all of the pages for Bryan Brigner's

10  postmortem toxicology report?

11  A.  Yes.

12  Q.  All right.  And that's two pages; right?

13  A.  Correct.

14  Q.  All right.  And is that what we see in front of us?  That's

15  one page.

16  A.  Yes, I guess.

17  Q.  And is this the second page?

18  A.  You've got to read the case number to see.  Yeah, that

19  appears to be it.

20  Q.  All right.

21  A.  Yes, I believe that's it.

22  Q.  Okay.  Just so we're all on the same page, that is 66c, the

23  toxicology postmortem report for Bryan Brigner; right?

24  A.  Yes.

25  Q.  And did you look at that in coming to your conclusion about

1  the cause of death?

2  A.  Yes.

3  Q.  And this toxicology report revealed low levels of oxycodone

4  and hydrocodone and diazepam; correct?

5       MR. OAKLEY:  Objection to the question and his

6  ascertation of what the levels may or may not be.

7       THE COURT:  Did you want to be heard in defense of

8  your question?

9       MS. CROSS:  No, Your Honor.

10      THE COURT:  Would you like to rephrase?

11      MS. CROSS:  Yes.

12      THE COURT:  Go ahead.

13 Q.  Dr. Kennedy, will you look at the levels for oxycodone,

14 hydrocodone and diazepam.

15 A.  Yes.

16 Q.  Are those low or high levels?

17      MR. OAKLEY:  Objection, Your Honor.

18 A.  Related to what?

19      THE COURT:  Would you like to be heard?

20 A.  I don't understand the phrasing, if they're low or high.

21      MS. CROSS:  No, Your Honor.  I'll ask another

22 question.

23      THE COURT:  Okay.

24 Q.  Let me ask it this way.  Are any of those levels for

25 oxycodone, hydrocodone and diazepam toxic or therapeutic

1    levels?

2          MR. OAKLEY:  Objection, Your Honor.

3          THE COURT:  Sustained.

4    Q.  Are they toxic?

5          MR. OAKLEY:  Objection, Your Honor.

6          THE COURT:  I'll permit it.  Overruled.

7    A.  Okay.  This is blood femoral, oxycodone 0.14 micrograms per

8    mL, which translates into to 0.14 milligrams per mL, and that

9    would be, yes, in the toxic range.

10   Q.  For all three?

11   A.  Well, I'm just -- you asked for me to answer the question.

12   I'm trying to, but I don't know.  I'm going drug by drug and

13   looking it up so I can be specific.

14   Q.  Which one is toxic?

15   A.  Well, oxycodone so far.

16   Q.  Okay.

17   A.  And then we have hydrocodone, which would translate into

18   0.05 milligrams per liter.  That's the upper, very upper end of

19   the therapeutic range.

20   Q.  So that's not toxic?

21         MR. OAKLEY:  Objection, Your Honor.

22         THE COURT:  I'll permit him to answer.  Overruled.

23   A.  Yeah.  We're talking about individual drugs.  If hydro-

24   codone or oxycodone were taken in these concentrations, there

25   have been fatalities reported at that oxycodone level.  And

1  that's the upper limits of normal of the hydrocodone level, so

2  that could potentially be toxic, especially combined with the

3  other drugs.

4  Q.  I'm just asking.

5  A.  You can't look at just one drug by itself.  You have to

6  look at them in combination.

7  Q.  I understand.  We're going to get to that.  But my specific

8  question is, is the hydrocodone level a toxic level?

9  A.  It's upper limits of therapeutic range.

10  Q.  Okay.

11  A.  Based on an average number of people.  It can be toxic in

12  some people.

13  Q.  What about diazepam?

14  A.  Diazepam is 0.24 milligrams per liter, and that would be

15  within -- by itself with no other drug, would be considered in

16  the therapeutic range, though it could be toxic to some

17  individuals.

18  Q.  And then looking at this report, you said you had this when

19  you made your, gave your opinion.

20  A.  I'm sorry.  We didn't finish answering that.  I apologize.

21      You have to add the nordiazepam level to the diazepam level

22  because that's a metabolite that's just as active.  So you have

23  to add the two together, so you get a 0.31 milligrams per

24  liter, and that would be still in the therapeutic range by

25  itself.

1    The problem with this too is they don't check oxazepam and

2    temazepam levels, which are active metabolites too.  So we

3    don't have that in addition.  But by itself, the Valium -- the

4    diazepam level is not considered toxic, on average, to most

5    people at that range by itself.

6    Q.  Did you note when you looked at this toxicology report that

7    it revealed two antidepressant medications in Mr. Brigner's

8    system?

9    A.  I note -- I see the other drugs that are listed.

10   Q.  What are they?

11   A.  Haloperidol, sertraline, norsertraline, and benztropine.

12   Q.  And what are the levels for those two?

13   A.  Haloperidol, which is Haldol, which is considered a major

14   tranquilizer, is at 0.002 milligrams per liter, and that's

15   considered in the therapeutic range given individually on

16   average.  We don't know where it was prescribed from, but it

17   was in there.

18       Sertraline, which is Zoloft, an antidepressant, is at 0.07

19   milligrams per liter, so that would not be toxic by itself.

20   And you have to have the norser-- the norsertraline level,

21   which is its metabolite.  So it's not considered toxic by

22   itself.  No salicylate was detected, and that's it.

23   Q.  So when you looked at this tox. report -- and you looked at

24   it in conjunction with the autopsy report?

25   A.  Yes.

1   Q.  And based on the toxicology report and the autopsy report,

2   you concluded that it was the medications prescribed by Dr.

3   Volkman that caused the death of Bryan Brigner?

4   A.  No.  My opinion was I didn't disagree with the pathologist,

5   the forensic pathologist.  I agreed with the forensic path-

6   ologist.  There was every indication that he had coronary

7   artery disease, and that very likely was brought on by the

8   drugs that he was taking, or an additive effect.

9   Q.  So you were aware when you formed your opinion that the

10  autopsy showed hypertensive heart disease with 50 to 75 percent

11  blockage for Mr. Brigner?  You were aware of that?

12  A.  Blockage of what?

13  Q.  Of his LAD artery, the main artery.

14  A.  Yes.  He had a slight enlargement of the heart, and

15  coronary arteries descending, left anterior descending and the

16  right coronary, two of the main three arteries were 50 to 75

17  percent narrowed.

18  Q.  And when you testify that the oxycodone level is toxic

19  level, what is your source for that?

20  A.  North Carolina medical examiner's guides, and also they

21  refer to Baselt toxicology reference.

22  Q.  Are you familiar with Dr. Forest Tennant?

23  A.  Yes.

24  Q.  And his blood study?

25  A.  Well, that's a pretty broad category, his blood study.

1   Q.  Are you familiar with a blood study that he did on chronic

2   pain patients who were being prescribed high levels of opiates?

3   A.  I'm familiar with the name.  If you could refer me to

4   something in particular.  I mean --

5   Q.  Did you review or did you take that in consideration when

6   you were looking at your other sources, the Baselt and the

7   North Carolina reference that you made?

8   A.  Yes.

9   Q.  You did take into consideration Dr. Tenant's blood study?

10  A.  No.  I've already said -- I thought that was a bifurcated

11  question to me.

12  Q.  Let me ask it simply.

13  A.  Yes.

14  Q.  You looked at Baselt as a resource in determining that the

15  oxycodone level was toxic; correct?

16  A.  That was one reference.

17  Q.  Okay.  And then what was the other reference you mentioned?

18  A.  The North Carolina medical examiner's guides that are used

19  in many states, especially the forensic lab in Kentucky, which

20  is where I learned about them.

21  Q.  And then my only other question was, did you consider the

22  blood study that Dr. Tennant did on chronic pain patients

23  taking high levels of opiates and their levels?

24  A.  There's no way I can answer that.  You're not quoting a

25  specific reference or article, so I don't -- I'd say I can't

1  answer that.

2          MS. CROSS:  Your Honor, may I approach the witness?

3          THE COURT:  You may.

4          MS. CROSS:  I want to show him two documents to see if

5  he recognizes them.

6          THE COURT:  Fine.

7  Q.  Dr. Kennedy --

8      One second.  I think this is my note.

9      -- I'm showing you two documents.  Do they appear to be Dr.

10 Forest Tennant's blood study on chronic pain patients taking

11 high levels of opiates?

12 A.  Yes.  "Opioid Serum Concentrations in Patients with Chronic

13 Pain."

14 Q.  Having looked at that -- I know you didn't have a chance to

15 read it; I'm not asking you to read it -- my question is just

16 this:  Did you take into consideration Dr. Tennant's blood

17 study --

18 A.  No.

19 Q.  -- when --

20 A.  I've never seen this study before.

21 Q.  Okay.  Thank you.  That's what --

22 A.  But I've read two of Dr. Tennant's articles and am familiar

23 with Dr. Tennant, but not that particular one.

24 Q.  Who is Dr. Tennant?

25 A.  He's a doctor.

1   Q.  You said you're familiar with him?

2   A.  No, I didn't say I was familiar.  I said I read two

3   articles of Dr. Tennant.

4   Q.  Okay.  So you don't know what he does, where he's from, his

5   credentials, or anything like that?

6   A.  I think he's from California.

7   Q.  That's all you know?

8   A.  Yes.

9   Q.  Okay.

10  A.  And I've read two articles by Dr. Tennant and --

11  Q.  Are you familiar that he's written a lot of articles?

12  A.  I know a lot of people --

13          MR. OAKLEY:  Objection, Your Honor.

14  A.  I guess.  I don't know.

15          MR. OAKLEY:  Objection, Your Honor.

16          THE COURT:  Sustained.

17  Q.  Let's look at Exhibit 56.  You reviewed the file of Daniel

18  Coffee; correct?

19  A.  Yes.

20          COURTROOM DEPUTY:  (Handing exhibit binder.)

21          THE WITNESS:  Thank you.

22  Q.  You reviewed the file of Daniel Coffee?

23  A.  Give me just a second.

24      Thank you.  Yes, I did.

25  Q.  And in reviewing that record you didn't have any medical

1  file records, did you?

2  A.  Well, I'll have to look.

3      Yeah, I have no medical records present.

4  Q.  So you didn't have any medical records in this case;

5  correct?

6  A.  No, I didn't have any records, medical records present.

7  Q.  But you did write a report and give an opinion as to

8  legitimate medical practice on this one, didn't you?

9  A.  Yes.

10  Q.  And on page six of your October 2010 report you stated what

11  your opinion was; right?

12  A.  Yes.

13  Q.  And do you have your report in front of you?

14  A.  Yes.

15  Q.  I just want to make sure I read it accurately.  You

16  basically write that:  Assuming Dr. Volkman was the prescribing

17  physician, and due to the lack of medical records, then all of

18  the controlled substances prescribed to Mr. Coffee by Dr.

19  Volkman were not for a legitimate medical purpose and beyond

20  the bound of medical practice.

21      Did I read that right?

22  A.  Yes.

23  Q.  Now, you have no idea whether a medical file existed for

24  Mr. Coffee at some point or not, do you?

25  A.  No.

1   Q.  Wouldn't you agree that it's difficult to determine the

2   nature and quality of a doctor-patient relationship without

3   looking at the medical records?

4   A.  Well, how do I know one existed, as you said?  But that's

5   why I said assuming.  And, yeah, I'd be glad to look at

6   anything that can be produced.

7   Q.  Thank you.  But my question is, wouldn't you agree that

8   it's difficult to make a determination as to the quality and

9   nature of a doctor-patient relationship when you don't even

10  have any medical records?

11  A.  Not entirely.  They had Dr. Volkman having prescribed

12  medication that had his name on the bottles where the person

13  died.

14  Q.  And so with that information --

15  A.  I wasn't finished answering.

16  Q.  I'm sorry.  Go ahead.

17  A.  But not having medical records, assuming that there were

18  none, is not indicative of a doctor-patient relationship.

19  Again, I'd be happy to look at anything that anybody can

20  produce.

21  Q.  And you assumed that there were no medical records; right?

22  A.  Yes.  In fact, I have used the word "assuming."

23  Q.  Okay.  Now, you relied upon the toxicology report and

24  autopsy report, right, in concluding that the medication that

25  Mr. Coffee was prescribed caused his death?  Right?

1    A.   Yes.

2    Q.   Because you didn't have any medical records; right?

3    A.   Still yes.

4    Q.   And so, therefore, you didn't know why medication was being

5    prescribed the way it was in this individual case; correct?

6    A.   Correct.  Well, I knew it was not for any legitimate

7    medical purposes assuming there were no medical records and

8    bearing -- not being able to review anything.

9    Q.   If there were records that you didn't have, you couldn't

10   make that determination; right?  If they existed but you just

11   didn't have them, you couldn't make that determination, could

12   you?

13   A.   Well, no.  I'm not all seeing and all powerful.  I mean, I

14   have to work with logic and what's in front of me, and that's

15   why I worded it the way I did:  Assuming he was a prescribing

16   physician and due to the lack of medical records.  "Due to the

17   lack" means I assume that there weren't any.  So that's clearly

18   implied there, so it leaves the door open for you to give me

19   records to look at, which I'd be happy to do.

20   Q.   Are you aware that the last set of prescriptions issued by

21   Dr. Volkman to Mr. Coffee included oxycodone 30, 90 tablets;

22   Norco, 10 milligrams, 120 tablets; and Xanax, 2 milligrams, 120

23   tablets?

24   A.   All I know is what was found at the scene, at the scene of

25   death from what the coroner's report and where they had the

1    pill bottles.

2    Q.   So you did read the report of Coffee's death scene?

3    A.   Yes.

4    Q.   Are you aware that Percocet and oxyContin were also found

5    at the death scene?

6    A.   Yeah.  I can pull up his record here and say exactly what I

7    had.

8         Okay.  Officer Hensley listed -- it's in my report, the top

9    of page six, actually.  And he had a history of drug abuse and

10   depression.  Officer --

11   Q.   I'm not asking about his history, sir.  I'm asking --

12   A.   Well, I'm reading what's -- what they reported on their

13   report.  Officer Hensley listed medications as Effexor, Soma,

14   Disalcid, Xanax was found on his person, along with Lorcet and

15   Phenergan.  Also reported was Physician Volkman.  This was

16   signed by the coroner or deputy coroner, and that's what I saw

17   on the sheet.

18   Q.   Okay.  My question is this:  Are you aware that Percocet

19   and oxyContin were found at the death scene?

20   A.   They don't have that listed here.

21   Q.   Are you aware that Dr. Volkman did not prescribe Percocet

22   or oxyContin?

23   A.   We don't know -- we know what some of the things he

24   prescribed.  Well, they found prescriptions for some of the

25   things that Dr. Volkman had written for, but it wasn't entirely

1  clear.  I believe it was Lorcet and Phenergan.

2  Q.  But it wasn't Percocet and it wasn't oxyContin; right?

3  A.  No.  I didn't see that listed.

4  Q.  Okay.  Are you aware when you reviewed this file and made

5  an opinion about the cause of death that oxycodone, 30

6  milligrams, which was prescribed, was not found at the death

7  scene?

8  A.  I don't have any information about that at all.

9  Q.  You have the death scene report in front of you?

10  A.  Well, I don't know that he was prescribed that.  I don't

11  have any records regarding that, so I can't address that issue.

12  Q.  Okay.

13  A.  I've already told you what I saw from the report, and I

14  can't really add anything to that.

15  Q.  My question is this.  Maybe you answered it; I just didn't

16  hear it.  Are you aware that oxycodone was not found at the

17  death scene as one of the prescriptions?

18  A.  Yes, you did ask that, and I answered no, I'm not aware of

19  that.  I didn't see it listed.

20  Q.  Okay.  Did you review the autopsy report in this case?

21  A.  I'll have to look.

22      Autopsy.  Nope.  That way.

23      I see an Autopsy Results/Findings.  I have multiple drug

24  intoxication, atherosclerotic cardiovascular disease.  Opinion:

25  Death is a case due to multiple drug intoxication.

1   Q.  Are you aware that the autopsy of Mr. Daniel Coffee showed

2   a significantly enlarged heart and near total blockage of the

3   main coronary artery?

4   A.  Okay.  Let me check to see, my records.

5       No.  We said the main coronary artery was not blocked.  The

6   left main or main coronary was not blocked.  It doesn't list

7   that.  And it doesn't say that 485 grams shows cardiomegaly,

8   which is enlarged, and I can't say that that's severely

9   enlarged.

10  Q.  Did you know that at the time the autopsy was done they

11  found a condition known as the widow-maker?  Are you familiar

12  with that?

13          MR. OAKLEY:  Objection, Your Honor.

14  A.  Oh, I'm sorry.  I'm looking at the wrong report here.

15  Q.  Let me put it on the screen for you.

16          MR. OAKLEY:  Objection, Your Honor.

17  A.  I was looking at Mr. Brigner's.

18          THE COURT:  Would you like to be heard at sidebar?

19  A.  I'm sorry.

20          MR. OAKLEY:  Yes.

21          THE COURT:  Just a minute.

22      See you at sidebar.

23  SIDEBAR CONFERENCE

24          MR. OAKLEY:  Your Honor, we would object.  There was

25  no testimony about anything about a widow-maker with Mr.

1    Coffee.  The coroner stated nothing about that.  It was

2    Christin Rolf who did the report.  This is a name that they

3    have come up with.  It's just simply not in evidence with this

4    particular case.

5         MS. CROSS:  Your Honor, that's not our recollection.

6    We asked the coroner about the widow-maker, that term, and it

7    was testified to not with this witness but with the coroner in

8    this case.  That term was not made up by us.  We actually asked

9    it of a government witness who confirmed yes.

10        MR. OAKLEY:  It was a different case, Your Honor.  It

11   was a different coroner.  It was a Greg Davis, nothing about

12   this particular affliction with this particular person.

13        THE COURT:  Mr. Oakley's recollection seems correct.

14   Someone has been ordering the daily transcript.  If you can

15   point me to something in the transcript that is different from

16   Mr. Oakley's and my recollection, I'll reconsider, but

17   otherwise sustained.

18        MS. CROSS:  Your Honor, just for clarification before

19   I go back, I can ask him about it, though, can't I?

20        THE COURT:  Well --

21        MS. CROSS:  It appears there's been some confusion.  I

22   must have confused the witness.  He was looking at the wrong

23   autopsy report and testifying to something different.  I'm

24   asking him questions, and he's saying, "No, that's not it,

25   that's not it," but he just stated that he was looking at the

1  wrong one.

2          THE COURT:  You can clarify, but I think to ask the

3  question as you stated it previously misstates the report.

4          MS. CROSS:  Okay.

5          THE COURT:  Okay.

6  CONCLUSION OF SIDEBAR CONFERENCE

7  BY MS. CROSS:

8  Q.  Dr. Kennedy, we were talking about Daniel Coffee.

9  A.  Yes.

10  Q.  And I was asking you questions about the autopsy.

11  A.  Yes.

12  Q.  And I believe you had the wrong one in front of you.

13  A.  Just for the autopsy report.  I have Coffee in front of me

14  now, Daniel Coffee.

15  Q.  Okay.  So when I asked you were you aware that the autopsy

16  of Mr. Coffee showed an enlarged heart, you said no.  Is that

17  still your answer as you look at the autopsy for Mr. Coffee?

18  A.  No.  I said I didn't believe it was severe cardiomegaly.

19  It was enlarged.  But concentric left ventricular myocardial

20  hypertrophy, that's often seen with people with long-term high

21  blood pressure.  And then coronary artery, focal grade four.

22  And I believe in another part it does mention -- in the actual

23  autopsy report I have highlighted, "Right dominant distribution

24  with focal grade four atherosclerotic stenosis at the junction

25  of the proximal and middle thirds of the left anterior descend-

1    ing artery."

2        But it was a right dominant distribution, which is the

3    opposite side of the left.  So the widow-maker is typically a

4    left main, which this is the left anterior descending artery.

5    And they were right dominant anyway.  Plus you can be

6    revascularized.  You'd have to do a cardiogram to find out what

7    the distribution was on that.

8    Q.  Well, we've heard testimony from the coroner and other

9    professionals on this case.  But I'm asking you, in your review

10   of the records, you reviewed the autopsy findings; correct?

11   A.  Yes.

12   Q.  Okay.  And you reviewed the toxicology report?

13   A.  Yes.

14   Q.  Okay.  And then you came to the conclusion that it was the

15   medication, if prescribed by Dr. Volkman, is what caused his

16   death; right?

17   A.  Yes.  I saw no reason to disagree with what the pathologist

18   and the coroner had stated.  There wasn't any reason to

19   disagree.

20   Q.  Because you didn't have any medical records, did you?

21   A.  No.  Still no.

22   Q.  You still disagree.

23   A.  No.

24   Q.  Right?

25   A.  It's still no.

1    Q.  All right.  You also reviewed the file for James Estep;

2    right?

3    A.  Yes.

4    Q.  Do you have an independent recollection as to how many

5    pages of records you were given to review?

6    A.  A number of pages in Dr. Volkman's record.  The patient

7    record were 202, with Dr. Volkman's own records being 37 pages.

8    Q.  So you reviewed 202 pages, but only 37 of them were Dr.

9    Volkman's records?

10   A.  That's what I have down, yes.

11   Q.  Okay.

12   A.  And, actually, there are only 29 actual pages after you cut

13   out dividers and duplicates and things.

14   Q.  And that's what you were given; right?

15   A.  Yes.

16   Q.  And then you made your analysis and gave your conclusion in

17   a report in October 2010 that this was not legitimate medical

18   practice; right?

19   A.  Yes, that's correct.

20   Q.  Now --

21   A.  Not for prescribing controlled substances and the doses in

22   the fashion that they were prescribed.

23   Q.  Now, in part of your conclusion that this was not

24   legitimate medical practice, you concluded that there was no

25   doctor-patient relationship?

1  A.  No, not a true one, for prescription of controlled

2  substances in that fashion, no.

3  Q.  Is there a not so true doctor-patient relationship?  I'm

4  trying to understand.  You said not a true one.

5  A.  Well, if you stop being a doctor at some point in that part

6  of the relationship, then it isn't.  It negates the relation-

7  ship.  So for giving an antibiotic or putting stitches in,

8  there's probably enough information here to do that, but

9  certainly not to prescribe the drug cocktails that are

10  prescribed and the doses and the combinations that were here.

11  Q.  So it's your testimony that it wasn't that there was no

12  doctor-patient relationship, right; it's just that it was not a

13  doctor-patient relationship as to the prescribing of opiates?

14  A.  Yes, I believe.

15  Q.  Okay.  Now, in coming to, forming your opinion about

16  legitimate medical practice you wrote in your report, didn't

17  you, on this person, Mr. James Estep?

18      Are you looking at your report?

19  A.  Yes.

20  Q.  Okay.

21  A.  Yep, sure am.

22  Q.  Did you make a conclusion in your report?

23  A.  Yes.

24  Q.  Okay.  And part of your conclusion was based on the fact

25  that you said that there were some initial forms that weren't

1   signed properly.

2   A.  Right.  That was part of it.

3   Q.  Not signed by the patient?

4   A.  I don't know if I said -- I'd have to look at the forms.

5   But there were some lacking signatures and witnessing, which

6   lines were on the form, so I thought they must have thought

7   they were important or they wouldn't be there, the blanks.

8         MS. CROSS:  Your Honor, may I publish various pages

9   from Exhibit 42?

10        THE COURT:  You may.

11  Q.  Taking a look at page three out of Exhibit 42 --

12      Do you have that in front of you?

13  A.  No.

14  Q.  Okay.  Does this appear to be page three of James Estep's

15  file, looking at the bottom of the page on the screen?

16  A.  Well, I don't know.  I can only see the bottom of the page.

17  Q.  That's what I'm asking.  Does it appear to be James Estep's

18  file, page three?

19  A.  It says James Estep page three.  I don't know what else is

20  there, though.

21        THE COURT:  Are you looking at 42a?

22        MS. CROSS:  42b.  Thank you.

23  Q.  Do you see 42b there?

24  A.  Not yet.

25      Yes, I have 42b.

1    Q.   Page three?

2    A.   Page three.

3    Q.   Exhibit 42b?

4    A.   Page -- right.  I've got 42 -- page three, okay.  If you'd

5    show me it up there, it would help.

6    Q.   Let me see what you have in front of you.  Is this Exhibit

7    42?

8    A.   "b," yeah.

9    Q.   "b."  Can you turn to page three.

10   A.   It's on page three.

11   Q.   Okay.

12   A.   I was waiting for you to show me that, and you can see the

13   page.

14   Q.   Okay.  Is that the page?

15   A.   I don't know.  You have not shown me all of it.  That's

16   what was confusing.

17        There.

18   Q.   That's confusing?

19   A.   No, now it's not.

20        MR. OAKLEY:  Objection, Your Honor.

21   A.   Now it's not.  It's got page three on it.  That's all I was

22   looking for.

23   Q.   Okay.  So this is what I showed you first; right?  Do you

24   remember?  You said James Estep, page three.

25   A.   Yeah.

1    Q.  Is that what you have on your page?

2    A.  Yes.

3    Q.  Okay.

4    A.  I try to be thorough and accurate, so --

5    Q.  And so my question is, what is this document?

6    A.  It says page 2 of 2 of a narcotic pain medication release.

7    Q.  And does it appear to be signed by James Estep?

8    A.  Yes.

9    Q.  Can you turn to page six, the same record, five and six.

10   A.  Are we page five and six, or page six?

11   Q.  Five and six.

12   A.  Okay.  I have those.

13   Q.  I'm going to show you the whole page.  Is that the record

14   you're looking at?

15   A.  I can't see the bottom.

16       Okay.  Yes, that looks like the page I'm looking at.

17   Q.  What's the title of it?

18   A.  "Tri-State Health Care Patient History Questionnaire."

19   Q.  Can you look at page six, the next page.

20   A.  Yes, I have that page.

21   Q.  Does it appear to be signed by James Estep?

22   A.  Yes.

23   Q.  Page seven.

24   A.  I have it.

25   Q.  Is that the document you're looking at?

1   A.  Yes.

2   Q.  Is that also signed by James Estep?

3   A.  Yes.

4   Q.  What is this called?

5   A.  That's a Patient Information Sheet.

6   Q.  And turn to page 10 and 11.

7   A.  Okay.  I have page 10 and 11.

8   Q.  Can you tell us what page 10 is called?

9   A.  After I see that we're looking at the same thing.

10  Q.  Can you look at what's in front of you.

11  A.  It says, "Physician/Institution Letterhead or Logo Here."

12  Q.  What's the name of the document?

13  A.  Well, I don't know that we're looking at the same thing.

14  Q.  Well, I'm asking you what's in front of you right now.

15  Just what's the name?

16  A.  Well, why does anybody else know what I'm looking at?

17  Q.  Sir, my question is, what is the name of the document

18  you're looking at at page 10?

19  A.  "Pain Management Agreement."

20  Q.  Okay.  The second page of that is page 11; right?

21  A.  Well --

22  Q.  Will you look at what is in front of you, please.

23  A.  Can I see the whole page, please.

24  Q.  I'm not asking you any questions about this.  Can you look

25  at page 11.

1   A.   Well, why don't you want me to look at the page?

2         MS. CROSS:   Your Honor, may I ask that the record be

3 stricken for the comments.   I'm asking a question.

4         THE COURT:   Well, Doctor, if you need more

5 information, just ask me --

6         THE WITNESS:   Okay.

7         THE COURT:   -- to ask Ms. Cross.

8         THE WITNESS:   I would like to see the page that I was

9 asked to comment on, because I want to make sure we're looking

10 at the same thing.

11         THE COURT:   And, Ms. Cross, if you're going to ask

12 about the document in the book, fine.   But if the Doctor has

13 concerns about whether what is being published is identical to

14 what is in the book, then he is entitled to see the entire

15 document on the display.

16         MS. CROSS:   Absolutely, Your Honor.

17         THE COURT:   Thank you.

18         MS. CROSS:   I was not asking him questions about page

19 10.   That's why I didn't show him page 10.

20         THE WITNESS:   Well, she asked me to read something on

21 it, and --

22         THE COURT:   Well, go by what's in the book, not what's

23 on the display.   But if you're going to ask about the display,

24 Ms. Cross, then you have to show him the full document so that

25 he can be sure that he's not going to make an erroneous answer.

1          MS. CROSS:   Okay.

2     Q.   Is this page 11?

3     A.   Yes.

4     Q.   Is that what you have in front of you?

5     A.   Yes.

6     Q.   Does it look like -- does it appear to be signed by James

7     Estep?

8     A.   Yes.   It's signed by Purdue Pharmaceuticals at the bottom.

9     Q.   And is this the second page to page 10 that's in your book?

10    A.   Yeah.   The one with, "Physician/Institution Letterhead or

11    Logo Here," yeah.

12    Q.   Looking at page 14 in your book --

13    A.   Yes, ma'am.

14    Q.   -- does this appear to be page 14?

15    A.   Yes.

16    Q.   What is it?   What does it appear to be?

17    A.   Well, it's James Estep has signed something, which looks

18    like -- he signed something.

19    Q.   It's a signature?

20    A.   Yes.

21    Q.   Page 15.   Is this page 15 that you're looking at?

22    A.   Yes.

23    Q.   Is it signed by Mr. Estep?

24    A.   Yes, it is.

25    Q.   Page 17.

1  A.  Yes.

2  Q.  Is it signed by Mr. Estep?

3  A.  Yes.  It is not witnessed.

4  Q.  Page 21.

5  A.  Okay.

6  Q.  Is this page two of a two-page document?

7  A.  May I see the whole page, please.

8  Q.  (Complies with request.)

9  A.  Yes, it appears to be.

10  Q.  Is it signed by Mr. Estep?

11  A.  Yes.

12  Q.  Witnessed by Tara Bentley?

13  A.  Yes.  Pharmacy's listed but not -- yeah.  CVS, Ashland,

14  Kentucky.  So that's good.

15  Q.  Is it appropriate and usual for a pain management doctor to

16  have these types of patient forms in the file?

17  A.  Yes.

18  Q.  Now, when you reviewed the record in this case for Mr.

19  Estep, what did you note as to the date when Dr. Volkman first

20  started treating him?

21  A.  It looks like there were five dates listed, according to my

22  report.  9/26/03.

23  Q.  Is that the first date you have?

24  A.  Yeah.  That's on page six, the first paragraph.  10/23/03,

25  11/20/03, 12/18/03 and 2/10/04.

1   Q.  Did you review any records outside of that time period for

2   Mr. Estep?

3   A.  Yes.

4   Q.  So you knew that -- I'm sorry.

5   A.  Would you like me to list them?

6   Q.  No.

7   A.  Okay.

8   Q.  So you knew, based on your review, that Mr. Estep was an

9   established patient at Tri-State before Dr. Volkman got there

10  in April of 2003?

11  A.  Yes, that's true.

12  Q.  And I'm going to show you, if you wouldn't mind turning in

13  your exhibit book, Number 42.

14  A.  Exhibit 42b, as in boy?

15  Q.  One second.

16  A.  I'm sorry.

17  Q.  42b.

18  A.  Okay.  Yes, I have that section.

19  Q.  Okay.  Will you turn to pages 35 -- and I'll tell you the

20  other pages thereafter.

21          MS. CROSS:  Your Honor, may I publish?

22          THE COURT:  You may.  However, it's a little after

23  12:00, and it sounds as if you're about to open --

24          MS. CROSS:  Uh-huh.

25          THE COURT:  -- a significant segment of testimony.

1    Folks, let's take the lunch break.  And if you don't mind,

2   I'll cheat you out of five minutes and ask you to come back at

3   1:30.  Again, please don't discuss the case among yourselves or

4   with anyone else or permit anyone to discuss it with you, and

5   the same about research and the usual caution about Internet

6   chitchat.  I'll see you back at 1:30.

7          COURTROOM DEPUTY:  All rise.

8      (Jury out at 12:06 PM.)

9   BEFORE THE COURT

10         COURTROOM DEPUTY:  Please be seated.

11         THE COURT:  All right.  Doctor, you can step down.

12         THE WITNESS:  Thank you.

13         THE COURT:  And we'll look forward to seeing you back

14  at 1:30, and don't discuss your testimony with anyone over the

15  lunch period.

16         THE WITNESS:  Yes, ma'am.

17         THE COURT:  Thank you.

18         THE WITNESS:  Thank you.

19     (Witness temporarily excused.)

20         THE COURT:  Counselors, anything that you want to put

21  on the record in the absence of the jury before we take the

22  lunch break?

23         MR. OAKLEY:  Not from the United States, Your Honor.

24         MS. CROSS:  No, Your Honor.

25         THE COURT:  Okay.  See you back at 1:30.

1          COURTROOM DEPUTY:  All rise.  This court is in recess

2     until 1:30.

3          (At 12:07 PM, a luncheon recess was taken.)

4                              - - -

5                    I N D E X   O F   W I T N E S S E S

6     WITNESS:                                    PAGE

7     L. DOUGLAS KENNEDY, M.D.
      Cross-Examination (Continued) by Ms. Cross .......   2

8

9                              - - -

10                    C E R T I F I C A T E

11          I, Luke T. Lavin, RDR, CRR, the undersigned, certify

12     that the foregoing is a correct transcript from the record of

13     proceedings in the above-entitled matter.

14

15                              s/Luke T. Lavin
                                Luke T. Lavin
16                              Official Court Reporter

17                              - - -

18

19

20

21

22

23

24

25