UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


UNITED STATES OF AMERICA,     . CRIMINAL NO. 1:07-cr-60(3)
                             .
          Plaintiff,     . Cincinnati, Ohio
                             .
     - v -           . Tuesday, March 15, 2011
                             . Afternoon Session
PAUL H. VOLKMAN,          .
                             .
          Defendant.     . *Day 9 of Jury Trial*
. . . . . . . . . . . . . . . . . .


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SANDRA S. BECKWITH, SENIOR JUDGE, and a
JURY

<u>APPEARANCES</u>:

For the Plaintiff:   UNITED STATES ATTORNEY'S OFFICE
                    BY: Timothy D. Oakley, Esq. (AUSA)
                    and  Adam L. Wright, Esq. (AUSA)
                    221 East Fourth Street, Suite 400
                    Cincinnati, Ohio  45202


For the Defendant:

W.C. CROSS & ASSOCIATES, LLC    STRAUSS & TROY, LPA
BY: Wende C. Cross, Esq.        BY: Candace C. Crouse, Esq.
3460 Reading Road             The Federal Reserve Building
Cincinnati, Ohio  45202       150 East Fourth Street
                               Cincinnati, Ohio  45202


Also present:        Agent Christopher A. Kresnak (DEA)

Law Clerk:           Laurie J. Nicholson, Esq.

Courtroom Deputy:    Mary C. Brown

Court Reporter:      Luke T. Lavin, RDR, CRR
                    838 Potter Stewart U.S. Courthouse
                    100 East Fifth Street
                    Cincinnati, Ohio  45202


*Proceedings recorded in stenotype;*
*transcript prepared by computer.*

1                    P R O C E E D I N G S

2          (In open court at 1:35 PM, with jury present.)

3          (Testimony of Christin M. Rolf, M.D. was previously

4     transcribed and filed at U.S. District Clerk of Courts Docket

5     No. 287.)

6               THE COURT:  Next witness.

7               MR. OAKLEY:  Lisa Wallace.

8               COURTROOM DEPUTY:  What's the last name?

9               MR. OAKLEY:  Wallace.  The marshals have her.  She

10    should be upstairs.

11              COURTROOM DEPUTY:  Oh.  Do they know?

12              THE COURT:  Another opportunity to stand and stretch,

13    folks.

14              COURTROOM DEPUTY:  Please raise your right hand.

15         (Lisa G. Wallace is duly sworn by the courtroom deputy.)

16              COURTROOM DEPUTY:  Please be seated.

17                        LISA G. WALLACE

18    a witness herein, having previously been sworn, testified as

19    follows:

20                       DIRECT EXAMINATION

21    BY MR. OAKLEY:

22    Q.  Okay.  Ms. Wallace, can you please tell us your name and

23    spell your last name for the record.

24    A.  Lisa Gail Wallace, W-a-l-l-a-c-e.

25    Q.  Ms. Wallace, do you know a Dr. Paul H. Volkman?

1  A.  Yes, sir.

2  Q.  Is he in the room today?

3  A.  Yes, sir.

4  Q.  Please tell the Court where he is seated and what he is

5  wearing.

6  A.  He's sitting right over here behind Chris.  He's at the

7  computer.  He's wearing a blue shirt, a dark blue jacket.

8        MR. OAKLEY:  Will the record reflect the

9  identification of the defendant, please.

10        THE COURT:  It will.

11  Q.  How do you know Dr. Volkman?

12  A.  I was a patient of his.

13  Q.  Okay.  What clinic did you start at?

14  A.  Tri-State Health Care.

15  Q.  Okay.  And why did you go to Tri-State?

16  A.  For pain management.

17  Q.  What was your problem?

18  A.  My knees.

19  Q.  Okay.

20  A.  I had problems with my knees.

21  Q.  Did you have an accident, or what?

22  A.  Yes.  My brother ran over me with his car.

23  Q.  Okay.  Do you remember when you started seeing Dr. Volkman?

24  A.  Yes.

25  Q.  When was that?

1   A.   August of 2003.

2   Q.   And do you remember, when you first got there, what was

3   your first -- what was your first visit like?

4   A.   I went in, paid the girls.  They took -- they took your

5   blood pressure.  Sat around and waited.  Seen the doctor.

6   Wrote prescriptions, and got them filled.

7   Q.   How much -- do you remember how much you paid?

8   A.   No, not the first time.

9   Q.   Okay.  If you could speak into the microphone, please.

10  A.   No, not the first time.

11  Q.   Now, did you get your prescriptions filled at the

12  dispensary?

13  A.   I can't remember if I did the first time or not.

14  Q.   Okay.  Now, was there any type of examination that first

15  time?

16  A.   He checked my reflexes on my knees, that was all.

17  Q.   Okay.  How did he do that?

18  A.   With one of those --

19  Q.   A little hammer?

20  A.   Reflex hammer, yeah.

21  Q.   That was the extent of the examination?

22  A.   Yes, sir.

23  Q.   Did you take some medical files with you?

24  A.   They already had them.

25  Q.   Okay.  How did they already have them?

1   A.  I had -- my family doctor give me a referral to a pain

2   clinic, no specific clinic just a pain management.  I took it

3   over, and they faxed for my records.

4   Q.  Okay.  Why did you pick Tri-State?

5   A.  I knew several people that went there.

6   Q.  Okay.  And did you talk to them about their treatment?

7   A.  Did I talk to who about the treatment?

8   Q.  About the people you knew who had gone to Tri-State.

9   A.  No.

10  Q.  Okay.  You just went there because you'd heard about it?

11  A.  Yeah.

12  Q.  Okay.  Now, when you were there -- now, did you have

13  insurance when you got there, when you first started?

14  A.  No.

15  Q.  Okay.  How did you pay for your visit?

16  A.  When I first started, my husband's a truck driver, I paid

17  cash.

18  Q.  Okay.  Did he have insurance?

19  A.  No.

20  Q.  And how long did you go to Tri-State?

21  A.  Till September of 2005.

22  Q.  Okay.  Now, when you were at Tri-State, do you remember

23  ever talking -- did you ever have any drug screens, urine

24  screens at Tri-State?

25  A.  Yes.

1  Q.  And how did those go?  Did you know about them in advance?

2  A.  No.  I heard about them, people talking about they was

3  getting them.

4  Q.  Did you ever have one?

5  A.  Yes.

6  Q.  And was that -- did you know about this in advance?

7  A.  No.

8  Q.  Okay.  Was it that day you walked in?

9  A.  Yeah.

10 Q.  Okay.  What happened?

11 A.  They sent me to Southern Ohio Medical Center to have a drug

12 screen.  I went back to the office and waited for the results

13 of that, and he told me that none of my levels was right.  THC

14 had showed up in my drug screen.  And I sit there all day long.

15 They asked us how we took our medication, the girls did and he

16 did.  I told them I took one or two of this and that every hour

17 or so.  The way it was prescribed, we would have took our

18 medicine one every hour or two, maybe more.

19 Q.  Okay.

20 A.  And then they wrote a prescription for one of everything

21 that I was prescribed.  I had to get it filled there in their

22 pharmacy and had to take the medicine in front of them and sit

23 there.

24     Sit there for a few more hours.  Got pretty high on the

25 medication in the office.  I about fell over the water cooler.

1    They had ordered some pizza, the girls did.  I ate pizza with

2    them.  Then he wrote a half a prescription of everything.  It

3    was real late at night, and I had to come back in two weeks and

4    do another drug screen to make sure there was no more pot in my

5    system.

6    Q.  Okay.  So do you remember when this was?

7    A.  It was early 2004, I think.

8    Q.  Okay.  So let's walk through this.  You said you had a

9    urine screen?

10   A.  Yes.

11   Q.  Unannounced?

12   A.  Yes.

13   Q.  And then what time did you get to the doctor's office?

14   A.  It was early in the morning.

15   Q.  And what time did you take your urine screen?

16   A.  It was before lunch.

17   Q.  And then you came back to the clinic?

18   A.  Yes.

19   Q.  And was this the first urine screen you'd had?

20   A.  Yes.

21   Q.  And you'd been on medication for about how long?

22   A.  Five, six months.

23   Q.  Okay.  What type of medication were you getting?

24   A.  When I had the urine screen?

25   Q.  Yes, yeah.

1  A.  I was getting oxycodone, Lortab or Lorcet, Somas, and Xanax

2  or Valium.

3  Q.  Did anybody ever explain why you were getting all four of

4  these?

5  A.  Not particularly, no.

6  Q.  Okay.  Did you ever talk to the doctor about why you were

7  getting all four of these?

8  A.  No.

9  Q.  Okay.  So you come back and you get the results of the

10  urine screen, and what happens?

11  A.  He tells me I failed for marijuana.

12  Q.  And had you been smoking marijuana?

13  A.  Yes.

14  Q.  Okay.  And what else?

15  A.  And asked how I took my medication, and I told him I took

16  at least one every hour of this or that.  And they wrote me a

17  prescription for one of each of everything I took, and I had to

18  get it filled in their office and I had to take it in front of

19  them.

20  Q.  Okay.  And you did that?

21  A.  Uh-huh.

22  Q.  And then what happened?

23  A.  I had to go out front and sit out front with the girls or

24  with the -- in the waiting area.

25  Q.  Now, who was watching you when you were sitting in the

1  waiting area?

2  A.   Really no one.

3  Q.   Was it busy?

4  A.   No, not really.

5  Q.   Okay.

6  A.   Not by that time.

7  Q.   And what effect did the pills have?

8  A.   I was pretty high.

9  Q.   Okay.  You had a problem with the water cooler?

10  A.   Yeah.  I about knocked it over.

11  Q.   And after this, you actually ate dinner with them?

12  A.   Yeah.  I ate pizza with the girls, yeah.

13  Q.   Okay.  Where was Dr. Volkman during this time?

14  A.   I'm not sure.

15  Q.   You didn't see him during this experiment?

16  A.   No.  He stayed upstairs a lot.

17  Q.   Okay.  And how long were you there after dinner?

18  A.   A few hours, probably.

19  Q.   And then what happened?

20  A.   Then he wrote me a prescription for half of what I would

21  normally get, and I had to take another drug screen in two

22  weeks and come back.

23  Q.   And how did that one go?

24  A.   Fine.

25  Q.   Now, after you passed that one, did your prescription

1    levels go up?

2    A.   Sometimes they did.   They raised it back to what I would

3    normally get.

4    Q.   After you passed your test?

5    A.   Yes.

6    Q.   Okay.   And this is the same dosage that made you knock over

7    the water, bang into the water cooler?

8    A.   Yes.

9    Q.   Now, were there other times that you'd gone there -- I'm

10   sorry.   Do you remember how much you had to pay for that one

11   dose prescription?

12   A.   I think it was $17.   I don't know.   I just think it was

13   $17.

14   Q.   Okay.   Was that cash or --

15   A.   Yes.

16   Q.   Now, were there other times that you went to Tri-State

17   high?

18   A.   Yes.

19   Q.   During that time before September?

20   A.   Yes.

21   Q.   Okay.   And tell us about it, please.

22   A.   I just take my medicine and go in.   Nobody ever said

23   anything.

24   Q.   Did the doctor ever say anything?

25   A.   No, sir.

1    Q.  And when you were high, were you functioning okay?  Were

2    you --

3    A.  Sometimes.

4    Q.  Sometimes having problems?

5    A.  Yeah, sometimes.

6    Q.  So this was more than once?

7    A.  Yes.

8    Q.  How often would you go high?

9    A.  Most of the time.

10   Q.  Now, were you tested any more about levels at Tri-State?

11   A.  Yes.

12   Q.  And did you pass those tests?  I mean, do you know?

13   A.  Most of the time.  I mean, I guess.

14   Q.  Okay.  Did anybody ever discuss what levels were?

15   A.  Not what they specifically were, no.

16   Q.  You just knew you had to have them?

17   A.  Uh-huh.  Yes.

18   Q.  Now, as a result -- I mean, did you ultimately get your

19   levels up to where the doctor thought they should be?

20   A.  I must have.  I kept getting my medication.

21   Q.  Okay.  Did you get increases?

22   A.  Yes.

23   Q.  Tell us about that.  Why would you get increased?

24   A.  Sometimes I asked for them.

25   Q.  If you asked for them, would you get them?

1    A.   Yes.

2    Q.   And when you asked for them, were you high?

3    A.   Yeah.  The last time, very.

4    Q.   Now, what happened at Tri-State that -- you said the last

5    time you went was September of '05.  Did you get dismissed, or

6    did something else happen?

7    A.   No.  He -- he changed his offices.  He went on his own and

8    left Tri-State.

9    Q.   And where was that?

10   A.   Excuse me?

11   Q.   Where did he go?

12   A.   To a house in Portsmouth on Center Street, I think.

13   Q.   Okay.  Did you go there?

14   A.   No.

15   Q.   Why not?

16   A.   I never made it there.

17   Q.   Okay.  Now, you're in prison stripes.

18   A.   Yeah.

19   Q.   What's happened?

20   A.   I got in trouble for selling my medication.

21   Q.   Where at?

22   A.   In Kentucky.

23   Q.   And when was that?

24   A.   February of 2006.

25   Q.   And what happened?

1    A.   I sold some of my medication to an informant.

2    Q.   Okay.  And why were you selling medication?

3    A.   The money.

4    Q.   And why did you need the money?

5    A.   I didn't.

6    Q.   Just greed?

7    A.   I liked the money.

8    Q.   Were you selling your pills?

9    A.   A lot of them, yes.

10   Q.   Now, were you taking all the pills that he prescribed?

11   A.   No.

12   Q.   Why not?

13   A.   Because I believe they probably would have killed me.

14   Q.   How many pills were you getting?

15   A.   At one time, over a thousand per month.

16   Q.   And how were you paying for those?

17   A.   Most of the time I had somebody that I sold the pills to.

18   They give me the money to go and get them filled.  When I got

19   them, I'd give them what they paid for, and then I would have

20   some and they would have some and we was all happy.

21   Q.   Okay.  Now, did you see the doctor after he left Tri-State?

22   A.   Yes.

23   Q.   And where was that?

24   A.   Chillicothe.

25   Q.   Tell us about Chillicothe.

1   A.  About the environment there or --

2   Q.  I'm sorry for interrupting.  Tell me about --

3   A.  What do you want to know about there?

4   Q.  Well, how did you find out about it?

5   A.  I called the number to the office he had on Center Street,

6   and Delbert Evans answered the phone and told me they was

7   opening up in Chillicothe.

8   Q.  Do you know Mr. Evans?

9   A.  Yes.

10  Q.  How do you know Mr. Evans?

11  A.  He worked for Dr. Volkman at Chillicothe, and I've known

12  Delbert for years before that, through the auctions we worked

13  together.

14  Q.  And did you know anybody else that worked there?

15  A.  Not personally.

16  Q.  So when did you get up to see Tri-State?  I'm sorry.  When

17  did you go up to see Dr. Volkman up in Chillicothe?

18  A.  In October, the first day they was open, I believe.

19  Q.  And were you able to get prescriptions?

20  A.  Yes.

21  Q.  And do you remember what you were getting?

22  A.  I was getting oxycodone, either Lorcet or Norco at that

23  time, Somas, and Xanax or Valium.  I switched the Valium and

24  Xanax sometimes, and the Lorcet and the Norco.

25  Q.  Whose idea was that?

1    A.   Mine.

2    Q.   And why?

3    A.   I asked for Norco instead of Lorcets because I could get

4    more.

5    Q.   Would you please explain.

6    A.   On the Lorcets he would only write 240, and on the Norco he

7    would write 360.

8    Q.   Did he ever explain why?

9    A.   The Tylenol that was in them, I believe.

10   Q.   But you could get more for the Norcos; you could get more

11   Norcos?

12   A.   Yeah.

13   Q.   Okay.

14   A.   I could get 120 more.  That's more money.

15   Q.   You were selling those?

16   A.   Yes.

17   Q.   Did you ever have to take a urine test while you were up in

18   Chillicothe?

19   A.   Yes.

20   Q.   And tell us about that.

21   A.   I took -- the last one I took was in the office.

22   Q.   And did you pass it?

23   A.   Oh, yeah.

24   Q.   Was that sent off or was that --

25   A.   It was done in the office.

1    Q.   Okay.   That showed the presence of --

2    A.   I assume everything.

3         MS. CROSS:   Objection.

4    A.   I mean, it should have showed everything I was taking.

5         THE COURT:   Sustained.

6    Q.   Whatever happened, did you get medication that day?

7    A.   Yes.

8    Q.   Okay.   Now, when you went up to Chillicothe, were there

9    times that you were under the influence of narcotics?

10   A.   Yes.

11   Q.   Tell us about that.

12   A.   The last time I went, somebody else had to drive.  I was

13   pretty messed up.  I really don't remember a whole -- I

14   remember being there and getting my medication and getting them

15   filled and going home.

16   Q.   Now, on that last time or at any time, did you ever talk

17   the doctor into giving you more pills when you were stoned?

18   A.   The last time.

19   Q.   Okay.  Tell us about that.

20   A.   The last time I went, I was getting 270 oxycodone 30s, I

21   believe, and I asked if I could have another one, and he upped

22   it to 360 that day.

23        MR. OAKLEY:   Okay.  Your Honor, if I could please show

24   the defendant what has previously been admitted under 64d,

25   that's the physical examination note dated 3 February 2006.  If

1    I could publish this document.

2            THE COURT:  You may.

3    Q.  What were you -- what was your pain?  What was wrong with

4    you?

5    A.  My knees.

6    Q.  Did you ever complain about thoracic or sacral pain?

7    A.  In my legs.  I had muscle spasms.

8    Q.  Okay.

9    A.  I don't know what -- I don't know what the other is you're

10   saying.

11   Q.  Okay.  So your legs hurt?

12   A.  Yes.

13   Q.  Not your neck?

14   A.  Yeah, from a car wreck I was in.

15   Q.  Okay.  New complaints:  Looks tired, looks sleepy.

16       Were you stoned?

17   A.  Yes.

18   Q.  And on this date were you seeing Dr. Deitch?

19   A.  Dr. Deitch?

20   Q.  Right here in the red.

21   A.  For what?

22   Q.  Anything.

23   A.  I don't know who Dr. Deitch is.

24   Q.  Okay.  Why would you have medical records there, then?

25   A.  I seen a specialist for when I started stuttering, and I --

1    and I'm not sure what his name was.  I stuttered a little bit

2    from a car accident.

3    Q.  Did you go to a neurologist?

4    A.  Yes.

5    Q.  Okay.

6    A.  In Virginia for a couple months.  I'm not sure -- I don't

7    remember what his name was, because I quit going to him.

8    Q.  Okay.  He wasn't in Ashland?

9    A.  No.

10   Q.  Okay.  And then it says -- then your medication list.  How

11   many Soma?

12   A.  Eight.

13   Q.  And Norco?

14   A.  Nine.

15   Q.  And oxy?

16   A.  Nine.

17   Q.  And do you remember how many Xanax you were given?

18   A.  90 to 120, usually.

19   Q.  Okay.  You got increased that day?

20   A.  Yes.

21   Q.  And this is one of the times you were there stoned?

22   A.  Yes.

23       Mr. Oakley, I think I did see Dr. Deitch.  He's a neuro--

24   he might be a neurologist in Ashland I went to once.

25   Q.  Do you remember when that was?

1    A.   No.

2    Q.   Okay.   I mean, thank you for answering that.

3         Now, when you were at either Tri-State or Chillicothe, did

4    you ever get told in advance of drug tests?

5    A.   No.

6    Q.   Did you ever have any discussion on levels?

7    A.   The time before I took my last one, he told me to take some

8    in the morning and some in the evening, or some before I go.

9    Q.   Okay.   Who's "he"?

10   A.   Dr. Volkman.

11   Q.   Please explain how that happened.

12   A.   He said my levels was never right the time before.

13   Q.   Which time was that?

14   A.   The time before the last time.   I don't -- it was -- I was

15   going to Chillicothe then.   It was during Chillicothe.

16   Q.   Okay.   And there was talk about your levels or your

17   numbers?

18   A.   Yeah.

19   Q.   And who brought that up?

20   A.   Dr. Volkman.

21   Q.   And please explain to us what happened.

22   A.   He just said that my levels wasn't right, that I needed --

23   and I "Well, they should be.   I'm taking all this medication.

24   They should be right."

25        "Well, you need to take some before you go and when you get

1    up."  That's all he said.

2    Q.   Okay.  Before you go to, what, take a urine test?

3    A.   Yes.

4    Q.   Now, Ms. Wallace, when you were at Tri-State did you use

5    the dispensary?

6    A.   Yes, a couple times.

7    Q.   Okay.  Where else were you getting your pills filled?

8    A.   I came to Columbus and got some, got them filled there.  I

9    got them filled in Paintsville, Kentucky; Pikeville, Kentucky.

10   Or no.  Paintsville, Kentucky and Louisa, Kentucky.

11   Q.   Okay.  Where at in Paintsville?

12   A.   I think it was Medicine Shop, maybe.

13   Q.   How far was that from your house?

14   A.   A couple hours.

15   Q.   Okay.  And what about Louisa?

16   A.   A couple hours.

17   Q.   And where was that?

18   A.   In Kentucky.

19   Q.   I mean, what was the name of the pharmacy, if you remember?

20   A.   I believe they both was named the Medicine Shop.

21   Q.   Okay.  And where at in Columbus?

22   A.   East Main Street Pharmacy.

23   Q.   And how were you paying for your prescriptions?

24   A.   My ex-husband.

25   Q.   Was that insurance or cash?

1   A.   Cash.

2   Q.   And you were trading -- were you trading him some of the

3   pills?

4   A.   Yes.

5   Q.   Was he also selling them?

6   A.   Yes.

7   Q.   Now, do you remember how much the prescriptions would cost?

8   A.   Around $800 for all of them.

9   Q.   At which place?

10  A.   East Main Street Pharmacy.

11  Q.   Okay.  That was 800 cash?

12  A.   Yes.

13  Q.   And how much were you paying to see Dr. Volkman at

14  Chillicothe?

15  A.   150, $180.

16  Q.   Okay.  And when you were at the dispensary, did you ever

17  have a problem getting all your pills?

18  A.   One time, yes.

19  Q.   And what happened?

20  A.   I was short on my Lortabs, and then in the Soma bottle they

21  was -- or in -- there was 20 extra Somas in another bottle.

22  Q.   So you got extra'd?

23  A.   Yeah.  And shorted.

24  Q.   Did they average out?

25  A.   Not cost-wise, no.

1    Q.   Did you tell them that you got too many pills?

2    A.   No.

3    Q.   Did you tell them you got too few pills?

4    A.   Yes.

5    Q.   And what happened?

6    A.   I didn't -- I didn't know till after I got home, so it was

7    later.  They just assumed I took them.

8    Q.   Okay.  Did you tell the doctor there was a problem?

9    A.   I mean, I don't think so.

10   Q.   Okay.  Do you remember if you ever talked about it with Dr.

11   Volkman later after he left Tri-State, about being shorted?

12   A.   No.

13   Q.   Okay.  Now, while you were at Tri-State, did you ever get

14   Dr. Volkman's cellphone number?

15   A.   Yes.

16   Q.   Why?

17   A.   Truthfully, I don't remember how I come about getting his

18   cellphone number.

19   Q.   Okay.  Did you give him your number?

20   A.   Yeah, he had my home phone number.

21   Q.   Okay.  And did you ever get referred to a specialist while

22   you were at Tri-State or at Chillicothe?

23   A.   When I was at Tri-State, he a couple times wanted me to see

24   a specialist here in Cincinnati.  The girls was supposed to set

25   me up with one.  They never did.

1   Q.   For what?

2   A.   For my knees.

3   Q.   Why Cincinnati?  Why not a local hospital?

4   A.   He didn't care too much for me going to one of the local

5   hospitals.

6   Q.   Why not Columbus?

7   A.   I -- I don't know.

8   Q.   How far was East Main Street from your house?

9   A.   About two hours.

10  Q.   Now, when you were at Tri-State or at Chillicothe, did you

11  ever have a pain pill count?

12  A.   Yes.

13  Q.   Please describe what happened.

14  A.   I had a pill count at Tri-State.  Alice called.  I took my

15  pills in and she counted them, and that was it.

16  Q.   And were you okay?

17  A.   Yeah.

18  Q.   So how were you managing that?  How were you managing to

19  take too many pills or abuse the pills and still have an

20  appropriate number?

21  A.   I would call somebody and get what I needed.

22  Q.   Now, Ms. Wallace, at some point were you dismissed?  Were

23  you thrown out of Tri-State?

24  A.   Yeah.

25  Q.   When was that?

1   A.   June, July, August.

2        June, July of --

3   Q.   Of what year?

4   A.   '05.

5   Q.   And why?

6   A.   Because I refused to take another drug test.

7   Q.   What was the problem?

8   A.   Because I knew I couldn't pass it.

9   Q.   Okay.  I need for you to speak up just a little bit.

10  A.   Because I knew I couldn't pass it.

11  Q.   And you were dismissed?

12  A.   Yeah.  They told me not to come back, the girls did.

13  Q.   How did you get back in to see Dr. Volkman?

14  A.   I called Dr. Volkman on his cellphone.  I had an issue with

15  my wrist and I had had surgery on it, and those doctors told me

16  to call him, so I called him.

17  Q.   What doctors?

18  A.   Dr. Aitken in Ashland.

19  Q.   Okay.  Was this at the emergency room or was this someplace

20  else?

21  A.   I had surgery on my wrist, and he was the specialist that

22  was --

23  Q.   Okay.  So did he prescribe you pain medication?

24  A.   No, absolutely not.

25  Q.   So he told you to call Dr. Volkman?

1   A.   Dr. Volkman had referred me there.  I had -- my wrist

2   started hurting in February of '05.  I don't know why.  It just

3   started hurting, and it hurt so bad.  There was no spots, no

4   marks, no nothing on it.

5        I had went to the ER, and nobody could tell me nothing.  So

6   I walked in the office one day and Dr. Volkman give me a

7   referral for a bone scan.  I did go to King's -- or I went to

8   Bellefonte in Ashland, Kentucky, had the bone scan done.  By

9   the time I got home from them running the dye in my hand, I had

10  a big abscess on the top of my hand.

11  Q.   Okay.  And they took care of the abscess at Bellefonte?

12  A.   No.  I went to Portsmouth, because I was only five minutes

13  from there.  They told me there was nothing they could do.  So

14  I called Dr. Volkman, and he was pretty mad that I went to

15  Portsmouth anyways.

16       And I left, I signed myself out of Portsmouth Hospital and

17  went to King's Daughters in Ashland, and they done emergency

18  surgery on Easter Sunday.  It was in March.

19  Q.   Okay.  Is this --

20  A.   Of 2005.

21  Q.   Okay.  So you have emergency surgery at King's Daughters,

22  and you say he didn't -- that doctor didn't give you any pain

23  medication?

24  A.   No.  No, because I complained that I got -- had better

25  stuff at home.

1    Q.   And did you have better stuff at home?

2    A.   Absolutely.

3    Q.   Okay.   And this would have been around Easter of 2005?

4    A.   Yes.

5    Q.   So this would have been before you got dismissed?

6    A.   Yes.

7    Q.   Okay.

8    A.   It took six months for this opening to -- you can't even

9    see it, but it took six months for it to close.

10   Q.   Okay.   And then after you got dismissed, though, in June or

11   July, how did you get back in to -- how did you get back in to

12   see Dr. Volkman?

13   A.   I called him on his cellphone.

14   Q.   Okay.   And what did you tell him?

15   A.   I told him about my wrist was hurting, and he told me to

16   see them.   And I told him they told me to see him, and he told

17   me to come on over and I came on over.

18   Q.   And what did you get?

19   A.   I'm not sure what I got that day, but it was four

20   prescriptions.

21   Q.   For what?

22   A.   It was the oxys, the Lortab.   It was oxycodone, either

23   Lortab, Lorcet or Norco, Somas, and either Xanax or Valium.

24   Q.   And did he ask you about getting thrown out just a couple

25   of months before?

1    A.   No.

2    Q.   Never mentioned it?

3    A.   Never.

4    Q.   Okay.  Did you have any more problems getting pills from

5    Dr. Volkman?

6    A.   No.

7    Q.   Now, at some point also did you learn that there was a DEA

8    search of Tri-State back in '05?

9    A.   Yes.

10   Q.   And as a result of that was your medical file taken?

11   A.   Yes.

12   Q.   And as a result, what did you do?

13   A.   I went to the DEA's office and asked for them.

14   Q.   And what kind of shape were you in?

15   A.   Pretty bad.

16   Q.   Meaning what?

17   A.   I was high.

18   Q.   Okay.  And did they give you a copy of the report?

19   A.   No.

20   Q.   Okay.  How did you know that the DEA had your file?

21   A.   They told me in the office that that's where they was.

22            MS. CROSS:  Objection.

23            THE COURT:  Sustained.

24   Q.   Who did you talk to?

25   A.   Alice and the girls in the office.

1  Q.  Okay.  Now, I do want -- just real quick again, I want to

2  make sure I got this right.  Now, I want to go back to the

3  February 3, 2006, prescriptions.  Is that 12 Norco a day?

4  A.  Yes.

5  Q.  And 12 oxycodone 30s a day?

6  A.  Yes.  Eight Soma.

7  Q.  Eight Soma?

8  A.  Yeah.

9  Q.  And how many Xanax?

10 A.  It looks like it says two.

11 Q.  Two.  So based on this, you were supposed to be taking 34

12 pills a day?

13 A.  Yes.

14 Q.  Did he tell you how often to take it?

15 A.  No.

16 Q.  Did you have any kind of dosing schedule?

17 A.  Just whenever I felt like it.  The bottles just said 12 a

18 day or eight a day, four times a -- four times a day, eight

19 times a day.

20 Q.  Okay.  At some point during the day you slept?

21 A.  Excuse me?

22 Q.  At some point during the day you slept?

23 A.  Yeah.

24 Q.  So you would have taken these while you were awake?

25 A.  Yes.

1   Q.  Do you know how many times that you went up to see the guy

2   in Columbus, the pharmacist?

3   A.  Five or six times maybe.

4   Q.  Okay.  And what kind of shape were you in when you went up

5   to see him?

6   A.  Not real good.

7   Q.  Stoned again?

8   A.  Yes.

9   Q.  Did you ever have a discussion with Dr. Volkman about the

10  DEA?

11  A.  I wrote a note on everything they asked me that day and

12  gave it to him.

13  Q.  Why?

14  A.  Because I wanted to see my doctor.  I wanted to get my

15  medicine.

16  Q.  Did he discuss what you had written in that note with you?

17  A.  We talked about the DEA coming in all the time.  He -- he

18  wasn't afraid of them.  He didn't care.  He wasn't doing

19  nothing.

20          MR. OAKLEY:  No other questions, Your Honor.

21                          CROSS-EXAMINATION

22  BY MS. CROSS:

23  Q.  Ms. Wallace, Dr. Volkman was your doctor for two years;

24  right?

25  A.  Two and a half years, yes.

1  Q.  August '03 to September of '05?

2  A.  No.

3  Q.  No?

4  A.  Till September '05 was still Tri-State.

5  Q.  Okay.

6  A.  Then he went from Tri-State to Chillicothe.  I seen him

7  from October there till 2006.

8  Q.  So from August '03 until?

9  A.  February of 2006.

10  Q.  2006.  And you're not telling the jury today that he was

11  not -- that all he was doing was giving you pills; right?

12  You're not saying that; right?

13  A.  Yeah.

14  Q.  It's your testimony that all he did was give you pills?

15  A.  To me, that's all he ever did.

16  Q.  Well, let me ask you this.  When you would go to see Dr.

17  Volkman --

18  A.  Yes.

19  Q.  -- the procedure would be, when you go to an office visit,

20  you would have to see the nurses first; right?

21  A.  Yes.

22  Q.  And then the nurses would do an intake or assessment of

23  your complaints and your problems that day; right?

24  A.  Yes.

25  Q.  And oftentimes -- well, every time you would see a nurse;

1   correct?

2   A.   Yes.

3   Q.   Before you saw Dr. Volkman?

4   A.   Yes.

5   Q.   And what you would do is you would tell the nurse, this is

6   my complaint, this is my pain level, this is how I'm feeling,

7   this is my condition today; correct?

8   A.   Yes.

9   Q.   And then they would write it on the chart?

10   A.   Yes.

11   Q.   And you would see that?

12   A.   Yes.

13   Q.   And then they would take your blood pressure?

14   A.   Yes.

15   Q.   And your pulse?

16   A.   Yes.

17   Q.   And weigh you and things like that; right?

18   A.   They never weighed me.

19   Q.   Okay.   But they did take your pulse and they did take your

20   blood pressure?

21   A.   Yes.

22   Q.   Okay.   And so this is the procedure every time you came in;

23   right?

24   A.   Yes.

25   Q.   And then you would see the doctor?

1    A.  Yes.

2    Q.  And during the visit you would tell the doctor what you

3    told the nurses; right?

4    A.  Yeah.  If he asked, yes.

5    Q.  And so your testimony was that you were most of the time

6    stoned; correct?

7    A.  Yes.

8    Q.  And so is it your testimony that you were stoned when you

9    talked with the nurses?

10   A.  Yes.

11   Q.  And that the nurses knew you were stoned?

12   A.  Yes.

13   Q.  And that, knowing that you were stoned, they went ahead and

14   let you see the doctor?

15   A.  Yes.

16   Q.  That's your testimony?

17   A.  Yes.

18   Q.  Now, Dr. Volkman on many occasions referred you to other

19   doctors; correct?

20   A.  A couple times, yes.

21   Q.  For various complaints that you had?

22   A.  Over my knees.  He asked the girls to send me to a

23   specialist, and they never did.

24   Q.  Well, let's start off, when you first got there, you were

25   already an established pain patient; right?  Because you came

1   by referral; right?

2   A.   I was not a pain patient, no.

3   Q.   Well, you had established pain.

4   A.   Yes.

5   Q.   Right?

6   A.   Yes.

7   Q.   And you were referred to a pain management clinic?

8   A.   Yes.

9   Q.   And you chose Tri-State?

10  A.   Yes.

11  Q.   So when you got to Tri-State, you didn't have to be

12  reassessed.  You were already an established patient being

13  referred there; right?

14  A.   My family doctor just give me a referral.  I took it.  He

15  never done no assessment.  I mean, he -- he told me if I wanted

16  to get pain medication, he would not write it.  I'd have to see

17  a pain specialist.

18  Q.   And that was because you had pain in your knees?

19  A.   Yes.

20  Q.   And that was due to the car accident --

21  A.   Yes, ma'am.

22  Q.   -- where you were run over by a car?

23  A.   Yes.

24  Q.   And did you have pain all the time in your knees?

25  A.   Yes.

1  Q.  And so you went to Tri-State for pain management; right?

2  A.  Yes, ma'am.

3  Q.  And then the first time you went you said Dr. Volkman did

4  do some reflexes on your knees?

5  A.  Yes.

6  Q.  There were other times that when you went to Dr. Volkman --

7  A.  Yes.

8  Q.  -- you would complain about other problems and he would

9  refer you to other doctors to make sure you were taken care of;

10  right?

11  A.  One time over my wrist was the only other time for anything

12  else.

13  Q.  Well, do you recall, on the February 3rd, '06, visit that

14  you complained about problems with breast pain and you

15  requested a mammogram and Dr. Volkman referred you for a

16  mammogram?  Do you remember that?

17  A.  I had breast pain a lot.  I just -- I don't remember that

18  specific day.

19  Q.  What I'm trying to get at, ma'am, is there were times that

20  Dr. Volkman referred you, based on your complaints of various

21  conditions, he would refer you to other doctors, right, to help

22  you?

23  A.  Sometimes, yes.

24  Q.  Yes.  Do you recall in August of '05 where you had a

25  painful condition about your face?

1   A.  Yes.

2   Q.  And what was that condition?

3   A.  I had an abscessed tooth.  And I had an abscess and it come

4   out to my chin.

5   Q.  And when you went for your visit, you told Dr. Volkman

6   about it; right?

7   A.  Yes.

8   Q.  And he referred you to somebody?

9   A.  He told me to come to Cincinnati.  I came to the ER.

10  Q.  And you went to the ER?

11  A.  Yes.

12  Q.  And was it taken care of?

13  A.  They tried to drain it.  They couldn't do nothing.

14  Q.  Now, when you would present to Dr. Volkman's office or

15  Tri-State, you would tell the nurses you had pain; right?

16  A.  Well, yeah.

17  Q.  You didn't go in there and say, "I'm high.  I don't need

18  any medication, but I just want to get to see the doctor"?  You

19  didn't do that, did you?

20  A.  No.

21  Q.  You said you had pain?

22  A.  Yes.

23  Q.  And every time they documented it; right?

24  A.  Yes.

25  Q.  And you also testified that you sold a lot of your pills?

1    A.   Yes.

2    Q.   So is it your testimony that you were high on the medica-

3    tion that you got from Dr. Volkman or you were high from

4    something else?

5    A.   I took the medication, and I sold some too.

6    Q.   So it's your testimony that you weren't taking what was

7    prescribed; correct?

8    A.   Right.

9    Q.   You were only taking a portion of it?

10   A.   Right.

11   Q.   And it's your testimony that you got high off of it?

12   A.   Yes.

13   Q.   And the whole time that you were seeing Dr. Volkman?

14   A.   Yes.

15   Q.   And that every time you went to the clinic you were high,

16   and it was obvious?  Is that your testimony?

17   A.   Not every time.

18   Q.   The times that you did go.

19   A.   It would have been obvious, yes.

20   Q.   It was obvious?

21   A.   Yes.

22   Q.   Because of what?  Were you slurring your speech?

23   A.   I had slurred speech, yes.

24   Q.   Did you fall down?

25   A.   I was uneasy on my feet, yeah.

1  Q.  And what other characteristics did you have that would have

2  made it obvious to the nurses and Dr. Volkman that you were

3  high?

4  A.  I was squinting, I mean, my eyes would be almost closed,

5  and nodding out.

6  Q.  Now, we see that you are incarcerated.

7  A.  Yes, ma'am.

8  Q.  And that's because you have a conviction for selling your

9  pills?

10  A.  Yes, ma'am.

11  Q.  Was that trafficking?

12  A.  Yes.

13  Q.  And do you have any other felony convictions?

14  A.  Yes.  Of possession.

15  Q.  When was that?

16  A.  2006.  And then I got in trouble again in 2009.

17  Q.  And when you were asked to identify Dr. Volkman, you said

18  he's sitting right over there behind Chris.  How do you know

19  Chris Kresnak?

20  A.  How do I know Chris Kresnak?  I've talked to him before.

21  Q.  You've talked to him many times, haven't you?

22  A.  Yes.

23  Q.  You've talked to him in preparation for your testimony

24  today too; correct?

25  A.  Yes.

1   Q.  And you feel pretty familiar with him.  That's why you

2   called him Chris; right?

3   A.  Yes.

4   Q.  Now, your sentence --

5   A.  Yes.

6   Q.  -- how long are you in jail for?

7   A.  Five years.

8   Q.  And you were brought here --

9   A.  Yes.

10  Q.  -- to testify.  And are you hoping that you will get

11  something off of your sentence or some leniency as a result of

12  testifying today?

13  A.  No, ma'am.

14  Q.  Were you told that you would, there would be some

15  consideration if you did?

16  A.  No, ma'am.

17  Q.  So you're here testifying and you expect nothing in return;

18  right?

19  A.  Yes, ma'am.

20  Q.  And did you contact the government to testify, or were you

21  contacted?

22  A.  I was contacted a long time ago.

23  Q.  Now, I want to make sure that I understand your testimony.

24  You said that there was a time at Tri-State that you went for

25  an office visit and you were so high that you nearly passed

1   out.

2   A.   I nearly knocked over the water cooler, yes.

3   Q.   And do you recall if -- which nurses were there?

4   A.   I know Liz was there and Alice was there.

5   Q.   Liz Madden?

6   A.   I don't know Liz's last name.

7   Q.   There was never a time when you went to any of these

8   clinics and there was not a nurse there; correct?

9   A.   No.

10  Q.   Because you had to talk to a nurse for the assessment

11  before you got to see Dr. Volkman; right?

12  A.   That's right.

13  Q.   And so on this particular occasion that you were supposedly

14  so high that you almost knocked over the water cooler, Liz

15  Madden would have been there and saw you?

16  A.   Yes.

17  Q.   Who else?

18  A.   Alice was there.

19  Q.   Alice Huffman?

20  A.   Yes.

21  Q.   What other nurses?

22  A.   I don't know who else was there that day.

23  Q.   You'd agree with me that when you went to Tri-State you did

24  have documented, established knee pain; right?

25  A.   Yes, ma'am.

1  Q.  And then during the course of your being treated for that,

2  you developed some other issues --

3  A.  Yes, ma'am.

4  Q.  -- over the course of the time of being treated by Dr.

5  Volkman; right?

6  A.  Yes.

7  Q.  That were required -- that were painful.

8  A.  Yes.

9  Q.  And every time that you acquired a new condition and had

10  pain, you would tell Dr. Volkman about it; right?

11  A.  Yes.

12  Q.  Now, you spoke of cash payments.  When you went in, you

13  paid cash for your office visit; right?

14  A.  Yes.

15  Q.  And your prescriptions; right?

16  A.  If I got them filled there, yes.

17  Q.  If you got them filled there.  And they didn't take

18  insurance?

19  A.  No.

20  Q.  But they did help out with reimbursement for insurance if

21  you wanted to do that; right?

22  A.  I don't know.

23  Q.  You don't know?

24  A.  I didn't have insurance.

25  Q.  So you've never submitted an insurance claim?

1    A.   Yes.   From a car wreck, yeah.

2    Q.   So now are you changing your "no" to a "yes"?

3    A.   Yes, ma'am.

4    Q.   So they would help you with reimbursement?

5    A.   Yeah.   That was from a car insurance; I didn't have

6    personal insurance.

7    Q.   Yes, ma'am.   But you did -- my question is, if you wanted

8    reimbursement and you took the papers that Tri-State, they

9    would help you fill out the reimburse -- to get reimbursed;

10   right?

11   A.   They gave me my -- they give me receipts, and I sent them

12   back in to the insurance company, yes.

13   Q.   Reimbursed you?

14   A.   Yes.

15   Q.   Now, you talked about a time where, and I'm not sure when

16   it was, but you said that you were bitten by a spider.   Was

17   that right?   Were you bitten by a spider?

18   A.   I don't know.

19   Q.   You don't know if you were bitten by a spider?

20   A.   No.   My hand just hurt real bad.

21   Q.   Okay.

22   A.   There was no marks, no nothing.

23   Q.   And you went to an office visit with Dr. Volkman.   You told

24   him about it; right?

25   A.   Yes.

1   Q.  And then he sent you to Ashland to get a bone scan?

2   A.  Yes, ma'am.

3   Q.  And you considered that to be a good thing that he did;

4   right?

5   A.  Yeah, yes.

6   Q.  So I'll ask this again.  He did other things than just give

7   you prescriptions; correct?

8   A.  Yes.

9   Q.  He was your doctor; right?

10  A.  Yes.

11          MS. CROSS:  Your Honor, may I have a moment?

12          THE COURT:  Yes.

13      (Ms. Cross, Ms. Crouse and the defendant confer privately.)

14  Q.  Ms. Wallace, you said that -- Mr. Oakley asked you about a

15  time where you took a pill in the office; correct?

16  A.  Yes.

17  Q.  And you said that it made you high.

18  A.  Yes.

19  Q.  Right?  And is that because you had not been taking your

20  medication?

21  A.  No.

22  Q.  So you had always been taking your medication?

23  A.  Yes.

24  Q.  And then you took one pill in the office and it made you

25  high?  Is that what you're telling the jury?

1          MR. OAKLEY:  Objection, Your Honor.  That's not the
2   facts in evidence.
3          THE COURT:  Sustained.
4   A.  It's one of everything.
5          THE COURT:  Wait a minute, Ms. Wallace.  I'm
6   sustaining the objection.  You don't have to answer the
7   question.
8      You can rephrase if you wish.
9   Q.  Ma'am, will you please explain what you said so I won't get
10  it wrong.
11  A.  He wrote a prescription for one of everything that I took.
12  Q.  One pill?
13  A.  One pill.  It was four different pills.
14  Q.  And you took each of those in the office?
15  A.  Yes.
16  Q.  And that's when you -- and you stayed there and waited;
17  right?
18  A.  Yes.
19  Q.  And you said that it made you high.
20  A.  Yes.
21  Q.  Right?
22  A.  Yes.
23  Q.  Now, you took one of each of the pills that you had been
24  getting from Dr. Volkman?
25  A.  Yes.

1   Q.  For quite some time, actually?

2   A.  Yes.

3   Q.  But when you took it when you got in the office that time,

4   one pill of each of the medications, it made you high?

5   A.  Yes.  If you took them all at the same time together, it's

6   going to.  I sold most of my pills.  I didn't take all of them

7   like that.

8   Q.  And that was my point.  You were high because you didn't

9   take all of your medication the way you were prescribed; right?

10  A.  No.  Not like I was prescribed, no.

11  Q.  Now, on February 3rd, 2006, you told Dr. Volkman and the

12  nurses that your pain level was pretty high, didn't you?

13  A.  Yeah.

14  Q.  Do you remember your pain scale?

15  A.  No, but I'm -- it was probably pretty high.  That's the day

16  I asked for more pills.

17  Q.  That's the day you asked for more pills.  Was your pain

18  high, pretty high that day?

19  A.  No.

20  Q.  So you lied?

21  A.  To him, yes.

22  Q.  And to the nurses?

23  A.  Yes.

24  Q.  But you told them that your pain scale was a six or a seven

25  out of ten; right?

1  A.  Always.

2  Q.  You told them that you had muscle spasms that day; correct?

3  A.  Yes.

4  Q.  And that was a lie, was it?

5  A.  Yeah.

6  Q.  You lied to the nurses; right?

7  A.  Yes.

8  Q.  And you lied to Dr. Volkman?

9  A.  Yes.

10  Q.  But after you told him that your pain level was very high,

11  that you had these muscle spasms, that your knee was paining

12  you, that you had pain in your breasts, you were given an

13  increase of medication; correct?

14  A.  Yes, ma'am.

15  Q.  So it wasn't a situation where you walked in, said "I need

16  more medication"; he gave you more medication, that was it.

17  Right?  You said you had more pain; correct?

18  A.  Yeah.

19          MS. CROSS:  Okay.  Your Honor, I believe that's all

20  the questions I have.  Thank you.

21          THE COURT:  Redirect, Mr. Oakley?

22          MR. OAKLEY:  There will be, but it's a little after

23  our break.

24          THE COURT:  Okay.

25      Well, folks, let's take the midafternoon break for 15

1    minutes.  And, let's see, we'll resume at essentially -- well,

2    let's see.  It would be nice if the clock were correct.  So

3    we're at ten after 4:00, yes?

4              MEMBERS OF THE JURY:  No.  It's correct.

5              THE COURT:  Oh, they fixed it.  Hallelujah.  Thank

6    you.

7       All right.  Well, let's resume at 3:30.  I was just getting

8    used to the clock being wrong.

9       All right.  Don't do anything I've cautioned you about over

10   the break.  We'll see you back in 15 minutes.

11             COURTROOM DEPUTY:  All rise.

12      (Jury out at 3:13 PM.)

13   <u>BEFORE THE COURT</u>

14             COURTROOM DEPUTY:  Please be seated.

15             THE COURT:  All right.  Counselors, is there anything

16   that you want to put on the record in the absence of the jury

17   before we take the break?

18             MR. OAKLEY:  Your Honor, I believe we have a

19   stipulation to 77, the admission of what's been marked 77,

20   which are the pills that were taken from Tri-State during the

21   search in June of 2005 and then, pursuant to the request of Dr.

22   Volkman, in September of 2005.  It's those big boxes right

23   there.

24             THE COURT:  Okay.  So it's Exhibit 77.  And is there

25   another?

1          MR. OAKLEY:  77 are the boxes in the front.  They

2    contain the narcotics back from the DEA.

3          THE COURT:  Okay.

4       Is that correct, Ms. Cross?

5          MS. CROSS:  That is correct, Your Honor.

6          THE COURT:  All right.

7          MS. CROSS:  So long as it is only the pills that were

8    taken out of the dispensary on June 7th, 2005, and then again

9    in September '05.

10         THE COURT:  Okay.

11      Okay.  Anything else?

12         MR. OAKLEY:  No, Your Honor.

13         THE COURT:  All right.  Thank you.

14      Ms. Wallace, you can step down.  The marshals will take you

15   back to the holding cell.

16      (Witness temporarily excused.)

17         COURTROOM DEPUTY:  All rise.  Court is in recess until

18   3:30.

19      (Recess taken:  3:15 PM - 3:35 PM.)

20      (Lisa G. Wallace resumes the witness stand.)

21      (Jury in at 3:37 PM.)

22         THE COURT:  Mr. Oakley, redirect.

23         MR. OAKLEY:  Thank you, Your Honor.

24                    REDIRECT EXAMINATION

25

1   BY MR. OAKLEY:

2   Q.  As we start, Ms. Wallace, I want to -- just to be fair, now

3   you have heard that the parole board will hear that you

4   testified today; is that correct?

5   A.  Yes.

6   Q.  But there's no recommendation?

7   A.  No.

8   Q.  Now, you were asked questions about nurses at Tri-State.

9   A.  Yes.

10  Q.  That the nurses would watch you.  Do you have any idea if

11  these folks who worked there were actually nurses?

12  A.  I don't.  I don't know.

13  Q.  Did you just assume they were?

14  A.  I assume, yes.

15          MS. CROSS:  Objection.

16          THE COURT:  Overruled.

17  Q.  I'm sorry.  Could you answer the question, please.

18  A.  I assumed they were nurses.

19  Q.  And you were asked about whether or not the doctor did more

20  than just -- gave you more than just pills.  You got some

21  referrals; correct?

22  A.  What is it?

23  Q.  You got some referrals to get your hand looked at; right?

24  A.  Yes.

25  Q.  Did Dr. Volkman do anything to actually fix the problem?

1   A.   No.

2   Q.   What did you get from Dr. Volkman?

3   A.   Pain pills.

4   Q.   And you were asked about taking all your pills.  You didn't

5   take all your pills, did you?

6   A.   No.

7   Q.   Was what you were taking still making you high?

8   A.   Yes.

9   Q.   What would have happened if you would have taken all your

10  pills as prescribed?

11          MS. CROSS:  Objection.

12  Q.   I mean, if you know.

13  A.   If I would have took all those 34 pills in one day, I

14  believe it would have killed me.

15          MR. OAKLEY:  No other questions, Your Honor.

16                      RECROSS-EXAMINATION

17  BY MS. CROSS:

18  Q.   Ms. Wallace.

19  A.   Yes, ma'am.

20  Q.   Now we know that the parole board is going to hear that you

21  testified here; right?

22  A.   Yes.

23  Q.   And how does that work?  I mean, when you're eligible for

24  parole, go before the board; right?

25  A.   Yes.

1    Q.   And then the government has told you that they're going to

2    make sure that the parole board knows that you came here and

3    testified for the government; right?

4    A.   I assume, yes.

5    Q.   That's your understanding; right?

6    A.   Yes.  He said that he talked to someone from the prison and

7    they was going to let the parole board know that I testified.

8              MS. CROSS:  Thank you.  No further questions.

9              THE COURT:  Okay.  Counselors, is there any reason for

10   Ms. Wallace to remain available for recall?

11             MR. OAKLEY:  No, Your Honor.

12             MS. CROSS:  No, Your Honor.

13             THE COURT:  Okay.

14      Thank you, Ms. Wallace.  You may step down.

15      (Witness excused.)

16             THE COURT:  And if you'll call your next witness.

17             MR. OAKLEY:  Nicole Bornstein.

18             COURTROOM DEPUTY:  Did you say Bornstein?

19             MR. OAKLEY:  Bornstein.

20             COURTROOM DEPUTY:  Please raise your right hand.

21      (Nicole Bowie is duly sworn by the courtroom deputy.)

22             COURTROOM DEPUTY:  Please be seated.

23                           NICOLE BOWIE

24   a witness herein, having previously been sworn, testified as

25   follows:

1                      DIRECT EXAMINATION

2    BY MR. OAKLEY:

3    Q.  Ms. Bornstein, can you please tell us your name and spell

4    your last name for the record.

5    A.  My name now is Nicole Bowie, B-o-w-i-e.

6    Q.  Back when you were -- where do you work now, Ms. Bowie?

7    A.  I work for a company called C-A-C-I out of Chantilly,

8    Virginia.

9    Q.  And what do they do?

10   A.  Background investigations for federal employees.

11   Q.  And prior to that where did you work?

12   A.  Federal Bureau of Investigation.

13   Q.  And prior to that where did you work?

14   A.  Drug Enforcement Administration.

15   Q.  Okay.  What was your duty at Drug Enforcement

16   Administration?

17   A.  I was a diversion investigator.

18   Q.  When did you start?

19   A.  December of 2003.

20   Q.  Okay.  And how long did you work at the DEA?

21   A.  From December of 2003 until August of 2008.

22   Q.  And why did you leave the DEA?

23   A.  I got a job with the FBI.

24   Q.  Now, as part of your duties what -- well, let's start with

25   this.  What were your duties as a diversion agent?

1    A.   As a diversion investigator I was regulatory compliance of

2    pharmaceutical products.

3    Q.   As part of that duty did you become aware of a place called

4    Tri-State Health Care?

5    A.   Yes, in Portsmouth, Ohio.

6    Q.   In Portsmouth, Ohio?

7    A.   Yes.

8    Q.   And did you become also aware of a fellow by the name of

9    Dr. Paul Holland Volkman?

10   A.   Yes, sir.

11   Q.   Now, were you part of the investigation of Tri-State?

12   A.   Yes, I was.  It was assigned to my boss -- Roy Head -- and

13   in October of 2004 he handed the case over to me.

14   Q.   Okay.  So that would have been one of the first cases you

15   worked on?

16   A.   Yes, sir.

17   Q.   Did you take part in a search warrant of Tri-State back in

18   June of 2005?

19   A.   Yes.

20   Q.   And what were your duties as part of that search warrant?

21   A.   Just to go through and watch.  I was the lead investigator

22   on the case, so it was my duty to pretty much just watch what

23   was going on and making sure that the correct files were taken

24   and that there was somebody in the dispensing center removing

25   records and counting the pills in the dispensing center.

1  Q.  Okay.  Did you take part in working in the dispensing

2  center?

3  A.  I did not physically take part in any of the counting of

4  pills, but I did take notice of what was going on and what

5  information was in the room itself.

6  Q.  Okay.  And were those pills secured?

7  A.  At the time when we went in, I don't recall if they were

8  secured or not.

9  Q.  Were they taken as part of the search?

10  A.  Yes.  They were taken as part of the search, yeah.

11  Q.  Okay.  And after those pills were taken, did you conduct an

12  audit of those pills?

13  A.  I did conduct an audit.

14  Q.  And please explain how that was conducted.

15  A.  Based on the information that I received from the

16  pharmaceutical companies that sent -- or the distributors that

17  sent the product to Tri-State Health Care, I had that as an

18  opening balance of what should have been in the dispensing

19  center.  There were no records readily available at the time

20  for us to utilize from the dispensing center, so I used only

21  what I had from the actual distributors, and then we counted

22  out what was dispensed, which again there were no records

23  showing what was dispensed out, so the audit kind of showed

24  only deposits going in and no credits.

25  Q.  Okay.  And did you come up with a computation chart of that

1    audit?

2    A.   I did.   There's a computation chart the DEA utilized in our

3    training to show, when we do regulatory audits on companies,

4    that we are supposed to use to show the actual incoming,

5    outgoing, and balance of medications or prescriptions or

6    pharmaceutical products, whatever it was that we were auditing

7    at the time.

8    Q.   Could you please look at what's been marked 22b, as in boy.

9    A.   (Witness complies.)

10   Q.   Okay.   Do you recognize that?

11   A.   I do.   That's my computation chart that I put together on

12   July 7th of 2005.

13            MR. OAKLEY:   Your Honor, I would move to admit 22b.

14            MS. CROSS:   No objection.

15            THE COURT:   It will be admitted.

16            MR. OAKLEY:   Thank you, Your Honor.

17       (Government's Exhibit 22b was admitted.)

18            MR. OAKLEY:   We would move to publish.

19            THE COURT:   You may.

20   Q.   Let's just start with this.   At the top there's a name at

21   the upper left of the screen.   Who is that?

22   A.   Upper left says, "Firm Name:   Volkman."

23   Q.   And below is a number.

24   A.   The DEA number, which would be his registration number that

25   was given to him.

1   Q.  And upper right there's a name.  Who is that?

2   A.  It says, "Investigators:  Bornstein," which was me prior to

3   my marriage.

4   Q.  And below that is a date.

5   A.  July 7th of '05.

6   Q.  Is that when the --

7   A.  That's when I completed the computation chart.

8   Q.  Now, Ms. Bowie, if we can just take a look at, first -- and

9   I'll pick a couple of things out.  For example, we have the

10  Alprazolam, 2 milligrams.  There is a column Initial Inventory.

11  A.  Yes.  That says the initial inventory as of January 1st,

12  2004, close of business.

13  Q.  Okay.  All of the numbers in this particular column all the

14  way down seem to have a zero.

15  A.  Correct.

16  Q.  Why?

17  A.  I did not have any information from the dispensing center

18  at Tri-State to give me that inventory number, so I didn't know

19  what was on hand for their -- for the year of 2004.

20  Q.  Okay.  So we start out with just zero?

21  A.  Yes.

22  Q.  And what's the next line?  What's the next column?

23  A.  Purchases and Receipts, and that's the information that I

24  received from the distributors.  I had subpoenaed the

25  distributors, and they sent me records of what they had sent to

1    Tri-State Health Care or Dr. Volkman, because it was his DEA

2    number for the year.

3    Q.   Okay.  And then the next column is what?

4    A.   It says "Total Accountable For," and that would be the two

5    columns for the initial inventory and the purchases would be

6    added together.

7    Q.   So that should be the number of pills that day?

8    A.   Correct.  That should be what they had purchased for the

9    time period of the audit.

10   Q.   Okay.  And the next number is what, the next column?

11   A.   Closing inventory as of December 31st of '04.

12   Q.   And there's a number using the Alprazolam 2 milligram.

13   A.   It says 1,638.

14   Q.   Is that how many pills you found?

15   A.   Based on the records that we had -- we received and the

16   pills, yes, that would be the amount that was recovered.

17   Q.   Okay.  And the next column over is what?

18   A.   It says "Scripts."  And in the pharmacies it would be any

19   of the dispensing materials or any of the prescriptions or

20   invoices that would show what has been taken out of inventory.

21   Q.   Now, did you find or did you -- all of it, that entire

22   column, has zero.

23   A.   Correct.

24   Q.   Why?

25   A.   I found no records that would -- complete and accurate

1  records that would denote any kind of inventory going out.

2  Q.  Okay.  Now, were there prescriptions there?

3  A.  During the search we did find boxes of scripts, but I don't

4  know if at the time of the search we really understood what

5  that was, because it was just in a box in a corner.

6  Q.  Okay.  Was that an appropriate way to keep this particular

7  record column?

8  A.  No, it would not be complete and accurate or readily

9  retrievable, according to the Code of Federal Regulations.

10 Q.  Do you remember approximately how many prescriptions you

11 found?

12 A.  No, I do not.  Hundreds.  It wasn't -- it wasn't one or

13 two.

14 Q.  Okay.  And then we have this number here, the "Total Can

15 Account For."  What's that?

16 A.  That was the total that we could account for based on the

17 information that we had that came in, and based on what we did

18 find that was either left in the facility or we did find

19 something to tell us that something had gone out, which left a

20 difference of 88,862 pills missing.

21 Q.  Missing or just simply not recorded?

22 A.  Not recorded, not accounted for, not something that we

23 could attribute to where they went.

24 Q.  Okay.  Well, let's jump down to the Carisprodol.  The same

25 process?

1    A.   Correct.

2    Q.   Okay.  Purchased 165,000?

3    A.   Correct.

4    Q.   And under the guidelines, how many could you actually find?

5    A.   4,321 actual.  These are actual pills that were counted,

6    physically counted.

7    Q.   Okay.  And, admittedly, I'm going to kind of pick and

8    choose going through here.  Let's go down to this particular

9    number here, this particular line here.  What's this for?

10   A.   Are you looking at the Hydrocodone 10/650?

11   Q.   Yeah, where my pen is.

12   A.   Okay.  That's the Hydrocodone 10, slash, 650 milligrams.

13   That would be ten grams of --

14        Do you want the definition of what that is?

15   Q.   If you can.

16   A.   I believe that's the ten grams of the controlled substance,

17   and then 650 milligrams of either ibuprofen or aspirin or

18   something of that nature.

19   Q.   Okay.  And how many were ordered?

20   A.   131,000 pills.

21   Q.   Okay.  And how many, under the guidelines, can we account

22   for?

23   A.   4,685 we can account for.

24   Q.   Okay.  So which gives us a net loss of?

25   A.   126,315 pills missing or unaccounted for.

1   Q.   Okay.  Now let's go down to the last line on this

2   particular page.  Using the oxy 30s, this indicates how many

3   were purchased?

4   A.   30,000 pills were purchased.  And then we could account for

5   1,390, which left a deficit of 28,610.

6   Q.   Did you total all these numbers up?

7   A.   At some point somebody did, yes.  On the second page

8   there's a total.

9   Q.   Okay.

10  A.   It's 1,013,223 pills that cannot be accounted for.

11  Q.   Okay.  And that's just recorded?

12  A.   Recorded.

13          MR. OAKLEY:  No other questions, Your Honor.

14          THE COURT:  Okay.

15      Cross?

16                      CROSS-EXAMINATION

17  BY MS. CROSS:

18  Q.   Good afternoon, Ms. Bowie.

19  A.   Good afternoon.

20  Q.   In looking at the chart, 22b, you said that you were there

21  at the search warrant execution at Tri-State in June of '05;

22  right?

23  A.   Yes, ma'am.

24  Q.   And while you weren't actually counting pills, you were

25  supervising the counting of pills that were collected?

1  A.  I was in and out of that area at the time, so I wouldn't

2  say I was supervising, but I was in and out, as well as other

3  investigators and DEA agents that were there physically

4  counting the pills.

5  Q.  Would you say monitoring?

6  A.  Sure.

7  Q.  Okay.  And you would agree that there were no inventory

8  books by which you could see what was going out in terms of

9  pills going out of the dispensary.  Is that what you testified

10  about?

11  A.  At the time of trying to do the audit, I did not find

12  anything from the search warrant.  At the time of the search

13  warrant we were just retrieving materials, so I wasn't -- I

14  couldn't tell you if I found it right then at the time of the

15  search warrant.

16  Q.  Now, you were with the DEA until August 2008; right?

17  A.  Correct.

18  Q.  And the search warrant was 2005; right?

19  A.  Yes, ma'am.

20  Q.  And so after all of the items were taken out of Tri-State

21  from the execution of the search warrant, you had to sift

22  through what you had; correct?

23  A.  Correct.

24  Q.  Okay.  And I want to show you -- I'd like to show you what

25  has been marked Government Exhibit 9c --

1         MS. CROSS:  I believe it's in evidence, Your Honor.

2         THE COURT:  It is.

3    Q.  -- page three.  Ms. Bowie, do you know what that is?

4    A.  It looks like -- it just looks like something that somebody

5    had signed that they were either -- a sign-in book.

6    Q.  Have you seen that before?

7    A.  I believe I saw it after the search warrant, yes.

8    Q.  It came out of Tri-State.  The sign-out logs at the

9    dispensary; correct?

10   A.  Correct.

11   Q.  And on this document -- this is just one page, because

12   there were many that you seized out of Tri-State; right?

13   A.  Yes, ma'am.

14   Q.  I'm just going to focus in on that.

15   A.  Okay.

16   Q.  This would show prescription that was filled at the

17   dispensary and how many pills were filled in that prescription;

18   correct?

19   A.  If that's what that says it's used for, yes, that's what

20   that says.

21   Q.  And so on your computation chart where you said you had no

22   basis for determining how many pills were dispensed, you had

23   these inventory sign-out logs, didn't you?

24   A.  I can't swear that I had those at the time I did the actual

25   audit.  I know at some point when we were able to go through

1   everything we found a binder with this in it.  I couldn't tell

2   you if I had it at the time when I was doing the audit or not.

3   Q.  But you would agree that if you went through these sign-out

4   logs, which indicate how much medicine was dispensed to a

5   patient on a given day and the type, that that would be useful

6   information in computing how many pills went out of the

7   dispensary; correct?

8   A.  It would be difficult to determine, because that one's

9   listed by patient, not by drug, but it could be -- it could be

10  used as, yes.

11  Q.  And so when you indicate that 1 million pills are

12  unaccounted for, that was just based on the information you had

13  at the time you made this?

14  A.  Correct.  Because I did not at the time find any records

15  that were complete and accurate and readily retrievable.

16  Q.  And to this date, you still haven't reviewed those sign-out

17  dispensary logs, have you?

18  A.  No, I have not.

19          MS. CROSS:  Your Honor, may I have a moment?

20          THE COURT:  You may.

21      (Ms. Cross and Ms. Crouse confer privately.)

22          MS. CROSS:  Thank you, Ms. Bowie.  No further

23  questions.

24          THE COURT:  Redirect, Mr. Oakley?

25          MR. OAKLEY:  Yes, Your Honor.

1                   REDIRECT EXAMINATION

2    BY MR. OAKLEY:

3    Q.  Ms. Bowie, was there a concern about the accuracy of the

4    records that you were able to find during your investigation?

5    A.  Yes.  Based on the information and the training that I had

6    and what I saw during the search warrant, I did not feel as

7    though any of the records would be accurate.

8    Q.  And you were shown a page from 9c.  Did you recall the

9    dates on some of those?

10   A.  I saw 2003 on those.

11        MR. OAKLEY:  No other questions, Your Honor.

12                   RECROSS-EXAMINATION

13   BY MS. CROSS:

14   Q.  And you said that there was some concern about whether or

15   not any of the records were accurate; correct?

16   A.  Correct.

17   Q.  But you thought the logbooks were accurate, didn't you?

18   A.  Thought the logbooks?

19   Q.  Yes, ma'am.

20   A.  I don't recall which logbooks you're referring to.

21   Q.  Did you take any logbooks out of the -- out of Tri-State

22   that day?

23   A.  For 2004?  I don't recall at the time.  Do you have --

24   Q.  What about 2003?

25   A.  I do believe that the pharmacy board had gone in and there

1    were logbooks based on the pharmacy board's information, but

2    there wasn't anything for us as far as when we went in in '05

3    for the '04.

4    Q.  But you didn't even look at these dispensing logs, did you?

5    A.  I don't believe I had those dispensing logs, if you're

6    referring to what you just showed.

7    Q.  Yes, ma'am.

8    A.  I don't believe I had those, and they weren't anywhere with

9    the search warrant material from the dispensing center at the

10   time I was doing the audit.

11   Q.  You did this audit in July 2005; right?

12   A.  Yes, ma'am.

13   Q.  One month after all this stuff was seized out of Tri-State;

14   correct?

15   A.  Yes, ma'am.

16   Q.  So you did have it, but you did not look at it?

17          MR. OAKLEY:  Your Honor, I'm going to object.  It's

18   beyond the scope of redirect.

19          THE COURT:  Sustained.

20          MS. CROSS:  No further questions.

21          THE COURT:  Counselors, is there any reason for Ms.

22   Bowie to remain available for recall?

23          MR. OAKLEY:  Not by the United States, Your Honor.

24          MS. CROSS:  No, Your Honor.

25          THE COURT:  Thank you, ma'am.  You may step down.

1          THE WITNESS:  Thank you.

2          THE COURT:  You're excused.

3      (Witness excused.)

4          THE COURT:  Call your next witness.

5          MR. OAKLEY:  Barry Houser.

6          COURTROOM DEPUTY:  Please raise your right hand.

7      (Barry Houser is duly sworn by the courtroom deputy.)

8          COURTROOM DEPUTY:  Please be seated.

9                        BARRY HOUSER

10  a witness herein, having previously been sworn, testified as

11  follows:

12                    DIRECT EXAMINATION

13  BY MR. OAKLEY:

14  Q.  Mr. Houser, if you could please tell us your name and spell

15  your last name.

16  A.  It's Barry Houser, H-o-u-s-e-r.

17  Q.  Okay.  Mr. Houser, I want to ask you if you were ever a

18  patient of either Tri-State Health Care or Dr. Volkman.

19  A.  Yes.

20  Q.  Was your wife also a patient?

21  A.  Yes.

22  Q.  What was her name?

23  A.  Glenna, G-l-e-n-n-a.

24  Q.  Why did you go to Tri-State?

25  A.  For pain management.

1    Q.   What was your problem?

2    A.   Mine or Glenna's?

3    Q.   Yours.

4    A.   Mine.  I have five degenerated vertebrae in my lower back,

5    two knees that need to be replaced, ankles that have swelled so

6    many times that I don't have any stability, and that's pretty

7    much it.

8    Q.   Now, you're a big guy.

9    A.   Uh-huh.

10   Q.   How much do you weigh?

11   A.   Over 300 right now.

12   Q.   Okay.  And at your top, how much did you weigh?

13   A.   525.

14   Q.   You've lost a couple hundred pounds?

15   A.   Yes.

16   Q.   Now, when you were going to Tri-State, did you also suffer

17   from hypertension?

18   A.   Unh-unh.

19   Q.   No.  And if you don't mind, what was Glenna's medical

20   problem?

21          MS. CROUSE:  Objection.

22   A.   She had --

23          MR. OAKLEY:  Hang on.  Hang on, Mr. Houser.

24          THE COURT:  Did you want to be heard?

25          MS. CROUSE:  No, Your Honor.

1          THE COURT:  Go ahead.

2      Overruled.  You can answer.  Go ahead.

3  Q.  What was Glenna's medical problem?

4  A.  She had kneeopathy (verbatim) in her legs.  She also had

5  bulging disks and ruptured disks in her back, because she was a

6  beautician.  And she also suffered the ill effects of gastric

7  bypass surgery that didn't go well.

8  Q.  Was she a big lady too?

9  A.  Yes.

10 Q.  And when did she have the surgery?

11 A.  In 2003.

12 Q.  Was that before you started at Tri-State?

13 A.  It was the same year, but it was towards the end of the

14 year.

15 Q.  Okay.

16 A.  Because she had her surgery October the 1st, and then about

17 two months after that we started.  She started going, and then

18 I started going after I got my MRIs of my knees and my back.

19 Q.  Okay.  Mr. Houser, what do you do for a living?

20 A.  I'm retired now, but I worked for the Department of

21 Transportation as a design tech.  I worked there for 30 years,

22 but I had to retire because I had sleep apnea really bad.

23 Q.  And did you go to a doctor about your sleep apnea?

24 A.  Yes.

25 Q.  So as a retired state employee, did you have insurance?

1  A.  Yes.

2  Q.  Okay.  And how did you find -- where do you live?

3  A.  I live in Jackson, Ohio.

4  Q.  And where is that in relationship to Portsmouth?

5  A.  I live in southeast.  It's probably about a 50-minute drive

6  to Portsmouth.

7  Q.  How did you find out about Tri-State?

8  A.  Basically we live in a small town, and we were looking for

9  pain management.  And my wife was a beautician, and she had

10  heard through her -- a lot of her customers that people were

11  going to pain management in Portsmouth.  We didn't have a pain

12  management in Jackson at the time.

13  Q.  Okay.  So you ended up at Tri-State?

14  A.  Yes.

15  Q.  Was Dr. Volkman there when you got there?

16  A.  Yes.

17  Q.  And you've treated with him at Tri-State?

18  A.  Yes.

19  Q.  Now, I've seen you a little bit.  Do you also have

20  breathing issues?

21  A.  Yes.

22  Q.  And how long have you had those?

23  A.  Pretty much after I started gaining my weight back.  I'm on

24  oxygen too and a breathing machine for my sleep apnea, but I

25  still have trouble breathing at times.  I have bad sinuses on

1   top of everything else.

2   Q.   Now, about the sleep apnea, did you suffer that before you

3   went to Tri-State?

4   A.   Yes.

5   Q.   And what about the breathing issues about the weight?  Was

6   that before or after Tri-State?

7   A.   No, that was before.

8   Q.   Okay.  Did you go to a doctor about that too?

9   A.   Yes.

10  Q.   And where was that doctor?

11  A.   For my sleep apnea?

12  Q.   Yes, sir.

13  A.   At the time the only place that was available, I had to go

14  to Huntington, either that or Dayton was the only two places at

15  that time, and that was before I retired.

16  Q.   Do you still suffer from that?

17  A.   No, not the way I did when I was working.  Because I almost

18  wrecked a vehicle in broad sunny daylight in the afternoon, and

19  I just dropped over, just like somebody would just pass out.

20  Q.   Now, when you got to Tri-State, what kind of treatment did

21  you receive at Tri-State?

22  A.   Basically it was -- this was all new to me.  I'd never been

23  to a pain management.  I had no idea what it all entailed.  I

24  received two types of pain medication.  One was for the pain

25  itself, and the other pain reliever was when you started coming

1  down off of your -- your high pain pill, to get you to the next

2  time that you got to take your high pain pill.  It was kind of

3  a in-between.  Plus I was given a muscle relaxer.  I was given

4  nerve pills.  I already was taking a water pill.  I think

5  that's pretty -- I think that's the four.

6  Q.  Did anybody ever explain what these pills do?

7  A.  Well, the muscle relaxer was because I had a lot of spasms

8  in my back.  The nerve pill I really didn't need.  I'm not a

9  nervous person.  Now, my wife did.  She was terrible nervous.

10  She just -- she always had trouble with her nerves as long as

11  we were married.  She --

12  Q.  And the other two -- my question, I guess maybe I wasn't

13  clear, did the doctor or someone on staff tell you how these

14  pills work and how they interact with each other?

15  A.  Basically they told us how they worked.  But as far as

16  interact, you know, they was supposedly safe to take them all.

17  Q.  Now --

18  A.  There was no -- nothing that I seen that would interact

19  with each other.

20  Q.  Who told you how the pills worked?

21  A.  Who did what?

22  Q.  Who told you how the pills worked?  Was that Dr. Volkman or

23  one of the staff?

24  A.  It was one of the staff.

25  Q.  Okay.  Now, how did you pay for your visits at Tri-State?

1  A.  I paid with cash.  I got a receipt, but I had insurance and

2  I kept bringing the paper in for them to fill out and send in

3  for me, but they never did, so --

4  Q.  Why?

5  A.  I have no idea.

6  Q.  How long did this go on?

7  A.  The whole time?

8  Q.  Yes, that you fought over the insurance.

9  A.  I couldn't send it in because they wouldn't fill it out.

10  You know, I -- I filled out my part on the insurance paper.  I

11  gave it to them to fill out their part and send it in.  Well,

12  they would never send it in.

13      But as far as my prescriptions, I just took the

14  prescriptions to the pharmacist, and I had insurance for my

15  prescriptions, which paid for my prescriptions, but I had to

16  pay for the office visits out of my pocket, all of it.

17  Q.  Okay.  Did you also pay for Glenna's?

18  A.  Yes.

19  Q.  Now, is she on your insurance?

20  A.  Yes.

21  Q.  And did the pharmacist take --

22  A.  Yeah.  Yeah, we had the same insurance.

23  Q.  Okay.  Now, Mr. Houser, was there ever a time at Tri-State

24  where you got pills, too many pills or pills that you didn't

25  need?  Too many pills.

A.  Well, like I said at the beginning, I was not familiar with
the pain management, and, yes, I received too many pills, I
thought.

Q.  Well, what happened?

A.  Well, I didn't take them.  I just kept them.  But whenever
he would send us for a blood test, we'd always come back that
we didn't have those pills in our system.  Well, there was no
way that we could have all them pills in our system.

Q.  Why not?

A.  It was too many.  It's too many pills.

Q.  Well, what was happening to you if you tried to take them?

A.  I didn't try to take them all.  That's why I just took what
I needed, and it wasn't what I was getting the prescription
for.  I only take what I needed.  I didn't --

Q.  Okay.  How did you know only to take -- how did you know to
only take what you thought you needed as opposed to as they
were prescribed?

A.  Because I took them when the pain was -- was serious,
because I have a hard time walking, and whenever it would get
so unbearable I couldn't walk, I would take one.

Q.  Well, did you ever tell the doctor you didn't need the
pills that he was prescribing?

A.  I told him that I could take something not as strong.  I
didn't say anything about I didn't take -- but he knew that I
wasn't taking them, because every time I'd have a blood test,

1   they wouldn't be in my system.

2   Q.  Okay.  And the --

3   A.  The amount that he prescribed.

4   Q.  Okay.  Was the amount -- was it showing a presence, or was

5   it showing a negative?  Was there a number, or did it say

6   negative?

7   A.  Well, that part I don't really understand.  He had a paper

8   that -- a report back from a blood test and certain percentages

9   he was going by, and that -- a percentage that wasn't in, so,

10  you know, he would take our pills back.

11  Q.  Okay.

12  A.  He would cut them back to the next strongest one.

13  Q.  Okay.  And would he keep it that next strongest one, or did

14  it go up and down?

15  A.  Yep, it went up again.  After a while it would go right

16  back up.

17  Q.  Despite the fact that you weren't taking them all?

18  A.  Yeah.  I never took them all, no.

19  Q.  Did you ever have a pill count?

20  A.  No.

21  Q.  Okay.  Do you know what a pill count is?

22  A.  Yes, I do.

23  Q.  How do you know what a pill count is?

24  A.  Well, it's to see if you are taking the right amount of

25  medication.  If you're not, they'll quit writing you the

1  prescription.

2  Q.  Well, apparently you passed.  You didn't get thrown out for

3  pill count.

4  A.  Well, I didn't -- the blood test I didn't pass, no.  There

5  was never a time that he asked me to bring in my pills.

6  Q.  Okay.  So when you didn't get to your number on your urine

7  test or your blood test, what would happen?  Did they dismiss

8  you?

9  A.  No.  He would just kind of -- he would give me a weaker

10 pain pill and not a stronger one.

11 Q.  And then what would happen after a while?

12 A.  Supposedly I would take more of it.  I would be more apt to

13 take all of the medication when it was weaker.

14 Q.  Did you take it all?

15 A.  No.

16 Q.  Can you describe for me, when you went in to Tri-State, did

17 you like going there?  Was it a comfortable place for you?

18 A.  The only thing that I had trouble with was we had to spend

19 most of the day there.  There was too many patients in one day,

20 and sometimes he would get started late and we might not -- we

21 might be in there from 9:00 in the morning till 9:00 at night.

22 Q.  What did the other patients look like?

23 A.  I don't know what you mean.

24 Q.  I mean were they clean, dirty, well kept?

25 A.  If you're asking if they was upper class, no.

1  Q.  That's not what I'm asking.  You can be clean and still --

2  A.  Okay.  Well, they were -- I don't know how you would

3  describe them.  Hmm.  A lot of good old boys.

4  Q.  Anybody seem to be in an incredible amount of pain that you

5  saw?

6  A.  An incredible amount?

7  Q.  Did anybody seem to be in pain that you saw?

8  A.  Yes.  There was some that -- there were some people there

9  that was in the service that were pretty messed up that really

10  needed help, but I seen a lot that I wondered about.  But like

11  I said, I'd never been -- this was the first time for me of

12  being to anything like that, so I just didn't pay too much

13  attention to everybody.

14  Q.  Now, if you don't mind, I'd like to show you a couple of

15  things.  And I would first look at the physical examination

16  note dated 5/5/04 that's already been admitted in 65a.

17          MR. OAKLEY:  If I could publish, Your Honor.

18          THE COURT:  Yes, you may.

19  Q.  Now, Mr. Houser, what's Trental?  What's Trental?

20  A.  I'm not sure.

21  Q.  Well, he prescribed it to you.

22  A.  Pardon?

23  Q.  You got prescribed Trental.  Do you know what that is?

24  A.  No.  I forgot.  I forgot even that I -- what it was for.  I

25  don't think -- I don't think that that was given -- was that

1  the very first time that I --

2  Q.  Well, the date was 5/5/04.

3  A.  Trental.

4  Q.  Well, let's look at another document, the physical

5  examination dated 6/2/04.

6          MR. OAKLEY:  If I may publish, please.  It's in 65a.

7          THE COURT:  You may.

8  A.  Is that blood pressure?

9  Q.  Well, it doesn't say that you got any more.  Do you note a

10 prescription for Trental on that one?  I mean, if you see it,

11 fine; if you don't, that's fine too.

12     I would ask you to take a look at this notation down here.

13 Were you taking your wife's Xanax?

14 A.  Yeah.  She -- she took Xanax, where I, you know, didn't

15 take -- my nerves wasn't quite as bad as -- nearly as what her

16 nerves were.

17 Q.  So why would it say that you took some of your wife's

18 Xanax?

19 A.  No.  No, we both had it.

20 Q.  Well, I guess I'm confused.  The notation indicates you

21 took some of your wife's Xanax.  Would you take your wife's

22 medication?

23 A.  Unless I -- unless I run out.  I mean, we were both taking

24 the same medications.

25 Q.  Okay.

1  A.  Most of them.  Maybe I run out.  That's the only --

2  Q.  Well, did you get thrown out for taking your wife's

3  medication?

4  A.  No.

5  Q.  And did you get more Xanax the next time?

6  A.  Yeah, as far as I know.

7        MR. OAKLEY:  Okay.  Your Honor, if I may publish

8  what's been admitted under 65a, the physical examination dated

9  8/3/04.

10        THE COURT:  You may.

11  Q.  Now, there's a handwritten notation where I'm pointing

12  right now.  It looks like you're doing okay.  And at this point

13  you're on eight Soma, 12 Norco, six oxy 15s, and a couple of

14  Xanax.  Is that about right?

15  A.  Yeah.

16  Q.  Is that five a day?

17  A.  Please?  I still can't hear you.

18  Q.  Is that five a day of Xanax?  Right here.

19  A.  Yeah.

20      No, it's two.

21  Q.  Okay.  Two a day of the Xanax?

22  A.  Yeah.

23  Q.  Okay.  Underneath, though, there's a notation that you just

24  got -- you went from oxycodone 15 six times day to 16 times a

25  day.  Is that what that says?

1        MS. CROUSE:  Objection.

2   Q.  I mean, if you know.

3   A.  Yeah, that's right.

4        THE COURT:  Overruled.

5   Q.  So that's an increase of ten a day.  Is that what it looks

6   like?

7   A.  If I --

8        MS. CROUSE:  Objection.

9        THE COURT:  Sustained.

10  Q.  Okay.  That's fine.  I don't need you to answer, Mr.

11  Houser.  But again read this first sentence here, if you can.

12  A.  Yeah.  "Current meds." --

13  Q.  Into the microphone.  If you could talk into the

14  microphone, please, Mr. Houser.

15  A.  Yeah, yeah.

16  Q.  Could you read that out loud for the court reporter.

17  A.  "Current meds.," and then they've got constantly, "pain

18  symptoms well - allows patient to work outdoors and around" --

19     Yeah.  It gives me more mobility.  My knees don't hurt and

20  my back don't hurt.

21     "Has lost weight."  Yeah.

22        MR. OAKLEY:  And then, Your Honor, if I may publish

23  what's previously been identified as 65a, the physical

24  examination note for September 3, 2004.

25        THE COURT:  You may.

1  Q.  Now, Mr. Houser, the month before it looks like you

2  received five Xanax, 16 oxycodone 15s, 12 Norcos, and eight

3  Somas.  Let's add that up.  That's approximately 41 pills a

4  day, Mr. Houser.

5  A.  Like I said, I didn't take them all.

6  Q.  Okay.  On this date, though, it looks like the oxycodone

7  numbers got changed.

8  A.  Yeah.  I went to -- I went to 30s.

9  Q.  Ten a day?

10  A.  (No response.)

11       THE COURT:  Counselors, can I see you at sidebar.

12  SIDEBAR CONFERENCE

13       THE COURT:  Okay.  It's a little past 4:30, and I

14  don't know how much more Mr. Oakley has.  I don't know how much

15  cross there will be.  I hate to have an out-of-town witness

16  have to come back, but it's looking like that's going to be

17  necessary.

18       MR. OAKLEY:  Your Honor, I've probably got 15, 20

19  minutes more.

20       MS. CROUSE:  Okay.  I'm going to have to go through

21  all the charts with him.

22       THE COURT:  Okay.  Well, I assume he'll either drive

23  back tomorrow or --

24       MR. OAKLEY:  Your Honor, I think that's what he has to

25  do.

1          THE COURT:  Or we'll tuck him in somewhere.

2          MR. OAKLEY:  No.  He's got issues at home.  He has to

3     go back tonight and then come back in the morning.

4          THE COURT:  Okay.  Can we reasonably expect him to

5     show up at 9:00 AM tomorrow morning?

6          MR. OAKLEY:  We should.

7          THE COURT:  Okay.  All right.  Well, we'll just break

8     for the day then.  Thanks.

9          MS. CROUSE:  Thank you.

10    CONCLUSION OF SIDEBAR CONFERENCE

11         THE COURT:  All right.  Ladies and gentlemen, it's a

12    little after 4:30, and counsel advise me that there remains a

13    significant amount of examination for Mr. Houser, so we'll

14    break until tomorrow morning at 9:00 o'clock.  And let me just

15    remind you not to discuss the case among yourselves or with

16    anyone else or permit anyone to discuss it with you or in your

17    presence.  Report any violation to Ms. Brown.

18       Make no attempt to do any research or investigation on your

19    own over the evening hours.  And no Internet chitchat of any

20    kind regarding the trial.  See you back at 9:00 o'clock

21    tomorrow morning.

22         COURTROOM DEPUTY:  All rise.

23       (Jury out at 4:34 PM.)

24    BEFORE THE COURT

25         COURTROOM DEPUTY:  Please be seated.

1              THE COURT:  Okay.  Mr. Houser, you are excused until

2    9:00 o'clock tomorrow morning.  I'm sorry you have to come

3    back.  Don't discuss your testimony with anyone during the

4    hours between now and 9:00 o'clock tomorrow morning.

5              THE WITNESS:  Be here by 9:00 o'clock?

6              THE COURT:  9:00 o'clock tomorrow morning.  Can you do

7    that?

8              THE WITNESS:  It's a two-hour drive, over two-hour

9    drive.  Yeah, I think I can make it.

10             THE COURT:  Okay.  We look forward to seeing you then.

11   Thank you.

12        (Witness temporarily excused.)

13             THE COURT:  Okay.  Counselors, anything that you would

14   like to put on the record in the absence of the jury before we

15   take the break?

16             MR. OAKLEY:  No, Your Honor.

17             MS. CROSS:  No, Your Honor.

18             THE COURT:  Okay.  See you tomorrow morning at 8:30.

19             COURTROOM DEPUTY:  All rise.  This court is in recess

20   until tomorrow morning.

21        (At 4:35 PM, the trial was recessed, to be continued on

22   Wednesday March 16, 2011, at 9:00 AM.)

23                            - - -

24

25

```
 1              I N D E X   O F   W I T N E S S E S
```

 2    PLAINTIFF'S WITNESSES:                              PAGE

 3    LISA G. WALLACE
      Direct Examination by Mr. Oakley .................   2
 4    Cross-Examination by Ms. Cross ..................  29
      Redirect Examination by Mr. Oakley ..............  47
 5    Recross-Examination by Ms. Cross ................  49

 6    NICOLE BOWIE
      Direct Examination by Mr. Oakley ................  51
 7    Cross-Examination by Ms. Cross ..................  59
      Redirect Examination by Mr. Oakley ..............  63
 8    Recross-Examination by Ms. Cross ................  63

 9    BARRY HOUSER
      Direct Examination by Mr. Oakley ................  65

```
10

11                          - - -

12                    E X H I B I T S
```

13    EXHIBIT NUMBER:                              ADMITTED

14    Government's Exhibit 22b .......................  54

```
15                          - - -

16                    C E R T I F I C A T E

17         I, Luke T. Lavin, RDR, CRR, the undersigned, certify

18    that the foregoing is a correct transcript from the record of

19    proceedings in the above-entitled matter.

20

21                         s/Luke T. Lavin
                           _____
                           Luke T. Lavin
22                         Official Court Reporter

23
                                - - -
24

25
```